**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| * | * | * | * | * | * | | * | |

**IN RE:**  *  Case No: 05-17697

**ENTERGY NEW ORLEANS, INC.**  *  **Chapter 11**

*

**Debtor**  *  **Section "B"**

* * * * * * * *

# FOURTH AMENDED DISCLOSURE STATEMENT FOR THE FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF ENTERGY NEW ORLEANS, INC., AS MODIFIED, DATED FEBRUARY 5, 2007

R. PATRICK VANCE (#13008)
ELIZABETH J. FUTRELL (#5863)
NAN ROBERTS EITEL (#19910)
TARA G. RICHARD (#26356)
JOSHUA J. LEWIS (#29950)
Jones, Walker, Waechter, Poitevent,
 Carrère & Denègre, L.L.P.
201 St. Charles Avenue
New Orleans, LA 70170-5100
Phone: (504) 582-8000
Fax: (504) 582-8011

Attorneys for Entergy New Orleans, Inc.,
The debtor and debtor-in-possession

# TABLE OF CONTENTS

                                                                                           Page

I.     INTRODUCTION                                                                            1

       A.    CHAPTER 11 OF THE BANKRUPTCY CODE                                                 1

       B.    THE DEBTOR'S PLAN OF REORGANIZATION                                               1

       C.    THE DEBTOR'S DISCLOSURE STATEMENT                                                 2

       D.    APPROVAL OF THE DEBTOR'S DISCLOSURE STATEMENT                                     2

       E.    EXHIBITS TO THE DEBTOR'S DISCLOSURE STATEMENT                                     2

       F.    CONFIRMATION HEARING                                                             3

       G.    VOTING FOR THE DEBTOR'S PLAN                                                      3

II.    DISCLAIMERS                                                                             4

III.   OVERVIEW OF CLAIMS AND EQUITY INTEREST                                                  5

       A.    SUMMARY OF CLAIMS TABLE                                                           5

       B.    CLAIMS OBJECTION PROCESS                                                          9

       C.    TREATMENT OF INTERESTS                                                           10

IV.    DESCRIPTION AND HISTORY OF DEBTOR'S BUSINESS                                           11

       A.    OPERATIONS                                                                       12

       B.    REGULATION OF ENOI                                                               14

       C.    SELF-INSURED WORKER'S COMPENSATION PROGRAM                                       16

V.     THE BANKRUPTCY CASE                                                                    16

       A.    EVENTS PRECEDING BANKRUPTCY                                                      16

       B.    COMMENCEMENT OF BANKRUPTCY AND CONTINUED
             OPERATION AS DEBTOR IN POSSESSION                                                17

       C.    GRAND GULF                                                                       18

       D.    ADMINISTRATION OF THE BANKRUPTCY CASE                                            18

{N1609126.3}

i

| | | | |
|---|---|---|---|
| VI. | | LITIGATION AGAINST DEBTOR | 29 |
| | A. | GORDON AND LOWENBURG RATEPAYER CASES | 29 |
| | B. | COMPROMISE OF CERTAIN INSURANCE COVERAGE CLAIMS | 31 |
| | C. | TAX DISPUTES | 32 |
| | D. | THE ODOM CLAIM | 32 |
| | E. | OTHER LITIGATION MATTERS | 33 |
| VII. | | THE DEBTOR'S PLAN OF REORGANIZATION | 34 |
| | A. | UNCLASSIFIED ADMINISTRATIVE CLAIMS AND CERTAIN FEES AND TAXES | 34 |
| | B. | TREATMENT OF CLASSIFIED CLAIMS | 38 |
| | C. | FINANCING THE DEBTOR'S PLAN | 47 |
| | D. | DISTRIBUTIONS UNDER THE DEBTOR'S PLAN | 51 |
| | E. | TIMING OF DISTRIBUTIONS UNDER THE DEBTOR'S PLAN | 52 |
| | F. | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 52 |
| | G. | IMPLEMENTATION AND EFFECT OF CONFIRMATION OF THE DEBTOR'S PLAN | 55 |
| | H. | DISCHARGE AND INJUNCTION | 55 |
| | I. | MISCELLANEOUS PROVISIONS OF THE DEBTOR'S PLAN | 59 |
| VIII. | | CONFIRMATION AND CONSUMMATION PROCEDURE | 64 |
| | A. | THE CONFIRMATION HEARING | 64 |
| | B. | CONFIRMATION | 64 |
| | C. | CONSUMMATION OF THE DEBTOR'S PLAN | 67 |
| IX. | | FINANCIAL INFORMATION | 68 |
| X. | | CERTAIN RISK FACTORS TO BE CONSIDERED | 69 |
| | A. | CERTAIN BANKRUPTCY CONSIDERATIONS | 69 |
| | B. | RISKS RELATING TO THE BUSINESS OF THE REORGANIZED ENOI AFTER THE EFFECTIVE DATE | 70 |

|     | C.  | ANOTHER DISASTROUS HURRICANE, INCREASES IN INSURANCE COSTS AND ABILITY TO PROCURE INSURANCE COVERAGE | 75 |
|     | D.  | RECOVERY OF THE CITY OF NEW ORLEANS | 75 |
| XI. | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE DEBTOR'S PLAN | | 76 |
|     | A.  | CANCELLATION OF INDEBTEDNESS INCOME | 77 |
|     | B.  | LIMITATION ON NOL CARRY FORWARDS | 78 |
|     | C.  | U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS | 78 |
|     | D.  | INFORMATION REPORTING AND BACKUP WITHHOLDING | 79 |
| XII. | VOTING BY HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON DEBTOR'S PLAN | | 79 |
| XIII. | CONCLUSION AND RECOMMENDATION | | 81 |

| EXHIBIT A | The Debtor's Plan and the Plan Exhibits |
| EXHIBIT B | The Confirmation Procedures Order (without exhibits) |
| EXHIBIT C | Projected Financial Information |
| EXHIBIT D | Forms of Ballots |
| EXHIBIT E | Schedule of the Intercompany Claims |

# I. INTRODUCTION

## A. CHAPTER 11 OF THE BANKRUPTCY CODE

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. The commencement of a chapter 11 case creates an estate comprised of all the legal and equitable interests of the debtor as of the date of filing of the bankruptcy petition. The Bankruptcy Code provides that the chapter 11 debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession." Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The principal objective of a chapter 11 case is the confirmation and consummation of a plan of reorganization. A plan sets forth the means for satisfying claims against and equity interests in a debtor. Confirmation of a plan by the bankruptcy court binds, among others, the debtor, any issuer of securities under the plan, any entity acquiring property under the plan and any creditor or equity interest holder of the debtor. Subject to certain limited exceptions, the order approving confirmation of a chapter 11 plan discharges a debtor from any debt that arose before the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

Certain holders of allowed claims against and equity interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of a proposed plan, however, section 1125 of the Bankruptcy Code, 11 U.S.C. §1125, requires approval by the bankruptcy court of a disclosure statement containing adequate information of a kind and in sufficient detail to enable a hypothetical reasonable investor to make an informed judgment regarding the plan.

## B. THE DEBTOR'S PLAN OF REORGANIZATION

On February 5, 2007, Entergy New Orleans, Inc. (the "Debtor" or "ENOI") Filed its Fourth Amended Chapter 11 Plan of Reorganization, as Modified (as the same may be amended, the "Debtor's Plan or the "Plan"). The Debtor's Plan (attached as Exhibit A) sets forth the manner in which Claims against and Interests in ENOI are treated under the Debtor's Plan. *Unless otherwise defined herein, all initially capitalized terms contained herein have the meanings ascribed to them in the Debtor's Plan.*

The Debtor's Plan is designed to reaffirm the Debtor's financial viability and provide for the payment of all Allowed Claims and for the treatment of the Preferred and Equity Interests in the Debtor. The Debtor's Plan also will assure that the Reorganized Debtor will be financially sound going forward, and able to provide safe and reliable service to its customers. For more detailed information regarding the payment of Claims and Interests, see Articles VII.B and VII.C of the Debtor's Disclosure Statement, entitled, "The Debtor's Plan of Reorganization."

The Debtor believes that its Plan is workable, fair and in the public's best interests. It allows the Debtor to continue operating its business under rate regulation by the City Council (retail) and FERC (sales for resale), in a manner consistent with sound business and environmental policies, and to provide a safe and reliable service to the Debtor's electric and gas customers in those portions of New Orleans, Louisiana served by the Debtor. The Debtor believes that its Plan will enable the

Debtor to successfully reorganize its business and accomplish the objectives of chapter 11. The Debtor also believes that acceptance of the its Plan is in the best interests of the Debtor, its creditors and all parties in interest.

## C. THE DEBTOR'S DISCLOSURE STATEMENT

In compliance with section 1125 of the Bankruptcy Code, the Debtor submits this Fourth Amended Disclosure Statement, as Modified, for its Fourth Amended Chapter 11 Plan of Reorganization for Entergy New Orleans, Inc., as Modified (as amended, the "Debtor's Disclosure Statement"). The Debtor's Disclosure Statement is submitted in connection with (i) the solicitation of acceptances or rejections of the Debtor's Plan, and (ii) the hearing to consider approval of the Debtor's Plan (the "Confirmation Hearing") scheduled for May 3, 2007, at 10:00 a.m. (Prevailing Central Time), and May 4, 2007, at 9:00 a.m. (Prevailing Central Time). At the same time, the Bankruptcy Court will commence a confirmation hearing on the Chapter 11 Plan of Reorganization for Entergy New Orleans, Inc. Proposed by the Creditors' Committee, as Modified, Filed on February 5, 2007 (the "Committee's Plan").

## D. APPROVAL OF THE DEBTOR'S DISCLOSURE STATEMENT

On February ▓ 2007, after notice and hearing, the Bankruptcy Court approved, among other things, the Debtor's Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical reasonable investors typical of the Holders of Claims against and Interests in the Debtor to make an informed judgment in voting to accept or reject the Debtor's Plan (the "Confirmation Procedures Order"). APPROVAL OF THE DEBTOR'S DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE DEBTOR'S PLAN.

## E. EXHIBITS TO THE DEBTOR'S DISCLOSURE STATEMENT

Attached as exhibits to the Debtor's Disclosure Statement are copies of the following documents:

* The Debtor's Plan and the Plan Exhibits (Exhibit A)

* The Confirmation Procedures Order, without exhibits (Exhibit B)

* Projected Financial Information (Exhibit C)

* Forms of Ballots (collectively, Exhibit D)

* Schedule of the Intercompany Claims (Exhibit E)

In addition, the Debtor has filed the following documents, which are incorporated herein by reference, with the SEC:

* Annual Report on Form 10-K for the year ended December 31, 2005;

* Quarterly Report on Form 10-Q for the quarter ended September 30, 2006; and

\* Various Current Reports on Form 8-K of the Parent and the Debtor.

Such documents and other information are available at a website maintained by the SEC at http://www.sec.gov that contains reports, proxy and informational statements and other information filed electronically with the SEC. The Debtor has approved the information included in the Debtor's Disclosure Statement, which is derived from the Debtor's books and records, public filings, and various third-party sources.

### F. CONFIRMATION HEARING

Pursuant to section 1128 of the Bankruptcy Code and the Bankruptcy Court's Order, the Confirmation Hearing on the Debtor's is scheduled for May 3, 2007, at 10:00 a.m. (Prevailing Central Time), and May 4, 2007, at 9:00 a.m. (Prevailing Central Time), before the Honorable Judge Jerry A. Brown, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Eastern District of Louisiana, 500 Poydras Street, Section B, Courtroom B-705, New Orleans, Louisiana, 70130. At the same time, the Bankruptcy Court will commence a Confirmation Hearing on the Committee's Plan. Objections, if any, to Confirmation of the Debtor's Plan or the Committee's Plan must be served and Filed so that they are received no later than ░░░░░░░░░░░░░░░, 2007. The Confirmation Hearing may be continued from time to time by the Bankruptcy Court without further notice except for announcement of the continuation date made at the Confirmation Hearing.

### G. VOTING FOR THE DEBTOR'S PLAN

The Confirmation Procedures Order (Exhibit B) sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Debtor's Plan, and Filing written objections to Confirmation, the record date for voting purposes (the "Voting Record Date"), the applicable standards for tabulating Ballots, and the date of the hearing to consider Confirmation of the Debtor's Plan. In addition, detailed voting instructions accompany each Ballot. Before voting on the Debtor's Plan, each Holder of a Claim or Interest that may be entitled to vote should read in its entirety the Debtor's Disclosure Statement, the Confirmation Procedures Order, including the instructions accompanying the Ballots, and other exhibits attached to the Debtor's Disclosure Statement. These documents contain, among other things, important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation of votes on the Debtor's Plan may be made except pursuant to the Debtor's Disclosure Statement and section 1125 of the Bankruptcy Code. (For a full discussion of the procedures for voting and Confirmation of the Debtor's Plan, see the attached Confirmation Procedures Order and Article XII of the Debtor's Disclosure Statement, entitled, "Voting By Holders of Claims and Interests Entitled to Vote on the Debtor's Plan.")

**FOR THE REASONS DISCUSSED HEREIN, THE DEBTOR URGES ALL HOLDERS OF CLAIMS AND INTERESTS IN VOTING CLASSES TO VOTE TO ACCEPT THE DEBTOR'S PLAN. THE BOND TRUSTEE AS WELL AS FGIC AND THE AD HOC BONDHOLDERS COMMITTEE, ON BEHALF OF HOLDERS OF OVER TWO-THIRDS OF THE BOND CLAIMS, ALSO RECOMMEND THAT HOLDERS OF BOND CLAIMS VOTE TO ACCEPT THE DEBTOR'S PLAN AND HAVE PROVIDED INFORMATION ABOUT THIS RECOMMENDATION IN A SEPARATE LETTER TO THE BONDHOLDERS.**

{N1609126.3}                    - 3 -

## II. DISCLAIMERS

THE INFORMATION CONTAINED IN THE DEBTOR'S DISCLOSURE STATEMENT IS PROVIDED FOR PURPOSES OF SOLICITING VOTES ON THE DEBTOR'S PLAN. THE INFORMATION MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE DEBTOR'S PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THE DEBTOR'S DISCLOSURE STATEMENT, REGARDING THE DEBTOR'S PLAN OR THE SOLICITATION OF VOTES ON THE DEBTOR'S PLAN.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED AND ENCOURAGED TO READ THE DEBTOR'S DISCLOSURE STATEMENT AND THE DEBTOR'S PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE DEBTOR'S PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THE DEBTOR'S DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE DEBTOR'S PLAN, THE EXHIBITS ATTACHED TO THE DEBTOR'S PLAN, AND ANY PLAN SUPPLEMENT DOCUMENTS THAT MAY BE FILED IN THE BANKRUPTCY CASE. THE STATEMENTS CONTAINED IN THE DEBTOR'S DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THE DEBTOR'S DISCLOSURE STATEMENT WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THE DEBTOR'S DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THE DEBTOR'S DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SEC, NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTOR IN THE BANKRUPTCY CASE SHOULD EVALUATE THE DEBTOR'S DISCLOSURE STATEMENT AND THE DEBTOR'S PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THE DEBTOR'S DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE. THE DEBTOR'S DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE DEBTOR'S PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR.

## III. OVERVIEW OF CLAIMS AND EQUITY INTEREST

### A. SUMMARY OF CLAIMS TABLE

The following table briefly summarizes the classification and treatment of Claims under the Debtor's Plan. The Debtor believes that the following chart contains a reasonable estimate of the Claims:

| CLASS | CLAIM | TREATMENT |
|---|---|---|
| Unclassified | Administrative Claims<br><br>(excluding Administrative Trade Claims and Professional Fee Claims) | Unimpaired. Each Holder of an Allowed Administrative Claim will receive from the Reorganized Debtor Cash equal to the allowed amount of such Administrative Claim.<br><br>As of June 30, 2007, estimated, approximate amount of the unpaid Allowed Administrative Claims, excluding the Administrative Trade Claims and Professional Fee Claims, but including (among other Claims), the Bond Trustee Claim, the Bond Trustee's Professional Fee Claim, the FGIC Professional Fee Claim and the FGIC Cure Amount Claim: \$8.2 million<br><br>Percentage recovery: 100% |
| Unclassified | Administrative Trade Claims | Unimpaired. Each Holder of an Allowed Administrative Claim will receive from the Reorganized Debtor Cash equal to the allowed amount of such Administrative Claim.<br><br>Estimated, approximate amount of the unpaid Allowed Administrative Trade Claims as of June 30, 2007: \$41 million<br><br>Percentage recovery: 100% |
| Unclassified | Professional Fee Claims | Unimpaired. Professionals or other Entities asserting a Professional Fee Claim for services rendered to the Debtor before the Effective Date must File and serve on the Reorganized Debtor and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other Order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claims within sixty (60) days after the Effective Date; *provided, however*, that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court review or approval, pursuant to the Ordinary Course Professionals Order.<br><br>Estimated, approximate amount of the unpaid Allowed Professional Fee Claims as of June 30, 2007: \$700,000<br><br>Percentage recovery: 100% |
| Unclassified | DIP Financing Claim | Unimpaired. Within fifteen (15) days of the Effective Date, the DIP Financing Claim will be paid in full in Cash, without any further action by Entergy Corporation; *provided, however*, that the Bankruptcy Court will resolve any dispute between the Debtor and Entergy Corporation regarding the amount of the DIP Financing Claim; and provided further however that the portion of the DIP Financing Claim constituting the Subordinated DIP Financing Claim will be paid as provided in Section 4.1(a)(v) of the Debtor's Plan.<br><br>Estimated, approximate amount of the unpaid Allowed DIP Financing Claim as of June 30, 2007: \$63.5 million<br><br>Percentage recovery: 100% |

| CLASS | CLAIM | TREATMENT |
|---|---|---|
| Unclassified | Priority Tax Claims | Unimpaired. Unless otherwise agreed in a written agreement by and between the Holder of a Priority Tax Claim and the Debtor or Reorganized Debtor, each Holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Priority Tax Claim, deferred Cash payments over a period not exceeding six years from the date of assessment of such Priority Tax Claim. Payments will be made in equal quarterly installments of principal (commencing on the later of the Effective Date and the first Quarterly Distribution Date following the date such Claim becomes an Allowed Claim), plus simple interest accruing from the Effective Date at the rate publicly quoted on the Confirmation Date by The Wall Street Journal as the "base rate on corporate loans posted by at least 75% of the nation's 30 largest banks" on the unpaid portion of each Allowed Priority Tax Claim (or upon such other terms determined by the Bankruptcy Court to provide the Holders of Priority Tax Claims with deferred Cash payments having a value, as of the Effective Date, equal to the allowed amount of such Priority Tax Claims).<br><br>Estimated, approximate amount of the unpaid Allowed Priority Tax Claims as of June 30, 2007: $2.0 million<br><br>Percentage recovery: 100% |
| Class 1 | Other Priority Claims | Unimpaired. Unless otherwise agreed in a written agreement by and between the Holder of an Other Priority Claim and the Debtor or Reorganized Debtor, in full satisfaction of the Holder's Other Priority Claim, each Holder of an Other Priority Claim will receive Cash in an amount equal to the Allowed amount of such Holder's Other Priority Claim.<br><br>Estimated amount of the unpaid Allowed Other Priority Claims as of June 30, 2007: $-0-<br><br>Percentage recovery: 100% |
| Class 2 | Capital One Secured Claim | Impaired. Unless Capital One and the Debtor or Reorganized Debtor otherwise agree, in writing, in full satisfaction of the Capital One Secured Claim, Capital One will receive Cash in an amount equal to the Allowed amount of the Capital One Secured Claim.<br><br>Estimated, approximate amount of the unpaid Disputed Capital One Secured Claim as of June 30, 2007: $960,000<br><br>Percentage recovery: 100% |
| Class 3 | Bond Claims | Impaired. The Bond Claim shall be deemed Allowed pursuant to the Debtor's Plan, including not limited to the outstanding principal amount of the Bonds. The Disbursing Agent will distribute Cash to the Bond Trustee, for the benefit of the Bondholders, in an amount equal to any unpaid interest on the Bonds as of the Effective Date (whether accruing before or after the Petition Date), at the non-default rate provided in the Bond Indenture and Mortgage, minus those amounts that FGIC has paid on the Insured Bonds. The Bond Collateral will continue to secure the Bond Claims as provided in the Bond Indenture and Mortgage, and the Bond Collateral will not be released, modified, cancelled or discharged under the Debtor's Plan or the Confirmation Order. The Debtor will pay the Ad Hoc Bondholders Committee Fees in an amount not to exceed $250,000.<br><br>Estimated, approximate amount to be paid pursuant to Section 5.3(a) and (e) of the Debtor's Plan, on the Effective Date: $9.1 million<br><br>Percentage recovery: 100% |

| CLASS | CLAIM | TREATMENT |
|---|---|---|
| Class 4 | Other Secured Claims | Impaired. Except as otherwise agreed, in writing, by the Holder of an Other Secured Claim and the Debtor or Reorganized Debtor, on the later of the Effective Date and the date on which such Claim is Allowed, each Holder of an Allowed Other Secured Claim will be entitled to receive treatment on account of such Allowed Other Secured Claim in the manner set forth in either Option A or B below, at the Debtor's election. The Debtor will be deemed to have elected Option B, except with respect to any Allowed Other Secured Claim as to which the Debtor elects Option A in a certification Filed within fifteen (15) days before the commencement of the Confirmation Hearing. Under Option A, each Holder of an Allowed Claim in Class 4 with respect to which the Debtor or Reorganized Debtor elects Option A will receive, in satisfaction of its Allowed Class 4 Claim, Cash equal to the Allowed amount of such Claim. Under Option B, each Allowed Claim in Class 4 with respect to which the Debtor or Reorganized Debtor elects Option B, or is deemed to have elected Option B, will be Unimpaired within the meaning of section 1123 of the Bankruptcy Code.

Estimated, approximate amount of the Allowed Other Secured Claims as of June 30, 2007: $-0-

Percentage recovery: 100% |
| Class 5 | General Unsecured Claims | Impaired. Unless otherwise agreed in a written agreement by and between the Holder of a General Unsecured Claim and the Debtor or Reorganized Debtor, in full satisfaction of the General Unsecured Claim, each Holder of a General Unsecured Claim will receive one of the following alternative treatments:

Option A: If Class 5 votes to accept the Debtor's Plan in accordance with section 1126 of the Bankruptcy Code, each Holder of a General Unsecured Claim will receive Cash equal to the aggregate amount of (a) the Allowed amount of such Holder's General Unsecured Claim, and (b) interest on the principal amount of the Allowed amount of such Holder's General Unsecured Claim at the following per annum interest rates: (i) six percent (6%) from the Petition Date through December 31, 2005; (ii) eight percent (8%) from January 1, 2006 through December 31, 2006; and (iii) the applicable Louisiana judicial interest rate plus one percent (1%) from January 1, 2007, until paid. The Louisiana judicial interest rate for 2007 is nine and one-half percent (9.5%). If the Holder's General Unsecured Claim is Allowed on or before the Effective Date, the Disbursing Agent will make the distribution to the Holder within fifteen (15) days of the Effective Date. If, however, the Holder's General Unsecured Claim is not Allowed on or before the Effective Date, the Disbursing Agent will make the distribution to such Holder within fifteen (15) days after the earlier of the date on which (a) an Order allowing the General Unsecured Claim becomes a Final Order, or (b) the Holder and the Debtor or Reorganized Debtor execute a Stipulation Regarding the Amount and Nature of the Claim.

Option B: If Class 5 does not vote to accept the Debtor's Plan in accordance with section 1126 of the Bankruptcy Code, each Holder of a General Unsecured Claim will receive an General Unsecured Claim Note in the principal amount of the Allowed amount of such Holder's General Unsecured Claim. The General Unsecured Claim Notes will mature on the earlier of (i) the third anniversary of the Effective Date, or (ii) at the Debtor's option, the sale, transfer or other disposition of all or substantially all of the Debtor's distribution assets. The General Unsecured Claim Notes will bear interest at the following per annum rates: (i) from the Petition Date through December 31, 2005, at six percent (6%); (ii) from January 1, 2006 through December 31, 2006, at eight percent (8%); and (iii) from January 1, 2007, until paid, at the applicable Louisiana judicial interest rate plus one percent (1%); *provided, however,* that if the Holder has a General Unsecured Claim in the Allowed amount of $1,000 or less, such Holder will receive Cash equal to the principal amount of the Allowed amount of such Holder's General Unsecured |

| CLASS | CLAIM | TREATMENT |
|---|---|---|
| | | Claim, together with interest at the following per annum rates: (i) from the Petition Date through December 31, 2005, at six percent (6%); (ii) from January 1, 2006 through December 31, 2006, at eight percent (8%); and (iii) from January 1, 2007, until paid, at the applicable Louisiana judicial interest rate plus one percent (1%). Estimated, approximate amount of the Allowed General Unsecured Claims as of June 30, 2007: $29.5 million. Estimated, approximate amount of interest pursuant to Section 5.5(a) (Option A) of the Debtor's Plan as of June 30, 2007: $4.2 million. Percentage recovery: 100% |
| Class 6 | Intercompany Claims | Impaired. In full satisfaction of the Intercompany Claims, each Holder of an Intercompany Claim will receive an Intercompany Note in the principal amount of the Allowed amount of such Holder's Intercompany Claim plus an amount equal to interest on such Allowed Claim at the following per annum rates: (a) from the Petition Date through December 31, 2005, at six percent (6%); (b) from January 1, 2006 through December 31, 2006, at eight percent (8%); and (c) from January 1, 2007, until the Effective Date, at the applicable Louisiana judicial interest rate plus one percent (1%). Each Intercompany Note will mature on the earlier of (i) the third anniversary of the Effective Date, or (ii) at the Reorganized Debtor's option, the earlier sale, transfer or other disposition of all or substantially all of the Reorganized Debtor's distribution assets. Interest on the Intercompany Notes will accrue at the per annum interest, until paid, at the Louisiana judicial interest rate plus one percent (1%), and will be paid quarterly. Estimated, approximately amount of the Intercompany Claims as of June 30, 2007: $69.5 million. Estimated percentage recovery: 100% |
| Class 7 | Litigation Claims | Unimpaired. Unless otherwise agreed in a written agreement by and between the Holder of a Litigation Claim and the Debtor or Reorganized Debtor, each Litigation Claim will be Unimpaired, and the legal, equitable and contractual rights to which such Litigation Claim entitles the Holder of such Claim shall be unaltered by the Debtor's Plan. Estimated amount of Allowed Litigation Claims, excluding the Disputed Claims of the Gordon and Lowenburg Plaintiffs (as hereinafter defined): range from $4 million to $18.5 million. Estimated percentage recovery: 100% |
| Class 8 | Workers' Compensation Claims | Unimpaired. Unless otherwise agreed in a written agreement by and between the Holder of a Workers' Compensation Claim and the Debtor or Reorganized Debtor, each Workers' Compensation Claim will be Unimpaired, and the legal, equitable and contractual rights to which such Workers' Compensation Claim entitles the Holder of such Claim shall be unaltered by the Debtor's Plan. Estimated amount of Allowed Workers' Compensation Claims: $1.5 million (over the life of the estimated Allowed Workers' Compensation Claim). Estimated percentage recovery: 100% |
| Class 9 | Government Environmental Claim | Unimpaired. Class 9 consists of the Government Environmental Claim. Although not liquidated and Disputed, the Debtor has reached an agreement in principle with the U.S. Government. Pursuant to that agreement, subject to the occurrence of the Effective Date, (a) the Government Environmental Claim will be deemed an Allowed Claim in the amount of $250,000, and (b) in full satisfaction of the |

| CLASS | CLAIM | TREATMENT |
|---|---|---|
| | | Allowed Government Environmental Claim, the Disbursing Agent will make distributions of $150,000 to the Louisiana Wildlife and Fisheries Foundation, and $100,000 to the U.S. Fish & Wildlife Service. |
| | | Amount of Allowed Government Environmental Claim: $250,000 |
| | | Estimated percentage recovery: 100% |
| Class 10 | Odom Claim | Impaired. The Odom Claim is a Disputed Claim, and the Holder(s) of the Odom Claim are subject to the injunction of Section 10.2 of the Debtor's Plan. Nevertheless, the Holder(s) of the Odom Claim and the Debtor may continue to prosecute and/or to defend the Odom Claim in the courts of the State of Louisiana, but the Holder(s) of the Odom Claim are and shall be enjoined from taking any action against the Debtor, the Reorganized Debtor, any insurer on any policy of insurance providing insurance in favor of the Debtor or Reorganized Debtor, or the property of any of them to collect or to further the collection of any portion of the Odom Claim, other than such action as may be allowed pursuant to other provisions of the Debtor's Plan. Upon entry of a final judgment that is not the subject of any appeal or writ of review and that has not been stayed by order of a court of competent jurisdiction, to the extent that such final judgment remains in full force and effect (a) the Odom Claim will become an Allowed Claim and will be entitled to the treatment afforded to General Unsecured Claims in Class 5, and (b) the Holder(s) of the Odom Claim may take any action to collect the Odom Claim allowed by non-bankruptcy law against any insurer on any policy of insurance in favor of the Debtor or Reorganized Debtor or any property of any such insurer. |
| | | Estimated amount of Disputed Odom Claim: Verdict was for $8.3 million |
| | | Estimated percentage recovery: 100% |

(For a more detailed discussion of the treatment of Claims and Interests under the Debtor's Plan, see Articles VII.B and VII.C of the Debtor's Disclosure Statement, and Article V of the Debtor's Plan.)

## B.    CLAIMS OBJECTION PROCESS

Any Holder of a Claim against the Debtor in an Impaired Class who wishes to vote on the Debtor's Plan must have an Allowed Claim. A Debtor or the Holder of a Disputed Claim, however, may seek an Order of the Bankruptcy Court estimating the Allowed amount of the Disputed Claim for voting purposes. A Holder of a Claim that was scheduled in the Debtor's Schedules and whose Claim was not listed as Disputed, contingent or unliquidated, is considered to have an Allowed Claim in the amount shown on the Schedules (unless such Holder Filed a Proof of Claim, in which case the Proof of Claim will supersede the scheduled Claim). Unless otherwise agreed by the Debtor and the Holder of the Claim, a Claim that is the subject of a properly Filed Proof of Claim will be deemed Allowed in the amount shown in the Proof of Claim. If the Debtor or another party in interest objects to the Claim, however, the Claim shall be Allowed in the amount determined by the Bankruptcy Court. As of the date hereof, the Debtor is reviewing Proofs of Claim, and is preparing to File additional objections to numerous Proofs of Claim.

The deadline to file Proofs of Claim was set for April 19, 2006 (the "Bar Date") (P-578 and 653). More than 550 Proofs of Claim have been Filed, and those Proofs of Claim assert an aggregate face amount of approximately $7.5 billion. Proofs of Claims aggregating approximately $2 billion have been disallowed by the Bankruptcy Court due to withdrawals and agreements with the Holders

of the Claims. The Debtor's Plan permits objections to Claims to be Filed until the Effective Date (or such later date as the Bankruptcy Court may Order), and the Debtor reserves the right for itself, the Creditors' Committee and any other party in interest to File objections through the objection deadline. At or before the Confirmation Hearing, the Debtor intends to estimate the aggregate amount of Allowed Claims.

## C. TREATMENT OF INTERESTS

The following table briefly summarizes the classification and treatment of Interests under the Debtor's Plan.

| CLASS | CLAIM/INTEREST | TREATMENT OF ALLOWED INTEREST |
|---|---|---|
| Class 11A<br>Class 11B<br>Class 11C | Preferred Interests | Unimpaired. Each Class 11A, Class 11B, and Class 11C will be entitled to one of the following treatments:<br><br>Option A: If the Class votes in favor of the Debtor's Plan, (i) the Preferred Interests in that Class will remain outstanding, (ii) within fifteen (15) days of the Effective Date, the Disbursing Agent will pay to the Holders of the Preferred Interests any accumulated, unpaid dividends, and (iii) the Holders of the Preferred Interests in that Class will be entitled to the same rights and privileges that existed on the Effective Date; *provided, however,* on and after the Effective Date, the Unsecured Debt Provision will terminate and have no force or effect. The accumulated unpaid dividends to June 30, 2007, are as follows: with respect to the 4.75% Preferred Series, $277,155; with respect to the 4.36% Preferred Series, $457,800; and with respect to the 5.56% Preferred Series, $583,800.<br><br>Option B: For each Class of Preferred Interests that does not vote in favor of the Debtor's Plan, in full satisfaction of the Preferred Interests in such Class, the Debtor will provide treatment that is fair and equitable for each Holder of Preferred Interests in such Class. Upon the Effective Date (i) the Preferred Interests in each Class that elect Option B will be cancelled and rendered null and void, without any corporate action or any action under any applicable agreement, law, regulation, rule or order, and (ii) the obligations of the Debtor and Reorganized Debtor under any and all agreements and instruments related to such Preferred Interests, or executed in connection therewith, shall be discharged. |
| Class 12 | Equity Interests | Impaired. The Holder of the Equity Interests shall retain such Equity Interests after the Effective Date, but shall be subject to the dividend restrictions set forth in Section 6.4 of the Debtor's Plan. |

## IV.   DESCRIPTION AND HISTORY OF DEBTOR'S BUSINESS

ENOI is an electric and gas utility company organized and existing under the laws of the State of Louisiana, with its principal place of business located at 1600 Perdido Street, Building 529, New Orleans, Louisiana.  ENOI's electric utility business includes the manufacture, production, transmission, distribution and sale of electric power to residential, commercial, industrial, and governmental consumers in the City of New Orleans, with the exception of the Fifteenth Ward of the City of New Orleans, also known as Algiers.  ENOI's gas utility business includes purchasing natural gas and transmitting and distributing that natural gas to customers throughout the City of New Orleans.

ENOI is a wholly-owned subsidiary of Entergy Corporation, an investor owned public utility holding company.   ENOI is an Affiliate of Entergy Louisiana, Entergy Gulf States, Entergy Arkansas, Entergy Mississippi, and SERI, all of which are  utility companies that are wholly owned subsidiaries of Entergy Corporation.  ENOI is also an Affiliate of Entergy Services, a corporation wholly-owned by Entergy Corporation.  Pursuant to that certain Service Agreement, as amended, between ENOI and Entergy Services (the "Services Agreement"), Entergy Services provides centralized management, administrative, technical and other support services to ENOI.  Entergy Services also has similar services agreements with  other regulated utility subsidiary companies of Entergy Corporation. Pursuant to its service agreement with ENOI, Entergy Services provides services that include finance, accounting, domestic operations support, human resources, information technology, legal, public relations, and various supply chain functions.  Entergy Services charges "cost" for services provided to ENOI.  The Debtor intends to assume the Services Agreement, pursuant to the terms of Article VIII of the Debtor's Plan.  Under the Debtor's Plan, however, Entergy Service's Claim for amounts owed by ENOI under the Services Agreement for the period before the Petition Date are treated as an Intercompany Claim, as opposed to a Cure Amount Claim, and are paid pursuant to the terms of an Intercompany Note.  (For a discussion of the Intercompany Claims, see Article VII.B.6 of the Debtor's Disclosure Statement, entitled, "Intercompany Claims.")

Following are the operating statistics for ENOI for the years 2001 through 2005.

|  | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| **ELECTRIC OPERATING REVENUES ($ thousands)** | | | | | |
| Residential | 150,409 | 184,155 | 178,133 | 170,517 | 189,474 |
| Commercial | 145,321 | 170,812 | 161,716 | 153,776 | 186,299 |
| Industrial | 31,597 | 34,261 | 26,416 | 24,657 | 31,725 |
| Governmental | 59,450 | 69,680 | 68,238 | 65,746 | 80,918 |
| Total Retail | 386,777 | 458,908 | 434,503 | 414,696 | 488,416 |
| Sales for Resale | 138,528 | 119,407 | 87,174 | 8,773 | 13,330 |
| Other | 10,711 | 10,142 | 5,983 | 1,058 | 926 |
| Total Electric Operating Revenues | 536,016 | 588,457 | 527,660 | 424,527 | 502,672 |
| | | | | | |
| **NATURAL GAS OPERATING REVENUES ($ thousands)** | 137,310 | 147,411 | 126,356 | 83,347 | 128,178 |

### SOURCES OF ELECTRIC POWER (GWh)

| | | | | | |
|---|---|---|---|---|---|
| Gas & Oil Fired Generation Plants | 1,661 | 2,146 | 2,099 | 2,580 | 2,232 |
| Purchased Power: | | | | | |
| Affiliated Companies | 4,024 | 3,880 | 3,742 | 2,706 | 3,271 |
| Non-affiliated Companies | 1,232 | 1,982 | 1,621 | 1,041 | 753 |
| Total Purchased Power | 5,256 | 5,862 | 5,363 | 3,747 | 4,024 |
| Total Sources of Energy | 6,917 | 8,008 | 7,462 | 6,327 | 6,256 |

### USES OF ELECTRIC POWER (GWh)

| | | | | | |
|---|---|---|---|---|---|
| Electric Power Sales: | | | | | |
| Residential | 1,616 | 2,139 | 2,133 | 2,158 | 1,981 |
| Commercial | 1,798 | 2,316 | 2,262 | 2,255 | 2,185 |
| Industrial | 498 | 575 | 413 | 409 | 414 |
| Governmental | 800 | 1,025 | 1,036 | 1,053 | 1,017 |
| Total Retail | 4,712 | 6,055 | 5,844 | 5,875 | 5,597 |
| Sales for Resale | 2,041 | 1,539 | 1,340 | 176 | 174 |
| Unbilled Energy | 135 | 41 | 22 | (49) | 29 |
| Total Electric Power Sales | 6,888 | 7,635 | 7,206 | 6,002 | 5,800 |
| Line Losses and Company Usage | 29 | 373 | 256 | 325 | 456 |
| Total Uses of Electric Power | 6,917 | 8,008 | 7,462 | 6,327 | 6,256 |

### AVERAGE ELECTRIC REVENUE (cents/KWh)

| | | | | | |
|---|---|---|---|---|---|
| Residential | 9.31 | 8.61 | 8.35 | 7.90 | 9.56 |
| Commercial | 8.08 | 7.37 | 7.15 | 6.82 | 8.53 |
| Industrial | 6.34 | 5.96 | 6.42 | 6.03 | 7.66 |
| Governmental | 7.43 | 6.80 | 6.59 | 6.24 | 7.96 |

### NUMBER OF RETAIL ELECTRIC CUSTOMERS

| (as of December 31) | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| Residential | 152,429 | 169,498 | 169,878 | 170,771 | 170,043 |
| Commercial | 14,220 | 16,376 | 16,336 | 16,576 | 16,431 |
| Industrial | 1,161 | 1,309 | 1,148 | 1,141 | 1,106 |
| Governmental | 858 | 1,798 | 1,755 | 1,632 | 1,649 |
| Total Retail Customers | 168,668 | 188,981 | 189,117 | 190,120 | 189,229 |

**Note:** Number of retail electric customers as of December 31, 2005 represents customers for which service is available, but these customers may not have returned to their homes due to the effects of Hurricane Katrina. Currently, approximately 85,000 electric customers and 65,000 gas customers have returned and are taking service.

### A.    OPERATIONS

#### 1.    Electric Utility

ENOI's asset base includes electric generation, transmission (including substations), and distribution assets. The following chart contains information regarding ENOI's electric generating

stations, with MW meaning megawatt(s), or one thousand kilowatts.

**GENERATION PORTFOLIO**

| Plant *(b)* | Unit | Ownership | Commercial Operation | Owned Capability (MW) *(a)* | Fuel Type | Purpose |
|---|---|---|---|---|---|---|
| A. B. Paterson | 3 | 100% | 1950 | 40 | Gas/Oil | Reserve |
| | 4 | 100% | 1954 | – | Gas/Oil | Reserve |
| | 5 | 100% | 1967 | 11 | Oil | Reserve |
| Michoud | 1 | 100% | 1957 | 65 | Gas/Oil | Reserve |
| | 2 | 100% | 1963 | 230 | Gas/Oil | Intermediate |
| | 3 | 100% | 1967 | 530 | Gas/Oil | Intermediate |
| Total | | | | 876 | | |

*(a) Owned Capability is the dependable load carrying capability as demonstrated under actual operating conditions based on the primary fuel (assuming no curtailments) that each station was designed to utilize.*

*(b) ENOI's plants were severely damaged by Hurricane Katrina. Michoud Unit 2 returned to service April 2006 and Unit 3 returned to service for the summer of 2006. Michoud Unit 1 and A. B. Paterson have Not restarted.*

In addition to the generation assets, ENOI's electric system includes transmission and distribution assets. ENOI owns approximately 125 miles of transmission lines (115 kilovolt and higher), which transmit power from generating sources to substations. ENOI owns 22 substations. ENOI's distribution assets, which deliver power from the substation to the consumer, include 1,054 miles of overhead lines and 380 miles of underground lines.

In addition to the electric power produced by its generating assets, ENOI also purchases electric power to supply its customers' needs. This power comes from a variety of sources, including contracts with the Debtor's Affiliates, contracts with third parties, and spot market purchases. (For a discussion of the power purchase agreements with the Debtor's Affiliates, see Article V.D.7 of the Debtor's Disclosure Statement.) ENOI obtains a significant portion of its purchased power through the UPSA, under which ENOI purchases from SERI 17% of SERI's share of the power and capacity of the Grand Gulf nuclear power plant. Grand Gulf is a 1270 MW plant located in Port Gibson, Mississippi. SERI owns or leases a total interest of 90% of Grand Gulf.

## 2. Gas Utility

ENOI purchases the natural gas that it sells to its customers from several suppliers. ENOI's natural gas system is interconnected with three interstate and three intrastate delivery pipelines. ENOI's retail gas system includes approximately 33 miles of transmission pipelines, 14 purchase points, approximately 1,495 miles of distribution mains, and 1,030 miles of distribution service lines. Before Hurricane Katrina, ENOI provided natural gas service to approximately 144,000 retail customers. ENOI sold 12,329,794 mcf (or one thousand cubic feet of natural gas) of natural gas to retail customers in 2005.

## B.    REGULATION OF ENOI

### 1.    The City Council

ENOI is subject to regulation by the City Council as to the following:

* utility service;
* retail rates and charges;
* standards of service;
* depreciation, accounting, and issuance and sale of certain securities; and
* other matters related to the provision of retail electric and gas services.

The City Council regulates ENOI's retail rates using traditional ratemaking practices. Under traditional regulation, public utilities are required to incur costs and to make investments in the utility plant infrastructure to meet their obligation to serve customers. In exchange, the public utility has the right to recover all prudently-incurred operating costs and investment, together with a reasonable opportunity to earn a fair return on those investments. Because utilities are capital-intensive by their nature, large amounts of investment capital are required to build power plants, transmission facilities, and distribution systems to provide electricity and gas service to consumers. This necessary capital is obtained by accessing the financial capital markets. Investors have the expectation of earning a fair return from the company for the value of the capital provided.

#### a.    *Formula Rate Plans*

Retail rate regulation for ENOI currently is administered by the City Council through electric and gas Formula Rate Plans (the "FRPs") approved by the City Council in 2003 and renewed in 2005. These FRPs call for the annual filing by ENOI of a report with the City Council containing an evaluation pursuant to a specific formula of ENOI's earnings for the immediately preceding calendar year. Adjustments to ENOI's rates are then made in accordance with ENOI's filing, subject to correction, if necessary, of any errors. The adjusted rates remain in effect until changed the following year, unless unresolved issues arise which are addressed through a process set forth in the FRPs. Both the electric and gas FRPs contain provisions to address the pass-through to customers of extraordinary costs, including storm costs.

In September 2005, the City Council approved a two year extension of ENOI's FRP with a target capitalization ratio for common equity of 45% (an increase from the original target of 42%), as well as a mid-point rate of return on common equity ("ROE") of 10.75%. The FRP established an ROE bandwidth for electric operations that is 100 basis points above or below the mid-point ROE (i.e., an allowed ROE earnings range of 9.75 to 11.75%). For gas operations, the ROE bandwidth is 50 basis points above or below from the mid-point ROE (i.e., allowed earnings range of 10.25 to 11.25%) and zero basis points above or below the mid-point for the 2005 evaluation period. (For a discussion of ENOI's 2006 FRP Applications, see Article VII.C.1 of the Debtor's Disclosure Statement, entitled, "Rate Relief.")

#### b.    *Fuel Recovery*

ENOI's electric rate schedules include a fuel adjustment clause designed to reflect no more than targeted fuel and purchased power costs, adjusted by a surcharge or credit for deferred fuel

{N1609126.3}                    - 14 -

expense arising from the monthly reconciliation of actual fuel and purchased power costs incurred with fuel cost revenues billed to customers, including carrying charges.

ENOI's gas rate schedules include a purchased gas adjustment to reflect estimated gas costs for the billing month, adjusted by a surcharge or credit similar to that included in the electric fuel adjustment clause, including carrying charges. In June and November 2004, the City Council passed resolutions implementing a package of measures developed by ENOI and the Council Advisors to protect customers from potential gas price spikes during the 2004 - 2005 winter heating season. These measures included maintaining ENOI's financial hedging plan for its purchase of wholesale gas. In October 2005, the City Council approved modification of the current gas cost collection mechanism effective November 2005 to address concerns regarding its fluctuations, particularly during the winter heating season. The modifications are intended to minimize fluctuations in gas rates during the winter months.

## 2. Federal Power Act

ENOI is also subject to FERC's regulation pursuant to the Federal Power Act. Under the Federal Power Act, the FERC regulates the transmission and wholesale sale of electric energy in interstate commerce and certain other activities, including accounting policies and practices of electric and gas utilities. Specifically regarding ENOI, the FERC regulates the rates charged for intra-Entergy System sales of electricity pursuant to the System Agreement (as discussed below), and the rates charged by SER1 under the UPSA for Grand Gulf capacity and energy provided to Entergy Arkansas, Entergy Louisiana, Entergy Mississippi and ENOI.

### a. *The System Agreement*

Entergy's Operating Companies historically have engaged in the coordinated planning, construction, and operation of generating and bulk transmission facilities under the terms of the System Agreement, which is a rate schedule that has been approved by the FERC. Under the terms of the System Agreement, generating capacity and other power resources are jointly planned, acquired, and operated by the Operating Companies. The System Agreement provides, among other things, that those Operating Companies having generating resources proportionately greater than their load responsibility (the "long companies") shall receive payments from the Operating Companies having generating resources proportionately lower than their load responsibilities (the "short companies"). Such payments are at amounts sufficient to cover certain of the long companies' costs for intermediate and peaking oil/gas-fired generation, including operating expenses, fixed charges on debt, dividend requirements on preferred stock, and a fair rate of return on common equity investment. Under the System Agreement, these charges are based on costs associated with the long companies' steam electric generating units fueled by oil or gas and having an annual average heat rate above 10,000 Btu/kWh. In addition, for all energy exchanged among the Operating Companies under the System Agreement, the Operating Companies allocated energy are required to pay the cost of fuel consumed in generating such energy plus a charge to cover other associated costs. In the event that the System Agreement is not assumed before the commencement of the Confirmation Hearing, the Debtor intends to assume the System Agreement in accordance with Article VIII of the Debtor's Plan.

#### b. *Unit Power Sales Agreement*

The UPSA allocates capacity, energy, and the related costs from SERI's 90% ownership and leasehold interests in the Grand Gulf nuclear power plant in the following proportions: Entergy Arkansas (36%); Entergy Louisiana (14%); Entergy Mississippi (33%); and ENOI (17%). Each of these Operating Companies is obligated to make payments to SERI for its entitlement to capacity and energy on a full cost-of-service basis regardless of the quantity of energy delivered, so long as Grand Gulf remains in commercial operation. In the event that the UPSA is not assumed before the commencement of the Confirmation Hearing, the Debtor intends to assume the UPSA in accordance with Article VIII of the Debtor's Plan and section 365 of the Bankruptcy Code. Because the Debtor paid SERI $6,174,218.64 after the Petition Date (the "UPSA Payment"), representing the amount owed under the UPSA for the period before the Petition Date, the Debtor will not need to pay any Cure Amount Claim in order to assume the UPSA. If, however, any default under the UPSA exists at the time that the Debtor assumes the UPSA, such default is treated as a Cure Amount Claim, as opposed to an Intercompany Claim, under the Debtor's Plan. (For a discussion of the Creditors' Committee Adversary Proceeding regarding, among other things, the UPSA Payment, see Article V.D.7 of the Debtor's Disclosure Statement, entitled, "Assumption of Certain Executory Contracts.")

### C. SELF-INSURED WORKER'S COMPENSATION PROGRAM

Certain laws of the State of Louisiana require ENOI to provide specified workers' compensation benefits for its employees who sustain an injury or occupational disease in the course and scope of their employment. Such benefits may be self-insured pursuant to the Louisiana Workers' Compensation Act (the "LWCA"), La. R. S. 23: 1021, *et seq.* and the applicable rules promulgated in accordance with the LWCA by the Louisiana Workers' Compensation Administration. The Debtor has self-insured its workers' compensation benefits for many years and has been granted a Certificate of Authority to Self-Insure by the Director of the Administration.

To obtain and retain the Certificate of Authority to Self-Insure, ENOI has obtained a surety bond in the amount of $100,000. In addition, ENOI pays an annual Self-Insured Assessment to the Louisiana Department of Labor Office of Workers' Compensation Administration Fund and an annual assessment to the Treasurer of the State of Louisiana.

## V. THE BANKRUPTCY CASE

### A. EVENTS PRECEDING BANKRUPTCY

The Bankruptcy Case is one of the many consequences of what is widely regarded as the worst natural disaster in the history of this nation. Hurricane Katrina was the costliest and one of the deadliest hurricanes in the history of the United States.

On August 29, 2005, the City of New Orleans was battered by Hurricane Katrina and subsequently was submerged due to a combination of storm surge and failure of the levees and flood walls surrounding the City. Hurricane Katrina was the third-strongest hurricane in recorded history to ever make landfall in the United States. The path of the storm's eye was to the northeast of the City and subjected the City to hurricane conditions for hours, causing a significant storm surge. The heavy winds and storm surge weakened the City's levee system, which resulted in extensive failure of the levees and flood walls around the City. Roughly 80% of the City flooded, with as much as 20

{N1609126.3}                                              - 16 -

feet of water in some areas. The flood waters inundated the City's pumping stations and rendered the pumps inoperable.

Hurricane Katrina and the prolonged flooding that followed resulted in extended, widespread power outages throughout the City. During ENOI's outage peak, all 190,000 of its electric customers and 120,000-125,000 of its gas customers were without service. The damage to ENOI's electric and gas infrastructure is unprecedented in the utility industry, causing ENOI to suffer hundreds of millions of dollars in physical damage and economic losses. All of ENOI's electric generating facilities, including switch yards, were inundated by flood waters and rendered inoperable. All of ENOI's transmission lines and 22 substations were knocked out of service. Of approximately 125 miles of transmission lines, 95 miles of transmission lines sustained substantial damage. Seventy-eight (78) transmission towers sustained significant structural damage. Twelve of 22 substations sustained moderate to heavy flood damage. ENOI's distribution facilities sustained extensive damage from the storm and flooding, including: 1,763 poles, 2,603 spans of conductor and 3,185 crossarms. Total restoration costs for the repair and/or replacement of ENOI's electric and gas facilities damaged by Hurricane Katrina and business continuity costs are estimated to be $271 million.

The cost estimate for storm restoration does not include other incremental losses that are potentially more significant to ENOI's business, such as the inability to recover fixed costs scheduled for recovery through base rates, which base rate revenue was not recovered due to a loss of anticipated sales. For instance, ENOI estimates currently that lost non-fuel revenue due to Hurricane Katrina will total approximately $194 million through 2007. In addition, ENOI estimates that the hurricanes caused $22 million of uncollectible customer receivables. This is because of the significant long-term decline in the number of customers. Currently, only approximately 85,000 electric customers and 65,000 gas customers have returned and are taking service.

In addition to the estimated storm restoration costs above, it will be necessary for ENOI to rebuild the gas distribution system in New Orleans due to the massive salt water intrusion into the system caused by flooding. ENOI currently expects the cost of the gas system rebuilding to be $355 million, with the project beginning in 2008 and extending for many years thereafter.

## B.   COMMENCEMENT OF BANKRUPTCY AND CONTINUED OPERATION AS DEBTOR IN POSSESSION

On September 23, 2005, ENOI Filed its voluntary bankruptcy petition seeking relief under the provisions of chapter 11 of the Bankruptcy Code. The Debtor continues to operate and manage its properties as a debtor-in-possession, and continues to provide and restore electric and gas service to its customers. ENOI made power available to those customers who could take service in most areas of Orleans Parish. ENOI's accelerated restoration efforts made service available by the end of 2005 to all electric and gas customers able to take service, with the exception of the three most-heavily devastated areas (portions of Lakeview, the lower Ninth Ward, and New Orleans East), where accelerated restoration of service was impractical. The accelerated restoration work included electrification of the backbone distribution feeders and laterals northward from the river. ENOI also stepped up its billing and collection efforts.

At the time the Bankruptcy Case was Filed, customers in the most devastated areas of New Orleans continued to be unable to accept electric and gas service for an unestimatable period of time. ENOI estimates currently that lost non-fuel revenues in 2006 caused by Hurricane Katrina will be

$194 million through 2007. ENOI's estimate of the revenue impact of customers who are currently unable to accept electric and gas service is subject to change, however, because of a range of uncertainties, in particular the timing of when individual customers will return to service. Restoration for many of these customers will follow major repairs or reconstruction of customer facilities, and will be contingent on validation by local authorities of habitability and electrical safety of customers' structures.

## C. GRAND GULF

In November 2005, the City Council approved measures proposed by ENOl to address the reduction in ENOI's retail customer demand caused by Hurricane Katrina and to provide revenue support for ENOI's share (approximately $90 million per year) of Grand Gulf costs. One of these measures was that ENOI began selling into the electric wholesale market its share of the output of the Grand Gulf nuclear power plant, shortly after Hurricane Katrina struck Orleans Parish.

Beginning July 1, 2006, the City Council approved the return of Grand Gulf output to serve ENOI's retail load. The City Council also approved the recovery of all of ENOI's Grand Gulf costs through ENOI's fuel adjustment clause (a significant portion of Grand Gulf costs previously had been recovered through base rates, but since Hurricane Katrina the number of customers paying base rates has been cut by more than half). For the rate treatment of Grand Gulf costs, see the discussion below.

## D. ADMINISTRATION OF THE BANKRUPTCY CASE

### 1. First Day Motions

On the Petition Date, the Debtor Filed a series of motions in the Bankruptcy Court designed to minimize any disruptions of its business operations and to facilitate its reorganization. The Debtor Filed the following: (a) a Motion for Order Authorizing Debtor to Obtain Post-Petition Financing, Granting Adequate Protection to Certain Pre-Petition Secured Parties and Scheduling a Final Hearing (P-2) (discussed more fully below) (the "DIP Financing Motion"); (b) an Application for Order Authorizing Employment of Jones Walker as Counsel (P-11) (the "Retention Application"); (c) a Motion for Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Committee Members (P-13); (d) a Motion to Pay Certain Accrued, Pre-Petition Wages, for Authority to Pay Certain Accrued Pre-Petition Employment Benefits, and for Authority to Pay Accrued, Pre-Petition Employment Related Taxes (P-14) (the "Wages Motion"); and (e) a Motion for Order Authorizing Debtor to Pay Pre-Petition Claims of Certain Critical Vendors in Ordinary Course of Business (P-15) (the "Critical Vendor Motion").

On September 26, 2005, the Bankruptcy Court granted the following motions: (a) the Wage Motion (P-23); (b) the Critical Vendor Motion (P-24); (c) the Retention Application (P-6); and (d) an interim Order granting the DIP Financing Motion (P-22). The Bankruptcy Court also approved an administrative order establishing procedures for compensation of professionals (P-27).

### 2. Certain Obligations to Customers

On December 22, 2005, the Debtor obtained various Orders from the Bankruptcy Court that allowed the Debtor to satisfy certain obligations to its customers without disruption. The Bankruptcy Court granted the Debtor the authority to issue refunds of security deposits to residential and non-

residential customers as those deposits became eligible for refund through the Debtor's existing deposit refund policies (P-92 and P-490).

### 3. Creditors' Committee

Section 1102 of the Bankruptcy Code, as soon as possible after the commencement of a chapter 11 case, the Office of the United States Trustee must appoint an official committee of unsecured creditors. On October 11, 2005, the following members were appointed to the Creditors' Committee: (a) Apache Corporation; (b) Magnus Energy Marketing, Ltd. ("Magnus"); and (c) Western Gas Resources, Inc. Following the resignation by Magnus from the Committee, Asplundh Tree Expert Company ("Asplundh") was added to the Creditors' Committee (P-632). Following the resignation by Asplundh from the Creditors' Committee, NRG Power Marketing, Inc. was added to the Creditors' Committee (P-1204). Thereafter, the Creditors' Committee was again reconstituted, and the current members are Apache Corporation and Western Gas Resources (P-1391).

### 4. DIP Financing by Entergy Corporation

On September 26, 2005, the Bankruptcy Court issued an interim Order (P-22) that granted the interim relief sought by the Debtor in its DIP Financing Motion (P-2), and authorized ENOI to enter into the DIP Financing Facility with Entergy Corporation, as the DIP lender. The Bankruptcy Court originally authorized $100 million in interim borrowing under the facility and increased the authorization to $200 million on October 26, 2005 (P-176). The Bankruptcy Court held a final hearing (the "Final DIP Hearing") on the DIP Motion on December 7, 2005, at which time an agreement was reached by and among ENOI, Entergy Corporation, Financial Guaranty Insurance Company ("FGIC"), an insurer of two of the six series of Bonds issued by ENOI, and Deutsche Bank Securities, Inc. ("Deutsche Bank"), one of the Bondholders. The agreed settlement resolved a protracted dispute over, among other things, the extent of the Liens granted to secure the Bond Indenture and Mortgage, and whether those Liens could be primed by the Liens granted to Entergy Corporation, as the DIP lender. The DIP Financing Final Order embodied a settlement of these disputes, announced into the record at the hearing (the "DIP Stipulation"), and provided that the DIP lender's Liens will secure up to $200 million in debt under the DIP Financing Facility, and prime those of the Bonds.

At the Final DIP Hearing, the Trustee did not consent to the DIP Stipulation and in fact Filed an additional objection after the Final DIP Hearing. Nevertheless, in its DIP Financing Final Order, the Bankruptcy Court overruled all of the Bond Trustee's objections. The Bankruptcy Court approved the DIP Financing Facility, as modified at the Final DIP Hearing, and incorporated the DIP Stipulation that is summarized below:

(a) A priming lien was granted to the DIP lender in connection with the DIP Financing Facility;

(b) ENOI agreed to pay certain reasonable fees and expenses of FGIC, the Bond Trustee and Deutsche Bank;

(c) The Liens of the Bond Trustee extended to the Katrina Insurance Proceeds;

{NI609126.3}                    - 19 -

(d)     The Bond Trustee was granted (for its benefit and the benefit of the Bondholders) a Lien on all of the Debtor's assets that secure the DIP Financing Facility (junior to the Liens of the DIP lender, Entergy Corporation, and Capital One) (the "Post-Petition Bond Liens");

(e)     The DIP Financing Facility was not and would not be a committed facility; and

(f)     If the Bondholders are entitled to accrue interest or other fees and expenses after the Petition Date, no such interest would accrue for a period of one year following the Petition Date.

The Bond Trustee appealed the DIP Financing Final Order, but subsequently agreed to the terms of the DIP Stipulation. Accordingly, on January 17, 2006, the Debtor and the DIP lender Filed a Motion for Order Approving Settlement with the Bond Trustee Pursuant to Bankruptcy Rule 9019 (the "9019 Settlement") (P-558 and Supplements nos. 582 and 602), which was approved by the Bankruptcy Court on March 29, 2006 (the "Compromise Order") (P-739). Under the terms of the 9019 Settlement, the Bond Trustee dismissed its appeal of the DIP Financing Final Order and the parties agreed that the DIP Stipulation was for the benefit of and binding on the Bondholders (except with respect to the provision for fees and expenses) and that the Compromise Order was binding on the Debtor, Entergy Corporation, FGIC, Deutsche Bank, and the Bond Trustee.

The Debtor had $51.8 million in borrowings outstanding under the DIP Financing Facility as of January 12, 2007. ENOI is using borrowings under the DIP Financing Facility to fund its working capital and general corporate requirements, including restoration costs. By Order dated July 7, 2006, the outside maturity date on the DIP Financing Facility was extended until August 23, 2007 (P-1044 and P-1084).

## 5.     Employee-Related Matters

The Debtor Filed motions requesting authorization with respect to a variety of employee-related matters, including workers' compensation, retiree benefits and pre-petition wages (P-263; P-88 and P-14). The Bankruptcy Court granted the wages motion on September 26, 2005 (P-23). The Bankruptcy Court granted the motion for authority to honor obligations owed pursuant to certain non-qualified plans on November 2, 2005 (P-209, P-39 and P-23) and the workers' compensation motion on December 2, 2005 (P-317).

On February 2, 2006, the Debtor also Filed a motion (the "Incentive Compensation Motion") (P-625) seeking authority to pay to its employees (except for ENOI's president) incentive compensation for exemplary performance by its employees during the calendar year 2005 pursuant to certain incentive compensation programs (collectively, the "Incentive Plans"). The Incentive Plans have been used by ENOI in excess of five (5) years and the payout criteria was determined well in advance of Hurricane Katrina and the Petition Date. The Bankruptcy Court granted the Incentive Compensation Motion (P-666), and the Debtor was authorized to pay incentive compensation under the Incentive Plans in an aggregate amount not to exceed $1,374,586, including incentive compensation to (a) approximately 265 eligible ENOI employees who are not exempt from overtime under the Fair Labor Standards Act, and (b) approximately 102 eligible ENOI employees who are exempt from overtime under the Fair Labor Standards Act.

The Debtor has not entered into any retention agreements with its employees, officers or directors since the Petition Date, and has no intention of entering into any such agreements as part of consummation of the Debtor's Plan.

### 6. Certain Gas Supply Contracts

ENOI had certain forward contracts for the supply of gas with Atmos Energy Marketing, LLC ("Atmos") and Bridgeline Gas Marketing, LLC ("Bridgeline"). Pursuant to section 556 of the Bankruptcy Code, and the applicable contracts with ENOI, each had the contractual right to terminate the forward contracts based on the commencement of the Bankruptcy Case. Because this supply of gas was critical to ENOI's continued operations, ENOI Filed a motion (P-166) seeking authority to pay the Claims owed to these entities as of the Petition Date in exchange for a written stipulation, executed by each, that they waived their right to terminate the forward contracts based on the commencement of the Bankruptcy Case. The following amounts were owed Atmos and Bridgeline on the Petition Date: (a) $13,219,465.92 for gas provided in August 2005, and $5,325,126.38 for gas sold by Atmos from September 1 through 22, 2005; and (b) $9,768,204.44 for gas sold by Bridgeline in August 2005 and $2,879,691.57 for gas sold by Bridgeline from September 1 through 22, 2005. The Bankruptcy Court granted the motion on February 7, 2006 (P-635).

### 7. Assumption of Certain Executory Contracts

Section 365 of the Bankruptcy Code provides generally that a debtor may assume, assume and assign, or reject an executory contract at any time before the confirmation of a plan of reorganization, but the Bankruptcy Code, on the request of a party in interest, may order the Debtor to determine whether to assume or reject a particular executory contract within a specified period of time. As a debtor in possession, the Debtor has the right under section 365 of the Bankruptcy Code, subject to approval of the Bankruptcy Court, to assume, assume and assign, or reject Executory Contracts and Unexpired Leases.

#### a. *Power Purchase Agreements with Affiliates*

Because electricity cannot be stored, ENOI, like other regulated electric public utilities, must have access to sufficient generating capacity at all times in order to meet the peak needs of its customers, plus keep a reserve margin as required by Service Schedule MSS-1 under the System Agreement. ENOI can fulfill this requirement for generating capacity through ownership of generating plants and/or through firm contractual commitments for the supply of capacity (the ability to make energy) and energy (the output of a generator). The Operating Companies meet these generation capacity needs at the lowest reasonable cost consistent with the highest practicable reliability of service, subject to financial considerations, reasonable utilization of natural resources and minimization of the effect on the environment. The prudence of ENOI's resource supply decisions is subject to the regulatory review and oversight of the City Council and/or the FERC.

ENOI's parent, Entergy Corporation, wholly owns five Operating Companies, which provide retail service to their customers. For more than fifty years, ENOI and the other Operating Companies have operated their collective generating resources and purchases and their bulk transmission facilities as a single, integrated electric system used to serve a single integrated electric load (the "Entergy System").

{N1609126.3}                                        - 21 -

Today, Entergy Services, a service company affiliate under the Public Utility Holding Company Act of 2005, provides various administrative and general services to the Operating Companies, by which those Operating Companies manage and operate the Entergy System pursuant to the current form of the System Agreement. The System Agreement, approved by FERC on June 13, 1985, constitutes a FERC-approved rate schedule or tariff that obligates the Operating Companies (including ENOl) to operate in, and as part of, the Entergy System.

By jointly planning and operating their electric generating and bulk transmission facilities, the Operating Companies are able to aggregate their loads and jointly dispatch all generating resources available to the Energy System to serve that aggregated load most efficiently and economically. This sharing arrangement allows each Operating Company to access additional capacity when demand exceeds the supply generated by any single Operating Company. The benefits (and the costs associated with those benefits) are allocated among the Operating Companies pursuant to the System Agreement, which is a FERC-filed rate schedule that is subject to the FERC's exclusive regulatory jurisdiction. The System Agreement also provides a basis for equalizing among the Operating Companies any imbalance of costs associated with the construction, ownership and operation of such transmission facilities that are used for the mutual benefit of all the Operating Companies. The FERC has used the cost allocations in the System Agreement, together with the UPSA, to balance the relative total production costs of each Operating Company participant in the System Agreement so that those costs are roughly equal. The System Agreement includes seven Service Schedules, each of which is a FERC-filed rate that governs specific types of transactions among the Operating Companies. The UPSA is a separate, FERC-approved power purchase agreement that allocates the costs, capacity and energy of SERI's undivided 90% interest in the Grand Gulf nuclear power plan among ENOI, Entergy Louisiana, Entergy Arkansas, and Entergy Mississippi. Pursuant to the UPSA, as modified and approved by the FERC, ENOI is responsible for 17% of SERI's share of the costs of Grand Gulf and is entitled to 17% of the capacity and energy from SERI's interest in the plant.

Service Schedule MSS-3 governs the exchange of energy between or among the Operating Companies. This exchange occurs at the cost of the energy, as determined by this FERC rate schedule. The "selling" Operating Company recovers only its energy costs when an exchange of energy occurs. The selling Operating Company still remains responsible for the capacity costs. Because the purchasing Operating Company does not pay for the capacity costs in such transactions, the purchasing Operating Company is not able to count the capacity associated with energy purchased under MSS-3 in order to meet its requirement of having sufficient generating capacity to meet its reserve requirements pursuant to Service Schedule MSS-1, another FERC rate schedule.

Service Schedule MSS-3 provides for an after-the-fact accounting of the energy exchanged each hour among any of the Operating Companies. Pursuant to MSS-3, energy is allocated each hour from the lowest cost source (generator or purchase) available in that hour, according to the following priority: (i) first to the loads of the Operating Company owning that generating source (whether through ownership or purchase), and (ii) next to the Entergy System exchange (the pool). Thus, an Operating Company's customers get the benefit of sources that they pay for through rates, and to the extent that they need additional energy in an hour, they are allocated the energy in the pool, at the weighted average cost of all energy in the pool in that hour. Therefore, in any given hour, an Operating Company needing pool energy is generally purchasing from a pool that includes the highest cost energy that is being produced by the Operating Company or Companies that are selling energy into the pool in that hour.

{N1609126.3}                    - 22 -

Service Schedule MSS-1 establishes the mechanism by which the Operating Companies share the cost of the reserve capacity available on the Entergy System. Under MSS-1, any Operating Company that has less than its share (as determined by a FERC-approved formula) of reserves (short companies) compensates monthly those Operating Companies that supply those reserves (long companies).

In addition to the UPSA, ENOI currently has the following three long-term forward contracts to procure electric power from certain of its Affiliates (collectively, the "PPAs"): (a) the RB 30 PPA; (b) the WBL PPA; and (c) the ISES PPA. The PPAs provide extremely low cost electricity and, in fact, are the lowest cost resources available to ENOI. Through the PPAs, ENOI is able to help meet its needs for generating capacity and energy at costs that are much lower than what ENOI would have paid had it obtained that capacity and energy through the wholesale market or through operation of Service Schedules MSS-1 and MSS-3. These are far less costly than purchases currently available in the competitive wholesale market. Without the PPAs, ENOI would be heavily dependent upon natural gas-fired resources. Thus, the resources made available under the PPAs are an integral part of ENOI's ability to serve its customers at the lowest reasonable cost consistent with the need to provide reliable service and to meet the needs of its customers and provide for adequate reserves.

Except for changes that are not relevant to this issue and proceeding, each of the PPAs incorporates the terms of the Edison Electric Institute Master Power Purchase Sale Agreement form (the "Master Agreement"). In the Master Agreement, each party (a) acknowledges and agrees that the transactions under the Master Agreement constitute "forward contracts" within the meaning of the Bankruptcy Code, and (b) represents and warrants that it is a "forward contract merchant" within the meaning of the Bankruptcy Code. As forward contracts, the Debtor was concerned that the counterparties to the PPAs, Entergy Arkansas, Energy Gulf States and Entergy Power (collectively, the "PPA Counterparties"), (a) were not stayed from terminating the PPAs after the Petition Date pursuant to section 556 of the Bankruptcy Code, notwithstanding the provisions of the automatic bankruptcy stay, and (b) could terminate the PPAs based on the bankruptcy termination clause contained in the PPAs, notwithstanding provisions of the Bankruptcy Code that would otherwise render such an "ipso facto" clause unenforceable. The following amounts were due and unpaid as of the Petition Date with respect to the PPAs: (a) with regard to the ISES PPA, $1,091,471.49; (b) with regard to the RB 30 PPA, $5,021,988.01; and (c) with regard to the WBL PPA, $6,821,182.02. In return for ENOI's payment of the foregoing amounts (collectively, the "PPA Payments"), each of the PPA Counterparties waived through stipulations any defaults of ENOI under the PPAs, as well as any rights the PPA Counterparties may have had to terminate the PPAs as forward contracts under section 556 of the Bankruptcy Code.

On December 6, 2005, ENOI Filed a Motion for an Order Authorizing the Debtor to Honor Pre-Petition Obligations Owed Affiliates Pursuant to Certain Power Purchase Agreements that Constitute Forward Contracts Under section 556 of the Bankruptcy Code (P-426) (the "Original PPA Motion"). The Original PPA Motion sought retroactive authority to make the Affiliate Payments as payments on forward contracts. On August 1, 2006, because the Debtor decided to assume the PPAs, the Debtor Filed the Amended and Restated PPA Motion, and sought authority to assume the PPAs (the "Amended PPA Motion") (P-1067). On October 20, 2006, the Debtor Filed a Motion to Withdraw the Amended PPA Motion (P-1243), so that the assumption of the PPAs could be made pursuant to the Debtor's Plan. The Motion to Withdraw was granted (P-1246). Because the Debtor has already paid the foregoing amounts, there is no Cure Amount Claim that the Debtor will need to pay in order to assume the PPAs. If, however, any default under the PPAs exists at the time that the

Debtor assumes the PPAs, such default is treated in the Debtor's Plan as a Cure Amount Claim, as opposed to an Intercompany Claim.

On November 29, 2006, after being granted leave to File the lawsuit (P-1415), the Creditors' Committee Filed a Complaint (Adversary Proceeding No. 06-01321 on the Docket) (the "Creditors' Committee Adversary Proceeding"), on behalf of the Debtor, against (a) the PPA Counterparties seeking the return of the PPA Payments, and (b) SERI, the counterparty to the UPSA, seeking the return of the UPSA Payment. The Creditors' Committee Adversary Proceeding is pending, but will be rendered moot if the Debtor's Plan is confirmed and the Effective Date occurs. (For a discussion of the UPSA Payment, see Article IV.B.2 of the Debtor's Disclosure Statement, entitled, "Unit Power Sales Agreement.")

### b. *Bridgeline Holdings, Inc.*

On June 8, 2006, ENOI Filed a Motion to Assume a Gas Storage Services Agreement with Bridgeline Holdings, L.P. (P-889). The Bankruptcy Court later approved the assumption of the Gas Storage Services Agreement by and between Bridgeline Holdings and ENOI dated July 2001, and as amended by the Firm Storage Confirmation, dated June 21, 2006 (P-976). The Debtor was directed to pay the agreed upon Cure Amount Claim of $401,574.86 in six equal installment payments commencing on July 1, 2006. ENOI has now fully paid the Bridgeline Cure Amount Claim.

### c. *Chaparral Energy, L.L.C.*

ENOI gained approval to assume an Interconnect Agreement that permitted Chaparral Energy, L.L.C. to connect with ENOI's natural gas pipeline facilities along U.S. Highway 90 (P-802). Assumption of the Chaparral Contract provided ENOI with flexibility needed to meet its potential future needs for natural gas in a changing environment. Because ENOI is not, and will not be, in default on the agreement, no Cure Amount Claim exists.

### 8. Extension of Time for Assuming or Rejecting Unexpired Leases of Non-Residential Real Property

Section 365 of the Bankruptcy Code further provides that a debtor is given until sixty (60) days after the date of commencement of its bankruptcy to decide whether to assume, assume and assign, or reject an unexpired lease of nonresidential real property. This period may be extended for cause. On March 9, 2006, the Bankruptcy Court entered an Order giving ENOI additional time to assume or reject Unexpired Leases of non-residential property (P-682), and ENOI has until Confirmation to assume, assume and assign, or reject its various Unexpired Leases of non-residential real property in accordance with section 365(d) of the Bankruptcy Code.

### 9. Payment of Dividends to Holders of the 4 3/4 Preferred Series

ENOI Filed a Motion for Authority Pursuant to sections 361 and 363 to Preserve Assets of Estate by Declaring Dividends and Making Payments on the Debtor's 4 3/4 Preferred Series, or, Alternatively, to Enforce Stay Pursuant to sections 105 and 362(a)(3) (P-760) (the "Preferred Dividend Motion"). ENOI Filed the Preferred Dividend Motion to preserve an asset that could provide it with significant payments for the use of its net operating losses over the next five years. To preserve this asset, however, ENOI must remain a member of Entergy Corporation's existing federal income tax consolidated group (the "Entergy Consolidated Tax Group"). To remain a

member of the Entergy Consolidated Tax Group, ENOI had to avoid the consequence that would result if it did not pay the quarterly dividend in the approximate amount of $92,000. The 4 3/4% Preferred Series is entitled to a dividend of 4 3/4% per annum, payable quarterly, on the par value of $100 per share. On September 23, 2005, ENOI had and continues to have 77,798 shares of 4 3/4% Preferred Series outstanding. The 4 3/4% Preferred Series is currently non-voting. However, if any four quarterly dividends are accumulated and unpaid, the Holders of the 4 3/4% Preferred Series are entitled to elect a majority of the directors of ENOI's board of directors. Moreover, the Articles of Incorporation also provide that if no shares of the 4 3/4% Preferred Series are outstanding, then these voting rights may be exercised by other series of preferred stock outstanding.

By the time the Preferred Dividend Motion was Filed, ENOI had missed three quarterly dividends, each of which became payable after the Petition Date. Had the Holders of the 4 3/4% Preferred Series become possessed of more than 20% of the voting power of shares entitled to vote for the ENOI Board, then regardless of whether they ever actually exercised that right, ENOI would no longer be eligible for membership in the Entergy Consolidated Tax Group, and ENOI would have lost an extremely valuable asset – its right to be paid for the use of its net operating losses by other members of the Entergy Consolidated Tax Group.

The Bankruptcy Court granted the Preferred Dividend Motion, and permitted ENOI to declare and pay the dividends (the "Preferred Dividend Order") (P-814), provided (among other conditions) such payments are only made with money advanced under the DIP Financing Facility, and that such advances (a) do not accrue interest, and (b) are subordinate to the repayment, in full, of all Allowed Claims. Since entry of the Preferred Dividend Order, with funds borrowed under the DIP Financing Facility, the Debtor has made three (3) quarterly dividends on and with respect to the 4 3/4% Preferred Series, in accordance with the conditions of the Preferred Dividend Order. As described in the Debtor's Plan, the money ENOI borrowed to pay the foregoing dividends is subordinated and, therefore, is treated in Entergy Corporation's Subordinated DIP Financing Claim.

## 10.   Purchase Certain Surplus Vehicles from Affiliates

On April 13, 2006, ENOI Filed a motion to purchase forty-five surplus vehicles from certain of the Debtor's Affiliates (P-758) for a total of $191,050. ENOI had lost much of its fleet of vehicles in Hurricane Katrina and its aftermath. It needed the vehicles to conduct its normal operations, and had been leasing replacement vehicles. The purchase of the surplus vehicles for fair market value was justified because (a) short-term leased vehicles are not as well-suited for ENOI's purposes as the surplus vehicles, and (b) the cost of the short-term leased vehicles is high compared to the cost of purchasing the better-suited surplus vehicles. The Bankruptcy Court granted the motion on May 4, 2006 (P-813).

## 11.   Payment of Taxes and Franchise Fees Owed to City of New Orleans

On December 6, 2005, the Debtor sought retroactive authority to pay certain taxes and franchise fees owed to the City of New Orleans as of the Petition Date (the "City Payment Motion") (P-46), including the following:  (a) $1,096,711.33 attributable to consumer taxes that, as of the Petition Date, ENOI collected for and on behalf of the City of New Orleans from utility payments made by ENOI customers (collectively, the "Consumer Taxes"); and (b) $3,491,973.59 for the franchise fees that, as of the Petition Date, ENOI owed the City of New Orleans pursuant to Section 3-123, *et seq*. of the Home Rule of The City of New Orleans (collectively, the "August Franchise Fees"). In accordance with standard practice, Entergy Services issued checks to the City on behalf of

ENOI to pay the August Franchise Fee and the Consumer Taxes, the checks were delivered to the City on September 19, 2005, but the City did not cash the checks until after the Petition Date. Subsequently, on October 5, 2005, the Debtor reimbursed to Entergy Services the amount of the August Franchise Fee and the Consumer Taxes that Entergy Services had paid on the Debtor's behalf. The reimbursement occurred during the confusion that was still existing as a result of Hurricane Katrina, the flooding of the City, and the further emergency events surrounding Hurricane Rita.

On September 26, 2006, the Debtor and Entergy Corporation, for itself and Entergy Services, entered into a stipulation with regard to the August Franchise Fee (the "Franchise Fee Stipulation." (P-1165). Similarly, on October 9, 2006, the Debtor and Entergy Corporation, for itself and Entergy Services entered into a stipulation with regard to the Consumer Taxes (the "Consumer Taxes Stipulation") (P-1193). Without admitting that it must do so, in the Franchise Fee Stipulation, Entergy Services agreed to refund to the Debtor the amount of the August Franchise Fee ($3,491,973.59), plus interest thereon from October 5, 2005, through the date of payment, calculated at the rate charged under the DIP Financing Facility. Similarly, without admitting that it must do so, Entergy Services agreed to refund to the Debtor the amount of the Consumer Taxes ($1,096,711.33), plus interest thereon from October 5, 2005, through the date of payment, calculated at the rate charged under the DIP Financing Facility. The Bankruptcy Court approved the Franchise Fee Stipulation by Order entered on September 26, 2006 (P-1170), and the Bankruptcy Court approved the Consumer Taxes Stipulation by Order entered on October 12, 2006 (P-1194). Thereafter, the City withdraw its proofs of claim for these amounts.

## 12.    Setoff of Funds and the Capital One Adversary Proceeding

On the Petition Date, Capital One was the Holder of a Secured Claim, represented by that certain promissory note, dated July 6, 2005, by ENOI, in favor of Capital One, in the principal amount of $15,000,000 (the "Promissory Note"). ENOI's obligations to Capital One pursuant to and under the Promissory Note are secured by a Lien on all of ENOI's accounts receivable from its retail electric and natural gas utility customers and, according to Capital One, subject to the setoff rights provided in the applicable documents. As of the Petition Date, the Debtor had borrowed the full principal amount available under the Line of Credit, making the principal outstanding balance due on the Capital One Secured Claim, as of the Petition Date, $15,000,000. In its Proof of Claim, Capital One takes the position that, as of the Petition Date, ENOI was also liable for (a) $98,575 in accrued, unpaid interest, and (b) unspecified "fees" in the amount of $5,216.40.

On June 22, 2006, the Debtor Filed a Motion for an Order Authorizing and Directing the Setoff of Certain Frozen Funds on Deposit Against Money that the Debtor Owes Hibernia National Bank (now Capital One) (the "Setoff Motion") (P-924). Both before and after the Petition Date, ENOI maintained various bank accounts at Capital One. On the Petition Date, $15,057,050 was on deposit in one or more such accounts (the "Frozen Funds"). Pursuant to the DIP Financing Final Order, ENOI did not have authority to use, and did not use, the Frozen Funds. In the Setoff Motion, ENOI proposed (among other things) that the Frozen Funds be setoff against the Capital One Secured Claim. Capital One opposed the Setoff Motion, and Filed an adversary proceeding against ENOI, Entergy Corporation, and other ENOI Affiliates, in case no. 06-1153 on the Docket of the Bankruptcy Court (the "Capital One Adversary Proceeding"). In the Capital One Adversary Proceeding, currently pending before the Bankruptcy Court, Capital One seeks, among other things, a judgment that approximately $13.5 million of the Frozen Funds (a) was not property of ENOI, but instead was property of ESI and/or certain of ENOI's Affiliates that participate in the Entergy System Money Pool, and (b) was "earmarked" to pay Capital One. Based on the allegations and issues

presented in the Capital One Adversary Proceeding, Capital One asserts that one possible outcome of the Capital One Adversary Proceeding is that the Bankruptcy Court will order a reinstatement of a portion or all of the Capital One Secured Claim as it existed on the Petition Date.

The Bankruptcy Court entered an Order granting, in part, the Setoff Motion (P-1072) (the "Setoff Order"). Pursuant to the Setoff Order, the Frozen Funds were offset against a portion of the Disputed Capital One Secured Claim, as follows: (a) first to fees that Capital One, N.A. incurred as of the Petition Date in the amount of $5,216.40; (b) then to interest that accrued as of the Petition Date; and (c) then to principal. The Setoff Order clearly reserved for later determination the allowance of both interest on the Capital One loan documents for the period after the Petition Date, and attorneys' fees and other amounts recoverable under Capital One loan documents for the period after the Petition Date. The Debtor intends to object to Capital One's Proof of Claim, while Capital One has sought an Order in the Capital One Adversary Proceeding that the Capital One Secured Claim is an oversecured Claim and entitled to all the rights related thereto. The Setoff Order further states that "nothing in this Order adjudicates the rights of any party" in the Capital One Adversary Proceeding. A trial in the Capital One Adversary Proceeding is scheduled for April 30 and May 1, 2007. The Capital One Secured Claim is treated in Section 5.2 (Class 2) of the Debtor's Plan. For an additional discussion of the Capital One Secured Claim and the Capital One Adversary Proceeding, see Article VII.B.2 of the Debtor's Disclosure Statement, entitled, "Class 2 - Capital One Secured Claim."

### 13.   Adequate Protection for the Bonds

On July 27, 2006, the Bond Trustee and FGIC Filed a Motion for Adequate Protection Pursuant to sections 361 and 363(e) of the Bankruptcy Code (the "Adequate Protection Motion") (P-1048), seeking periodic cash payments in an amount equal to the monthly interest that would accrue on the Bonds, absent this Bankruptcy Case. The Debtor objected to the Adequate Protection Motion because, among other reasons, the value of the property securing the Bonds has improved, not deteriorated, since the Final DIP Financing Order was entered. At the conclusion of a hearing held on October 24, 2006, the Bankruptcy Court denied the Adequate Protection Motion, in its entirety (P-1275).

On December 8, 2006, the Debtor, the Bond Trustee and FGIC Filed a Stipulation (P-1469 and P-1478), wherein the Debtor offered (subject to Bankruptcy Court approval and the Filing of the Debtor's Plan) to begin making payments equal to the interest that accrues on the Bonds, at the non-default interest rates specified in the Bond Indenture and Mortgage or FGIC Insurance Agreements, as applicable. At a hearing held on December 19, 2006, the Bankruptcy Court entered that certain Stipulation and Order (P-1493), such that the Bankruptcy Court approved and authorized (among other things) the following:

(a)   The Debtor's payment to the Bond Trustee of an amount equal to the interest that has accrued on the Bonds and that is due to be paid (other than such interest that was previously paid by FGIC in respect of the Insured Bonds) from and including September 23, 2006 through and including the effective date of the Stipulation and Order (the "Initial Accrual Period");

(b)   The Debtor's reimbursement to FGIC of an amount equal to any and all amounts paid by FGIC pursuant to the Bond Indenture and Mortgage, the FGIC Insurance Agreements, and the Surety Bonds, during the Initial Accrual Period in respect of interest on the Insured

Bonds; *provided, however*, that the Debtor may cease, at its sole discretion, making such payments on the earlier of the date that the Debtor withdraws the Debtor's Plan, or the Bankruptcy Court denies confirmation of the Debtor's Plan;

(c)     The Debtor's payment to the Bond Trustee of an amount equal to any and all interest accruing on the Bonds when and as such amounts become due and payable in accordance with the Bond Indenture and Mortgage from and after the Initial Accrual Period through and including the Effective Date; *provided, however*, that the Debtor may cease, at its sole discretion, making such payments on the earlier of the date that the Debtor withdraws the Debtor's Plan, or the Bankruptcy Court denies confirmation of the Plan; and

(d)     As provided in Paragraph 9 of the Stipulation and Order, with respect to the interest that became due and payable on the Bonds during the period beginning on the Petition Date through September 23, 2006 (the "Interest Amount"), if the Effective Date shall not have occurred by June 30, 2007 (irrespective of whether the Bankruptcy Court grants an extension of the June 30, 2007 deadline for the Effective Date), the Debtor's payment to the Bond Trustee, or with respect to that portion of the Interest Amount that FGIC paid with respect to the Insured Bonds, to FGIC, of an amount equal to interest on the Interest Amount at the non-default rate specified in the Bond Indenture and Mortgage, or the interest rate under section 2.02 of the FGIC Insurance Agreements, as applicable, for the period beginning July 1, 2007, and ending on the earlier of the Effective Date or the date that the Debtor withdraws the Debtor's Plan, or the Bankruptcy Court denies confirmation of the Debtor's Plan. The Debtor's Plan defines the Bond Claim so as to comply with Paragraph 9 of the Stipulation and Order.

### 14.     **Formation of an Ad Hoc Bondholders' Committee**

Sometime in October, 2006, the Ad Hoc Bondholders Committee was formed. As of this time, the members of the Ad Hoc Bondholders Committee are Bay Harbour Management, Bay Harbour 90-1, Ltd., Bay Harbour Master LTD, Institutional Benchmarks Master Fund Limited, MSS Distressed & Opportunities 2, BHCO Master, Ltd., Drawbridge Special Opportunities Advisors LLC, Drawbridge DSO Securities LLC, Drawbridge OSO Securities LLC, Drawbridge Global Macro Master Fund Ltd., Catalyst Credit Opportunity Master Fund LLP, LYXOR Catalyst Credit Opportunity Ltd., Catalyst Investment Management Co., LLC, Luminous Management, LLC, Luminous Energy Partners Master Fund, LTD, Luminous Asset Partners, LP, and J.P. Morgan Securities Inc., each in its capacity as a Bondholder.

### 15.     **Termination of the Exclusive Periods**

From time to time, the Bankruptcy Court extended the Debtor's exclusive period to File and solicit acceptances of a plan of reorganization. The last extension expired on December 7, 2006, when the Bankruptcy Court refused to further extend the exclusive period, and granted a Motion Filed by the Creditors' Committee (P-1420) for an Order Terminating the Exclusive Periods Within Which the Debtor may File and Solicit Acceptances to a Plan of Reorganization and Authorizing the Committee to File and Solicit Acceptances for its Plan of Reorganization. The Bankruptcy Court further ordered that all proposed plans of reorganization and accompanying disclosure statements must be Filed by December 19, 2006, provided that FGIC could File a plan of reorganization until December 22, 2006 if the Debtor did not File a third

{N1609126.3}                                        - 28 -

amended plan of reorganization by December 19, 2006 (P-1495). At a hearing on December 19, 2006 with respect to the Stipulation and Order (P-1493), the Bankruptcy Court extended the December 19, 2006 deadline to December 20, 2006. As previously discussed, on December 20, 2006, the Debtor Filed a Fourth Amended Chapter 11 Plan of Reorganization, dated December 20 (P-1500), and the Creditors' Committee Filed the a Chapter 11 Plan of Reorganization, dated December 20, 2006 (P-1504). Thereafter, the Debtor Filed the Debtor's Plan on February 5, 2007, and the Committee Filed the Committee Plan on February 5, 2007. Neither FGIC nor any party other than the Debtor and the Creditors' Committee has Filed a plan of reorganization in the Bankruptcy Case.

## VI.   LITIGATION AGAINST DEBTOR

### A.   GORDON AND LOWENBURG RATEPAYER CASES

The Gordon and Lowenburg Plaintiffs are two separate groups of ratepayers who are involved in multiple actions against ENOI. The Lowenburg Suit, the Lowenburg Regulatory Proceeding, the Gordon Suit, and the Gordon Regulatory Proceeding (as those terms are defined below), were all filed before the Petition Date. After ENOI Filed its bankruptcy petition, the Gordon and Lowenburg Plaintiffs together Filed an adversary proceeding seeking a declaratory judgment (the "SBE Adversary Proceeding") that Entergy Corporation and Entergy Services are solidarily liable with ENOI for any and all liability, damages or relief of any kind for which ENOI may be found liable in the Gordon and Lowenburg Suits and the Gordon and Lowenburg Regulatory Proceedings. This liability is allegedly based in the single business enterprise and/or alter ego theory. The Gordon and Lowenburg Plaintiffs also Filed a motion for class certification and Proofs of Claim on behalf of the purported members of the Gordon and Lowenburg classes. The Gordon and Lowenburg Claims are treated as Class 7 (Litigation Claims) in the Debtor's Plan.

#### 1.   The SBE Adversary Proceeding

The Bankruptcy Court dismissed the SBE Adversary Proceeding initiated by the Gordon and Lowenburg Plaintiffs for failure to state a claim because Plaintiffs have no standing to assert the single business enterprise and/or alter ego claims (collectively, the "SBE claims") Adversary Proceeding 06-1012 (P-42). The Bankruptcy Court did not address the merits of the SBE claims themselves. Rather, the Bankruptcy Court held that the SBE claims are property of the bankruptcy estate as defined by section 541(a)(1) of the Bankruptcy Code, such that the automatic stay of section 362(a)(3) of the Bankruptcy Code bars anyone but the debtor-in-possession from asserting them. This ruling was appealed to the United States District Court for the Eastern District of Louisiana.

On October 6, 2006, Judge Duval of the Eastern District of Louisiana affirmed the dismissal, stating that the adversary proceeding brought by the Gordon and Lowenburg Plaintiffs was premature. The Gordon and Lowenburg Plaintiffs did not lodge a timely appeal from this decision. Other parties, such as the Creditors' Committee, may still attempt to assert the SBE claims.

#### 2.   The Motion for Class Certification and the Class Proofs of Claim

The Gordon and Lowenburg Plaintiffs, in addition to the SBE Adversary Proceeding, Filed a motion for class certification in the bankruptcy. Class certification was sought in order to legitimate the putative class Proofs of Claim Filed by the Gordon and Lowenburg Plaintiffs. The class Proofs of Claim, in turn, sought to preserve the claims of the class members purportedly represented by the

{N1609126.3}                                   - 29 -

Gordon and Lowenburg Plaintiffs in the Gordon and Lowenburg Suits, discussed below. ENOI moved for summary judgment against the Gordon and Lowenburg Plaintiffs on the issue of class certification, arguing that the Gordon and Lowenburg Regulatory Proceedings were superior to class action suits. The Bankruptcy Court denied class certification on October 13, 2006, partially granting ENOI's motion for summary judgment in both of these proceedings. The Bankruptcy Court, however, partially denied ENOI's motion for summary judgment, finding the "documentation appended to each Proof of Claim filed by each group is sufficient at this time" (P-1209 and P-1210).

### 3. The Lowenburg Suit and the Lowenburg Regulatory Proceeding

On April 15, 1998, Thomas P. Lowenburg, Martin Adamo, Vern K. Baxter, Philip D. Carter, Bernard Gordon, Leonard Levine, Ivory S. Madison, and Maison St. Charles, LLC d/b/a Quality Inn Maison St. Charles (collectively, the "Lowenburg Plaintiffs") filed a class action petition against ENOI (the "Lowenburg Suit"). *See Thomas P. Lowenburg, et al. v. Entergy New Orleans, Inc.,* Case No. 98-6638 Section 15, Division L, Civil District Court, Parish of Orleans, State of Louisiana. The Lowenburg Plaintiffs alleged that ENOI unlawfully charged rates in violation of Council of the City of New Orleans ("City Council") Ordinance No. 6833 (the "Settlement Ordinance"). Simply stated, the Lowenburg Plaintiffs argued that (a) the Settlement Ordinance set a ceiling upon the rate-of-return ENOI could earn, so (b) even though the City Council adjusted rates with the clear intention of allowing ENOI a greater rate-of-return, and (c) all rate increases providing a rate-of-return above the alleged ceiling were unlawful because the City Council adjusted them by resolution, rather than by ordinance as allegedly required.

After the state trial court overruled ENOI's exception of lack of subject matter jurisdiction, the Louisiana Fourth Circuit Court of Appeal reversed the trial court and ordered dismissal of the Lowenburg Suit on May 17, 2000, for lack of jurisdiction. The appellate court so ordered because the City Council has exclusive, original jurisdiction over matters involving regulation of utility rates. *Lowenburg v. Entergy New Orleans, Inc.,* 1999-1270 (La. App. 4 Cir. 5/17/00), 763 So.2d 751. Consequently, the Lowenburg Plaintiffs filed a complaint with the City Council (the "Lowenburg Regulatory Proceeding") asserting the same allegations contained in the Lowenburg Suit—that ENOI allegedly charged unlawful rates in excess of the allowable rate-of-return permitted by the Settlement Ordinance. On April 20, 2006, the City Council found, on numerous grounds, that the rates charged by ENOI were lawful. *See* City Council Resolution No. R-06-166. Therefore, the City Council held that the Lowenburg Plaintiffs, and the ratepayers they sought to represent, were not entitled to any recovery.

The Lowenburg Plaintiffs appealed the ruling of the City Council to the Civil District Court for Orleans Parish, where it remains pending. *See Lowenburg, et al. v. Entergy New Orleans, Inc., et al.,* Case No. 2006-4163 Division D, Section 16 (subsequently transferred to Division A), Parish of Orleans, State of Louisiana.

### 4. The Gordon Suit and the Gordon Regulatory Proceedings

On April 8, 1999, the Reverend C. S. Gordon, Jr. on behalf of New Zion Baptist Church, J. Michael Malec, Darryl Malek-Wiley, Willie Webb, Jr., and Maison St. Charles, LLC, d/b/a Quality Inn Maison St. Charles (collectively, the "Gordon Plaintiffs"), filed a class action petition against ENOI (the "Gordon Suit"). *Reverend C.S. Gordon, Jr., et al. v. Entergy New Orleans, Inc., et al.,* Case No. 99-5707, Division D, Section 11, Civil District Court, Parish of Orleans, State of Louisiana. The Gordon Plaintiffs in the Gordon Suit allege, *inter alia,* that ENOI improperly included certain

charges in its fuel adjustment clause and therefore overcharged customers. Like the Lowenburg Plaintiffs, the Gordon Plaintiffs were required by state law to bring their claims first before the City Council. The parties agreed that the Civil District Court Suit should be stayed pending a decision by the City Council, and the court so ordered. After the Bankruptcy Case was Filed, ENOI removed the Gordon Suit to the Eastern District of Louisiana where it is pending but stayed by both the earlier stay order and the automatic bankruptcy stay. The Gordon Suit has been, therefore, essentially dormant since its inception seven years ago.

As in Lowenburg, the Gordon Plaintiffs filed a complaint with the City Council on May 12, 1999, that made the identical claims alleged in the Gordon Suit (the "Gordon Regulatory Proceeding"). On February 5, 2004, the City Council issued findings of fact and conclusions of law in the Gordon Regulatory Proceeding, *see* City Council Resolution No. R-04-66, and ordered a refund of $11,310,072 to ratepayers, which ENOI paid through customer refunds in 2004. The Gordon Plaintiffs appealed the City Council's decision to the Civil District Court for the Parish of Orleans, which affirmed. The Gordon Plaintiffs then appealed (the "Gordon Regulatory Appeal") to the Louisiana Court of Appeal the Fourth Circuit, where it remains pending.

### 5.   The Future of the Gordon Suit and the Lowenburg Suit

Although the Gordon Plaintiffs and Lowenburg Plaintiffs argue that they may proceed with their putative class suits upon conclusion of their respective Regulatory Proceedings, ENOI disputes this position. The City Council heard and determined all of the issues raised in each Regulatory Proceeding, which are identical to the issues raised in the respective suits. Thus, under Louisiana's Constitution, any further relief from the City Council's decisions is limited to appellate review by the state courts of Louisiana. Additional relief or further review by any other court would usurp the City Council's constitutionally granted regulatory authority.

Thus, as of now, ENOI has no liability to either the Gordon Plaintiffs or the Lowenburg Plaintiffs. Only if they are successful in their respective appeals of the respective Regulatory Proceedings would ENOI be liable to the appellants.

On January 2, 2007, the Gordon Plaintiffs Filed a Motion for Relief from Automatic Stay Combined with Memorandum in Support Thereof (the "Stay Motion") (P-1526), wherein they sought relief from the automatic stay for the sole purpose of seeking class certification in the Gordon Suit, pending in the United States District Court for the Eastern District of Louisiana. The Gordon and Lowenburg withdrew, without prejudice, the Stay Motion (P-1638), based on certain changes that the Debtor has made to the Debtor's Plan.

### B.   COMPROMISE OF CERTAIN INSURANCE COVERAGE CLAIMS

On September 7, 2006, the Debtor Filed a Motion for an Order Approving the Compromise of Certain Insurance Claims by and between the Debtor and American Motorists Insurance Company (P-1119). In that Motion, ENOI sought authority to compromise its insurance coverage claims against American Motorists Insurance Company ("AMICO"), related to potential asbestos and other alleged tort exposures that occurred during the construction of two ENOI-owned powerhouses, for $800,000, payable in two installments, in exchange for (a) ENOI's release of rights to certain insurance policies, and (b) ENOI's limited agreement to defend and hold AMICO harmless, up to $800,000, for certain specified "Indemnified Claims" as defined in the motion. The Bankruptcy Court granted the Motion to compromise on September 27, 2006 (P-1174). On October 11, 2006, the

Debtor received $400,000 of the settlement funds, minus the 17% contingent fee approved by the Bankruptcy Court for the Debtor's consultants (the "Contingent Fee"). The Debtor is scheduled to receive the additional amount of $400,000 (minus the Contingent Fee) on or before December 31, 2006.

## C.   TAX DISPUTES

The Debtor Filed an Objection under Section 502(a) and (c) of the Bankruptcy Code to the Allowance of the Proofs of Claim Filed by the Internal Revenue Service (P-1059). In that Objection, the Debtor sought to have IRS Proof of Claim no. 176 (the "IRS Claim") estimated at zero, because Claims asserted therein are unliquidated and liquidation would unduly delay the administration of the Bankruptcy Case.   Pursuant to that certain Entergy Corporation and Subsidiary Companies Intercompany Income Tax Allocation Agreement, dated April 28, 1988, as amended through the date hereof (the "Income Tax Allocation Agreement"), the Debtor is one of many members of a federal income tax consolidated group (the "Entergy Consolidated Tax Group"). The Claims asserted in the IRS Claim arise out of potential tax liability of the Entergy Consolidated Tax Group, and exceed $2.5 billion.  Determining the tax liability of the Entergy Consolidated Tax Group will be a lengthy process, including administrative appeal rights and possible litigation.  Based upon past experience, the entire process could take years to conclude.

In order to determine its tax liability, ENOI believed that it would be in its best interests for ENOI to participate in proceedings before the United States Tax Court with respect to Disputed Tax Claims for 1997 through 2000.  As such, ENOI Filed a Motion for an Order Approving an Agreement to Modify the Automatic Bankruptcy Stay to Permit Liquidation of Certain Disputed Claims in the United States Tax Court (P-1101).  The Bankruptcy Court granted the Motion to Modify the Stay such that tax claims for 1997 through 2000 could be liquidated (P-1148).  The automatic stay was not modified (a) with respect to the Disputed Tax Claims for 2002, Disputed Tax Claims for 2003, and Disputed Tax Claims for 2004, or (b) to permit the IRS to attempt to collect from ENOI any part of any judgment or ruling that may be rendered by the United States Tax Court.

The IRS and Debtor have an agreement in principle (subject to Bankruptcy Court approval) to enter into a stipulation pursuant to which the proper amount of the IRS Claims will be determined administratively or in litigation outside the Bankruptcy Court in a court or courts chosen by Entergy Corporation, the common parent of the Entergy Consolidated Tax Group (the "IRS Stipulation"). Pursuant to the IRS Stipulation, the IRS and Debtor expect to agree that the Allowed Amount of the IRS Claims will be that amount of the Entergy Consolidated Tax Group's tax liability, as finally determined administratively or through the non-bankruptcy litigation, less all amounts paid or credited for and on behalf of the Entergy Consolidated Tax Group in respect of that liability. The Debtor expects that the IRS will not have an Allowed Claim.

## D.   THE ODOM CLAIM

Todd Odom ("Odom") sued ENOI and his landlord in the Civil District Court for the Parish of Orleans. He sought damages for personal injuries he sustained after an explosion/fire in his apartment. A jury found ENOI 86% at fault for Odom's injuries and assessed a total of $11,458,000 in damages.  The district court signed a judgment consistent with the jury's verdict on March 12, 2005. ENOI timely moved for a judgment notwithstanding verdict, or alternatively, a new trial. The aftermath of Hurricane Katrina prevented further proceedings from taking place before ENOI Filed

for bankruptcy protection. The case proceeded in Civil District Court only after the Bankruptcy Court modified the automatic stay so that the Claim against ENOI could be liquidated in state court.

On July 25, 2006, the state court judge presiding over the case rejected most of ENOI's post-trial arguments, including arguments about the significance of new evidence that suggested the potential bribery of a key witness, and denied ENOI's motion for a judgment notwithstanding verdict. The court also rejected ENOI's alternative request for a new trial. The court did grant a remittitur, however, after recognizing a major error in the calculation of damages. The judge reduced the plaintiff's award for "future life care costs" accordingly to approximately $2.8 million. The court formally signed the judgment on August 10, 2006, casting ENOI in judgment to the plaintiff in the amount of $8,378,262.44. ENOI timely moved for a suspensive appeal of the verdict to the Louisiana Fourth Circuit Court of Appeal. The appellate court has not yet rendered a decision in that case.

## E.    OTHER LITIGATION MATTERS

### 1.    Disputed Asbestos Claims

ENOI is presently a defendant in a number of asbestos-related personal injury lawsuits. The plaintiffs allege that they were exposed to asbestos while working at ENOI facilities. The claims generally fall within three categories. The first category includes former employees of ENOI. The second category includes employees of subcontractors who worked at Michoud Unit 1, 2, and/or 3 during their initial construction, which took place between 1954 and 1967. The third category includes employees of subcontractors who worked at either Michoud, A.B. Paterson or Market Street performing maintenance or during turnarounds. The categories are not mutually exclusive.

### 2.    Disputed Property Loss, Personal Injury and Death Claims

ENOI is a party to numerous suits in which claims are asserted against it arising from casualty occurrences that resulted in property damage, as well as personal injuries and/or deaths of certain individuals. These include losses arising from motor vehicle accidents, electrical contact incidents, fires, excavation activities, and various tasks associated with the operation of the Debtor's electrical and natural gas distribution systems. Each of these suits involve claims that the Debtor Disputes in whole or in part, as to liability and/or the amount of recovery sought by the opposing party. ENOI is also a party plaintiff in several suits in which it is asserting claims against other parties, seeking recovery of damage to its property or facilities, in which the opposing parties have disputed liability to the debtor and/or the amount of damages the Debtor claims. Suits filed against the Debtor have been stayed in accordance with applicable law. The Debtor continues to prosecute suits seeking to recoup pre-petition casualty losses.

### 3.    Disputed Employment Discrimination Claims

ENOI is presently a defendant in an age discrimination suit involving a number of plaintiffs. Efforts to have a class certified failed. The plaintiffs were employed by a number of Entergy entities in Louisiana, including ENOI. Their claims generally fall into two categories. The first are employees who were terminated during various reorganization efforts Entergy implemented in the early 1990s. The second group involves employees whose employment ended through a ranking process that was implemented in 1994. Claims made by non-ENOI employees continue to be

litigated in the 24th JDC, but the Claims of ENOI employees have been stayed by the automatic bankruptcy stay.

### 4. Disputed Contract Claims

ENOI is a party to a few suits or disputes in which claims are asserted by or against it arising from commercial disputes. These consist of disputes as to fulfillment of contract terms including whether payments are due under such terms. ENOI is also a party plaintiff in suits in which it is asserting claims against other parties, asserting claims for breach of contract, in which the opposing parties have disputed liability to the Debtor and/or the amount of damages the Debtor claims. Any pre-petition suits filed against the Debtor have been stayed in accordance with applicable law. The Debtor continues to prosecute suits seeking to recoup pre-petition commercial claims.

### 5. Workers' Compensation Claims

ENOI has one administrative proceeding pending against it. The claims arise from a dispute over payment of workers' compensation benefits due as of the Petition Date. The benefits at issue were paid after the Bankruptcy Court granted ENOI permission to pay such claims. Claims for penalties for discontinuing the payments after the Petition Date are still pending against ENOI. The litigation has been stayed. The Louisiana Workers' Compensation Corporation Filed a Proof of Claim in the amount of $575,668.68. It represents a workers' compensation lien for payments made to Otoniel Romero from October 1, 1992 through March 13, 2006. In addition, Otoniel Romero Filed a Proof of Claim in the amount of $500,000. The Debtor disputes both of those Proofs of Claim.

## VII.  THE DEBTOR'S PLAN OF REORGANIZATION

The Debtor's Plan classifies Claims and Interests separately and provides different treatment for different Classes of Claims and Interests in accordance with the provisions of the Bankruptcy Code. As described more fully below, the Debtor's Plan provides, separately for each Class, that Holders of certain Claims and Interests will receive various amounts and types of consideration, thereby giving effect to the different rights of Holders of Claims and Interests in each Class. The Debtor's Plan provides that the Reorganized Debtor, or an entity designated by the Reorganized Debtor, shall act as the Disbursing Agent. At this time, the Debtor intends to act as the Disbursing Agent.

### A.  UNCLASSIFIED ADMINISTRATIVE CLAIMS AND CERTAIN FEES AND TAXES

#### 1.  Administrative Claims

Administrative Claims are Claims for costs or expenses of administration of the Bankruptcy Case Allowed under sections 503(b), 507(a)(1) or 1114(e)(2) of the Bankruptcy Code. Such Claims include the actual and necessary costs and expenses of preserving the Estate incurred after the Petition Date. Except as otherwise provided herein or unless agreed in a written agreement by and between the Holder of an Administrative Claim and the Debtor or Reorganized Debtor, each Holder of an Allowed Administrative Claim will receive from the Reorganized Debtor, in full satisfaction of its Administrative Claim, Cash equal to the allowed amount of such Administrative Claim either (a) within fifteen (15) days of the Administrative Claims Bar Date, or (b) if the Administrative Claim is

not Allowed on or before the Effective Date, within thirty (30) days after the date on which (i) an Order that Allows such Administrative Claim becomes a Final Order, or (ii) a Stipulation of Amount and Nature of Claim is executed by the Reorganized Debtor and the Holder of such Administrative Claim. Except as provided under applicable law or certain agreements with the Debtor approved by the Bankruptcy Court and which are incorporated into and made a part of the Debtor's Plan, post-petition interest will not be paid on Allowed Administrative Expense Claims.

ENOI estimates that it will have unpaid Administrative Trade Claims as of June 30, 2007, in the approximate amount of $41 million, based on the Debtor's estimate of one month's accounts payable as of the Effective Date. ENOI further estimates that its unpaid DIP Financing Claim as of June 30, 2007 will be approximately $63.5 million. Finally, the Debtor estimates that it will have the following additional unpaid Administrative Claims in the approximate aggregate amount, as of June 30, 2007, of $8.2 million, consisting of the following: (a) the Bond Trustee's Professional Fee Claim in the approximate amount of $1,225,000; (b) the Bond Trustee's Claim in the approximate amount of $30,000; (c) the FGIC Professional Fee Claim in the approximate amount of $1,500,000; (d) the FGIC Cure Amount Claim in the approximate amount of $4,500,000; and (f) the remaining Cure Amount Claims, assuming the Debtor does not have to pay any Cure Amount Claim in order to assume the UPSA or the PPA, in the approximate amount of $1,000,000.

## 2. Professional Fee Claims

The Debtor will pay Professional Fee Claims for the compensation of professionals and reimbursement of expenses incurred by such professionals, the Creditors' Committee and members of the Creditors' Committee pursuant to sections 330(a), 503(b)(2), 503(b)(3), 504(b)(4), and 503(b)(5) of the Bankruptcy Code. All payments to professionals for Professional Fee Claims be made in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court relating to the payment of interim and final compensation for services rendered and reimbursement of expenses. The Bankruptcy Court will review and determine all applications for compensation for services rendered and reimbursement of expenses.

Based on past invoices, the Debtor estimates that the Professional Fee Claims will be roughly $700,000 as of June 30, 2007, including $300,00 for the Professionals retained by the Creditors' Committee, and $400,000 for the Professionals retained by the Debtor.

## 3. U. S. Trustee Fees

On or before the Effective Date, fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6), will be paid by the Debtor or the Disbursing Agent in Cash. All fees payable pursuant to 28 U.S.C. § 1930(a)(6) will be paid by the Reorganized Debtor in accordance therewith until the closing of the Bankruptcy Case pursuant to section 350(a) of the Bankruptcy Code.

## 4. Ordinary Course Liabilities

As provided in Section 4.2(a)(iii) of the Debtor's Plan, Allowed Administrative Claims based on liabilities incurred by the Debtor in the ordinary course of its business (including Administrative Trade Claims, Administrative Claims of governmental units for Taxes, including Tax audit Claims related to tax years commencing after the Petition Date, Allowed Administrative Claims of the PBGC, and Allowed Administrative Claims arising from those contracts and leases of the kind described in Section 8.2 of the Debtor's Plan, other than Cure Amount Claims) will be paid by the

Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, and Allowed Cure Amount Claims will be paid in accordance with Section 8.2 of the Debtor's Plan, in each case without any further action by the Holders of such Administrative Claims.

### 5.    The DIP Financing Claim

Unless otherwise agreed in a written agreement by and between Entergy Corporation and the Debtor or Reorganized Debtor, within fifteen (15) days of the Effective Date, the DIP Financing Claim will be paid in full in Cash, without any further action by Entergy Corporation; *provided, however,* that the Bankruptcy Court will resolve any dispute between the Debtor and Entergy Corporation regarding the amount of the DIP Financing Claim; and further provided that the portion of the DIP Financing Claim constituting the Subordinated DIP Financing Claim will be paid as provided in Section 4.1(a)(iv) of the Debtor's Plan.

### 6.    The Subordinated DIP Financing Claim

Under Section 4.1(a)(v) of the Debtor's Plan, the Subordinated DIP Financing Claim will be paid in full in Cash, without any further action by Entergy Corporation, within ten (10) days from the date that all other Allowed Claims are paid when they are due under the Debtor's Plan.

### 7.    Bond Trustee's Professional Fee Claim.

Section 4.2(a) of the Debtor's Plan provides that the Bond Trustee's Professional Fee Claim shall be Allowed in accordance with the terms and procedures set forth in the Fee Order. Within fifteen (15) days after the Effective Date, the Bond Trustee will receive from the Reorganized Debtor Cash equal to the amount of such Allowed Bond Trustee's Professional Fee Claim (to the extent not previously paid by the Debtor) in full satisfaction of the Bond Trustee's Professional Fee Claim, and neither the Bond Trustee nor the Bond Trustee's Professionals shall have any additional Claim against the Debtor or Reorganized Debtor for services rendered by the Bond Trustee's Professionals in connection with the Bankruptcy Case through the Effective Date. The Bond Trustee's Professional Fee Claim in respect of its financial advisors, Houlihan, Lokey, Howard, Zukin, shall be deemed Allowed on the Effective Date in the following amounts, exclusive of amounts previously paid by the Debtor (it being agreed that the following amounts are reasonable based on the settlement among the parties related to the DIP Financing Final Order, the settlement in the Debtor's Plan among the parties, including FGIC, the Bond Trustee, the Ad Hoc Bondholders' Committee and the Debtor (as discussed in more detail at Article VII.B.3 of this Disclosure Statement, entitled, "Class 3--Bond Claims)," as well as the contributions of the Bond Trustee's Professionals in the Bankruptcy Case and to the formulation of the Debtor's Plan): $150,000 plus reasonable expenses for each month from the Petition Date through November 30, 2006; $75,000 plus reasonable expenses for the month of December 2006; $37,500 plus reasonable expenses per month from January 2007 through the month that the Confirmation Date occurs; and $25,000 plus reasonable expenses per month thereafter through the month that the Effective Date occurs. As part of the settlement related to the DIP Financing Final Order, and as further detailed in the Fee Order, the Debtor agreed to pay the Bond Trustee's Professional Fee Claim. The Debtor continues to believe such payment is justified.

As provided in Section 4.3(a) of the Debtor's Plan and the Fee Order, the Debtor's payment of the Bond Trustee's Professional Fee Claim (including the fees and expenses of Houlihan) shall remain subject to a reasonableness review by the Bankruptcy Court pursuant to the Fee Order.

## 8. The Bond Trustee's Claim.

Pursuant to Section 4.2(b) of the Debtor's Plan, the Bond Trustee's Claim shall be Allowed in accordance with the terms and procedures set forth in the Fee Order. Within fifteen (15) days after the Effective Date, the Bond Trustee will receive from the Reorganized Debtor Cash equal to the amount of such Allowed Bond Trustee's Claim (to the extent not previously paid by the Debtor) in full satisfaction of the Bond Trustee's Claim, and the Bond Trustee shall have no additional Claim against the Debtor or Reorganized Debtor for services rendered or expenses incurred on or before the Effective Date in connection with the Bankruptcy Case. As provided in the Fee Order and Section 4.3(b) of the Debtor's Plan, the Debtor's payment of the Bond Trustee's Claim shall remain subject to a reasonableness review by the Bankruptcy Court pursuant to the Fee Order. As part of the settlement related to the DIP Financing Final Order, and further detailed in the Fee Order, the Debtor previously agreed to pay the Bond Trustee's Claim. The Debtor continues to believe such payment is justified.

## 9. FGIC Professional Fee Claim.

Section 4.3 of the Debtor's Plan provides that the FGIC Professional Fee Claim shall be Allowed in accordance with the terms and procedures set forth in the Fee Order, regardless of whether the applicable FGIC Professional has been previously determined to be a "Lender Professional" covered by the Fee Order. Within fifteen (15) days after the Effective Date, FGIC will receive from the Reorganized Debtor Cash equal to the amount of such Allowed FGIC Professional Fee Claim (to the extent not previously paid) in full satisfaction of the FGIC Professional Fee Claim, and neither FGIC nor the FGIC Professionals shall have any additional Claim against the Debtor or Reorganized Debtor for services rendered by the FGIC Professionals in connection with the Bankruptcy Case through the Effective Date. The FGIC Professional Fee Claim in respect of its financial advisors, The Blackstone Group, LP ("Blackstone"), shall be Allowed (regardless of whether The Blackstone Group, LP is a "Lender Professional" covered by the Fee Order) pursuant to the Debtor's Plan in the amount of $750,000 plus reasonable expenses. The Debtor has agreed that $750,000 is a reasonable fee for Blackstone, and that the payment is justified based on Blackstone's contributions to the settlement contained in the Debtor's Plan among the parties, including FGIC, the Bond Trustee, the Ad Hoc Bondholders' Committee and the Debtor, as well as Blackstone's contributions in the Bankruptcy Case and to the formulation of the Debtor's Plan. As provided in Section 4.3 of the Debtor's Plan, the Debtor's payment of the FGIC Professional Fee Claim (including the fees and expenses of The Blackstone Group, LP) shall remain subject to a reasonableness review by the Bankruptcy Court either pursuant to the Fee Order, if applicable, or otherwise, in the Bankruptcy Court's discretion.

## 10. Priority Tax Claims

Section 4.5 of the Debtor's Plan provides that, unless otherwise agreed in a written agreement by and between the Holder of a Priority Tax Claim and the Debtor or Reorganized Debtor, each

Holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Priority Tax Claim, deferred Cash payments over a period not exceeding six (6) years from the date of assessment of such Priority Tax Claim. Payments will be made in equal quarterly installments of principal (commencing on the later of the Effective Date and the first Quarterly Distribution Date following the date such Claim becomes an Allowed Claim), plus simple interest accruing from the Effective Date at the rate publicly quoted on the Confirmation Date by The Wall Street Journal as the "base rate on corporate loans posted by at least 75% of the nation's 30 largest banks" on the unpaid portion of each Allowed Priority Tax Claim (or upon such other terms determined by the Bankruptcy Court to provide the Holders of Priority Tax Claims with deferred Cash payments having a value, as of the Effective Date, equal to the allowed amount of such Priority Tax Claims). The Reorganized Debtor will have the right to pay any Allowed Priority Tax Claim, or any remaining balance of such Priority Tax Claim, in full at any time on or after the Effective Date, without premium or penalty.

Notwithstanding the provisions of Section 4.4(a) of the Debtor's Plan, the Holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. ENOI estimates that the Allowed Priority Tax Claim owed to the Louisiana Department of Revenue total $2,026,703, while the Allowed Priority Tax Claim owed to the IRS is $0.

## B.    TREATMENT OF CLASSIFIED CLAIMS

### 1.    Class 1 – Other Priority Claims

Class 1 consists of the Other Priority Claims. The Debtor estimates that the Allowed Other Priority Claims total $-0-. Under the treatment proposed in Section 5.1 of the Debtor's Plan, and as described below, the Other Priority Claims in Class 1 are Unimpaired under the Debtor's Plan. Therefore, the Debtor shall not solicit acceptances of the Debtor's Plan from Holders of Other Priority Claims.

The Debtor's Plan provides for the following treatment of Other Priority Claims. Unless otherwise agreed in a written document by and between the Holder of an Other Priority Claim and the Debtor or Reorganized Debtor, in full satisfaction of the Holder's Other Priority Claim, each Holder of an Other Priority Claim (Class 1) will receive Cash in an amount equal to the Allowed amount of such Holder's Other Priority Claim. If the Holder's Other Priority Claim is Allowed on or before the Effective Date, the Disbursing Agent will make the distribution to such Holder within fifteen (15) days of the Effective Date. If, however, the Holder's Class 1 Claim is not Allowed on or before the Effective Date, the Disbursing Agent will make the distribution to such Holder within fifteen (15) days after the earlier of the date on which (a) an Order allowing the Other Priority Claim becomes a Final Order, or (b) such Holder and the Debtor or Reorganized Debtor execute a Stipulation Regarding the Amount and Nature of the Claim.

### 2.    Class 2 – Capital One Secured Claim

Class 2 consists of the Capital One Secured Claim. The Debtor Disputes the amount of the Capital One Secured Claim. (For a discussion of the Capital One Adversary Proceeding, see Article V.D.12 of the Debtor's Disclosure Statement, entitled, "Setoff of Funds and the Capital One Adversary Proceeding.") Capital One asserts a Claim for all interest, fees, costs, and other amounts to which it is entitled as an oversecured creditor. Capital One has informed the Debtor that those amounts would be approximately $1,025,000 as of November 30, 2006. Capital One also asserts

that, based on the allegations and issues presented in the Capital One Adversary Proceeding, one possible outcome of the Capital One Adversary Proceeding is that the Bankruptcy Court will order a reinstatement of a portion or all of the Capital One Secured Claim as it existed on the Petition Date. Under the treatment proposed in Section 5.2 of the Debtor's Plan, and as described below, the Capital One Secured Claim is Impaired under the Debtor's Plan. Therefore, the Debtor shall solicit acceptances of the Debtor's Plan from Capital One.

Unless Capital One and the Debtor or Reorganized Debtor otherwise agree, in writing, in full satisfaction of the Capital One Secured Claim, Capital One will receive Cash in an amount equal to the Allowed amount of the Capital One Secured Claim. If the Capital One Secured Claim is Allowed on or before the Effective Date, the Disbursing Agent will make the distribution to Capital One within fifteen (15) days of the Effective Date. If, however, the Capital One Secured Claim is not Allowed on or before the Effective Date, the Disbursing Agent will make the distribution to Capital One within fifteen (15) days after the earlier of the date on which (a) an Order that Allows the Capital One Secured Claim becomes a Final Order, or (b) Capital One and the Debtor or Reorganized Debtor execute a Stipulation Regarding the Amount and Nature of the Claim. In any event, payment in Cash of the Allowed Capital One Secured Claim is conditioned on the simultaneous execution and delivery by the Holder of the Lien in the Capital One Collateral of all necessary documentation to effect a full release of such Lien. Unless and until payment is made, the Capital One Collateral will continue to secure the Capital One Secured Claim until the Capital One Secured Claim is satisfied.

### 3.    Class 3 – Bond Claims

The Bond Claims are treated in Class 3. On the Effective Date, the Bond Claims will be afforded the following treatment:

(a)    The Bond Collateral will continue to secure the Bond Claims as provided in the Bond Indenture and Mortgage, and the Bond Collateral will not be released, modified, cancelled or discharged under the Debtor's Plan or the Confirmation Order;

(b)    As defined in Section 1.27 of the Debtor's Plan, Bond Collateral collectively means all of Debtor's property and assets that collateralized and secured the Bond Claims as of immediately before the Petition Date, including but not limited to (irrespective of whether the Bond Trustee's security interest or Lien existed immediately before the Petition Date and/or pursuant to the DIP Financing Final Order), the Insurance Policies and Proceeds.

(c)    Immediately upon full payment of the DIP Facility, without the necessity of any further notice or Order, the Post-Petition Bond Liens will be dissolved and released, and until the DIP Facility is fully paid the Post-Petition Bond Liens shall remain in full force and effect;

(d)    The terms and conditions of the Bonds and the Bond Indenture and Mortgage (including without limitation the provisions of Section 9.05 of the Bond Indenture and Mortgage) and the FGIC Agreements will remain unaltered (and shall be supplemented by Section 5.3(c) of the Debtor's Plan, described below), the Bond Claims shall become obligations of the Reorganized Debtor, and the Reorganized Debtor shall have, undertake and perform all obligations to pay interest and principal, in such amounts and as and

{N1609126.3}                                    - 39 -

when due, pursuant to the Debtor's Plan, the Bonds, the Bond Indenture and Mortgage and the FGIC Agreements;

(e) Notwithstanding anything to the contrary, any and all defaults and events of defaults or events which, with the passage of time, the giving of notice or both, would constitute defaults or events of defaults or would otherwise give rise to the right to exercise remedies under the Bond Indenture and Mortgage or the Bonds, in each case occurring prior to the Effective Date, shall be deemed to be cured, without further action or notice (or, to the extent cure is not applicable, to be irrevocably waived as of the Petition Date in accordance with the terms thereof), by the treatment provided under the Debtor's Plan; and

(f) The Bond Claim shall be deemed Allowed pursuant to the Debtor's Plan, and the Disbursing Agent will distribute Cash to the Bond Trustee, for the benefit of the Bondholders, in an amount equal to the following: (i) any unpaid interest as of the Effective Date (whether accruing before or after the Petition Date), notwithstanding any stipulation regarding interest contained in the DIP Financing Final Order or otherwise, at the non-default rate provided in the Bond Indenture and Mortgage through September 24, 2006, in the approximate amount of $13,571,565, minus that portion of the FGIC Cure Amount Claim related to interest for such period; plus (ii) if the Effective Date has not occurred by June 30, 2007, interest at the applicable non-default rate provided in the Bond Indenture and Mortgage on the amount in clause (i) from and after June 30, 2007 until paid; plus (iii) interest on the outstanding principal amount of the Bonds at the applicable non-default rate provided in the Bond Indenture and Mortgage after September 24, 2006, net of any periodic Cash payments made by the Debtor on account of the Stipulation and Order, and, in each case to the extent applicable, minus that portion of the FGIC Cure Amount Claim related to interest for such period.

Pursuant to Section 5.3(c) of the Debtor's Plan, the Bond Trustee's Liens, security interests and rights in the Debtor's rights in the Insurance Policies and Proceeds (whether the Debtor, the Reorganized Debtor, Entergy Corporation and/or Entergy Services are named as the insured parties) are found and declared (and the Confirmation Order shall so find and declare) to be valid and fully perfected, and such Liens, security interests and rights are acknowledged, reaffirmed, regranted and perfected as a continuing security interest in the form of a collateral assignment or otherwise. Notwithstanding anything in the Bond Indenture and Mortgage to the contrary, the Debtor and the Reorganized Debtor grant to the Bond Trustee a security interest in the Debtor's and the Reorganized Debtor's rights with respect to such Insurance Policies and Proceeds, including the right to receive proceeds of the same from the named insured, whether such rights exist as general intangibles, accounts receivable or some other type of collateral, and the Debtor and the Reorganized Debtor will take all necessary action to evidence the perfection of such security interest. The Debtor and the Reorganized Debtor agree that, if it is not a named insured, it will cause the named insured to agree to receive and to distribute the Debtor's and the Reorganized Debtor's allocable share of the proceeds of such Insurance Policies and Proceeds in a manner consistent with the allocation provisions of the Katrina Insurance Protocol (whether in respect of insurance proceeds related to Hurricane Katrina or any other insurance proceeds as to which the Debtor and the Reorganized Debtor may now or in the future be entitled), and will

{N1609126.3}                                        - 40 -

provide notice to such named insured of the Bond Trustee's security interest in the Debtor's and the Reorganized Debtor's rights to receive such proceeds. The Confirmation Order shall set forth the foregoing provisions.

When ENOI issued the Insured Bonds, ENOI obtained insurance from FGIC, in the form of the Surety Bonds, to insure the timely payment of interest on and principal of the Insured Bonds. In connection with the issuance of the Surety Bonds, ENOI entered into the FGIC Insurance Agreements, and promised, among other things, to reimburse FGIC for any amounts of principal or interest FGIC was required to pay under the Surety Bonds. After the Petition Date, ENOI has failed to pay interest that became due and payable on the Insured Bonds, and FGIC has paid approximately $5.3 million under the Surety Bonds on account of such interest.

Section 5.3(b) of the Debtor's Plan provides as follows with respect to the FGIC Insurance Agreements and the Surety Bonds: (a) the legal, equitable, and contractual rights of FGIC and the Bond Trustee under the FGIC Insurance Agreements and the Surety Bonds shall remain unaltered and shall survive and be unaffected by entry of the Confirmation Order; (b) the legal, equitable, and contractual obligations of ENOI under the FGIC Insurance Agreements shall remain unaltered and the FGIC Insurance Agreements shall become obligations of the Reorganized Debtor; and (c) on the Effective Date, FGIC shall receive Cash in an amount equal to the FGIC Cure Amount Claim (which Claim shall be deemed Allowed pursuant to the Debtor's Plan) and, subject to the provisions of Section 4.3 of the Debtor's Plan, the FGIC Professional Fee Claim. Notwithstanding anything contained in the Debtor's Plan to the contrary, FGIC's rights under the Bond Indenture and Mortgage, the FGIC Insurance Agreements, and/or applicable law (including, without limitation, any and all subrogation rights) are expressly reserved under the Debtor's Plan; *provided, however*, notwithstanding anything to the contrary in this Section 5.3(b) of the Debtor's Plan, or any other provision of the Debtor's Plan, any and all defaults and events of defaults or events which, with the passage of time, the giving of notice or both, would constitute defaults or events of defaults or would otherwise give rise to the right to exercise remedies under the FGIC Insurance Agreements, in each case occurring prior to the Effective Date, shall be deemed to be cured, without further action or notice (or, to the extent cure is not applicable, to be irrevocably waived in accordance with the terms thereof), by the treatment provided under the Debtor's Plan.

Upon the occurrence of ENOI's payment default under the Bond Indenture and Mortgage, FGIC became entitled to "control and direct the enforcement of all rights and remedies with respect to the [Insured] Bonds (including but not limited to any right . . . to vote for approval of any plan of reorganization" (FGIC Insurance Agreements, at Section 5.03(a).) The Supplemental Bond Indentures and Mortgages for each series of the Insured Bonds contain similar provisions. Accordingly, FGIC is entitled to vote to accept or reject the Debtor's Plan as if it were the Holder of the Insured Bonds and the Confirmation Procedures Order (Exhibit B), and the Debtor's Plan acknowledges those voting rights. Under Section 5.3(d) of the Debtor's Plan, consistent with Section 5.03(a) of the FGIC Insurance Agreements and Section 2.03 of the supplemental indentures for the Sixteenth Bond Series and Seventeenth Bond Series, FGIC is entitled to vote to accept or reject the Debtor's Plan as if it were the Holder of the Insured Bonds.

Finally, under Section 5.3(e) of the Debtor's Plan, on the Effective Date, the Disbursing Agent will distribute Cash to the Ad Hoc Bondholders Committee, on behalf of the members of the Ad Hoc Bondholders Committee, in an amount equal to the Ad Hoc Bondholders Committee Fees. Notwithstanding the foregoing, the Debtor's payment of the Ad Hoc Bondholders Committee Fees shall be subject to a reasonableness review by the Bankruptcy Court either pursuant to the Fee Order, if applicable, or otherwise, in the Bankruptcy Court's discretion. The Debtor believes the payment of the Ad Hoc Bondholders Committee Fees is justified based on the Ad Hoc Bondholders Committee's contributions both in the Bankruptcy Case and the formulation of the Debtor's Plan.

As of the Petition Date, the following amounts were outstanding (principal and accrued interest): (a) as to the First Mortgage Bonds, 6.75% Thirteenth Series, due on October 15, 2017, in the original principal amount of $25,000,000, issued pursuant to the Bond Indenture and Mortgage on or about October 18, 2002, $25,037,500; (b) as to the First Mortgage Bonds 3.875% Fourteenth Series, due on August 1, 2008, in the original principal amount of $30,000,000, issued pursuant to the Bond Indenture and Mortgage on or about July 31, 2003, $30,167,916; (c) as to the First Mortgage Bonds, 5.25% Fifteenth Series, due on August 1, 2013, in the original principal amount of $70,000,000, issued pursuant to the Bond Indenture and Mortgage on or about July 31, 2003, $70,530,833; (d) as to the Insured Quarterly First Mortgage Bonds, 5.65% Sixteenth Series, due on September 1, 2029, in the original principal amount of $40,000,000, issued pursuant to the Bond Indenture and Mortgage on or about August 1, 2004, $40,058,511 (the "Sixteenth Bond Series"); (e) as to the Insured Quarterly First Mortgage Bonds, 5.60% Seventeenth Series, due on September 1, 2024, in the original principal amount of $35,000,000, issued pursuant to the Bond Indenture and Mortgage on or about August 15, 2004, $35,094,847 (the "Seventeenth Bond Series"); and (f) as to the First Mortgage Bonds, 4.98% Eighteen Series, due on July 1, 2010, in the original principal amount of $30,000,000, issued pursuant to the Bond Indenture and Mortgage on or about June 22, 2005, $30,377,650. In addition to principal and accrued interest as of the Petition Date, the Bond Claim includes interest that accrued on the Bonds after the Petition Date in the approximate amount of $9.1 million, which is net of (a) interest payments made by FGIC on the Insured Bonds, and (b) other payments made by the Debtor pursuant to the Stipulation and Order (P-1493).

The Debtor's Plan is a result of negotiations among numerous parties, including, the Bond Trustee, FGIC, and the Bondholders' Committee. FGIC and the Bond Trustee have indicated that they support the Debtor's Plan. Additionally, the members (the "Members") of the Bondholders' Committee (who have represented that they own, in the aggregate, more than $80 million in principal of Bond Claims) have indicated that they support the Debtor's Plan. As a result of those negotiations, the Debtor, Entergy Corporation, the Bond Trustee, FGIC, and the Members have executed that certain Lock Up and Voting Agreement, dated as of December 8, 2006 (the "Lockup"). Pursuant to the Lockup, and subject to the terms thereof, FGIC and the Members have agreed that upon Bankruptcy Court approval of the Disclosure Statement and receipt of the solicitation materials they will timely vote in favor of the Debtor's Plan and Entergy, the Bond Trustee, FGIC and the Members have agreed not to support, solicit, encourage or vote for any other plans of reorganization for the Debtor. The Lockup is binding on transferees of the Members, and expires on the earlier of June 30, 2007, and the date the Debtor's Plan is confirmed, or upon the occurrence of certain other events.

The treatment provided to the Bondholders, the Bond Trustee and FGIC pursuant to Section 5.3 of the Debtor's Plan, as well as the other applicable provisions of the Debtor's Plan,

shall be deemed to constitute a settlement and compromise of all issues and Claims by and between the Debtor, the Bondholders, the Bond Trustee and FGIC in accordance with the Debtor's Plan and pursuant to Bankruptcy Rule 9019. Before Filing the Debtor's Plan, the Debtor, Entergy Corporation, the Bond Trustee, FGIC and the Ad Hoc Bondholders' Committee engaged in numerous and often contentious negotiations concerning the terms of a plan of reorganization for the Debtor in an effort to resolve a variety of issues and disputes among the parties. These disputes included, among other things, issues with respect to the Final DIP Financing Order as it related to the extent and nature of the Bondholders' Liens, the Debtor's desire to have certain post-petition Liens granted to the Bondholders extinguished as of the Effective Date, the desire of the Bondholders to be paid the Bond interest that accrued during the first year of the Bankruptcy Case, and the extent to which the liquidity of the Debtor should be preserved following the Effective Date in order for ENOI to maintain a viable business going forward. Ultimately, the parties were able to reach agreement on a plan of reorganization for the Debtor which, if confirmed and consummated, will avoid what no doubt would have been costly and lengthy litigation among the parties.

### 4.     Class 4 – Other Secured Claims

Class 4 consists of the Other Secured Claims. The Debtor has not identified any Holders of Other Secured Claims and, therefore, estimates that the Allowed Other Secured Claims total $-0-. Under the treatment proposed in Section 5.4 of the Debtor's Plan and described below, the Other Secured Claims in Class 4 are Unimpaired under the Debtor's Plan. Therefore, the Debtor shall not solicit acceptances of the Debtor's Plan from Holders of Other Secured Claims.

Except as otherwise agreed, in writing, by the Holder of an Other Secured Claim and the Debtor or Reorganized Debtor, on the later of the Effective Date and the date on which such Claim is Allowed, each Holder of an Allowed Other Secured Claim will be entitled to receive treatment on account of such Allowed Other Secured Claim in the manner set forth in either Option A or B below, at the Debtor's election. The Debtor will be deemed to have elected Option B, except with respect to any Allowed Other Secured Claim as to which the Debtor elects Option A in a certification Filed within fifteen (15) days before the commencement of the Confirmation Hearing.

Option A:     Each Holder of an Allowed Claim in Class 4 with respect to which the Debtor or Reorganized Debtor elects Option A will receive, in satisfaction of its Allowed Class 4 Claim, Cash equal to the Allowed amount of such Claim.

Option B:     Each Allowed Claim in Class 4 with respect to which the Debtor or Reorganized Debtor elects Option B, or is deemed to have elected Option B, will be Unimpaired within the meaning of section 1123 of the Bankruptcy Code.

### 5.     Class 5 – General Unsecured Claims

Class 5 consists of General Unsecured Claims. The Debtor estimates that the Allowed General Unsecured Claims total approximately $29.5 million. Under the treatment proposed in Section 5.5 of the Debtor's Plan and as described below, the General Unsecured Claims in Class 5 are Impaired under the Debtor's Plan. Therefore, the Debtor will solicit acceptances of the Debtor's Plan from Holders of General Unsecured Claims.

{N1609126.3}                    - 43 -

Unless otherwise agreed in a written agreement by and between the Holder of a General Unsecured Claim and the Debtor or Reorganized Debtor, in full satisfaction of the General Unsecured Claim, each Holder of a General Unsecured Claim will receive one of the following alternative treatments:

Option A: If Class 5 votes to accept the Debtor's Plan in accordance with section 1126 of the Bankruptcy Code, each Holder of a General Unsecured Claim will receive Cash equal to the aggregate amount of (a) the Allowed amount of such Holder's General Unsecured Claim, and (b) interest on the principal amount of the Allowed amount of such Holder's General Unsecured Claim at the following per annum interest rates: (i) six percent (6%) from the Petition Date through December 31, 2005; (ii) eight percent (8%) from January 1, 2006 through December 31, 2006; and (iii) the applicable Louisiana judicial interest rate plus one percent (1%) from January 1, 2007, until paid. The Louisiana judicial interest rate for 2007 is nine and one-half percent (9.5%). The Debtor estimates that interest on the Allowed General Unsecured Claims, as of June 30, 2007, based on the foregoing interest rates, is approximately $4.2 million. If the Holder's General Unsecured Claim is Allowed on or before the Effective Date, the Disbursing Agent will make the distribution to the Holder within fifteen (15) days of the Effective Date. If, however, the Holder's General Unsecured Claim is not Allowed on or before the Effective Date, the Disbursing Agent will make the distribution to such Holder within fifteen (15) days after the earlier of the date on which (a) an Order allowing the General Unsecured Claim becomes a Final Order, or (b) the Holder and the Debtor or Reorganized Debtor execute a Stipulation Regarding the Amount and Nature of the Claim.

Option B: If Class 5 does not vote to accept the Debtor's Plan in accordance with section 1126 of the Bankruptcy Code, each Holder of a General Unsecured Claim will receive an General Unsecured Claim Note in the principal amount of the Allowed amount of such Holder's General Unsecured Claim. The General Unsecured Claim Notes will mature on the third anniversary of the Effective Date, and will bear interest at the following per annum rates: (i) from the Petition Date through December 31, 2005, at six percent (6%); (ii) from January 1, 2006 through December 31, 2006, at eight percent (8%); and (iii) from January 1, 2007, until paid, at the applicable Louisiana judicial interest rate plus one percent (1%); *provided, however,* that if the Holder has a General Unsecured Claim in the Allowed amount of $1,000 or less, such Holder will receive Cash equal to the principal amount of the Allowed amount of such Holder's General Unsecured Claim, together with interest at the following per annum rates: (i) from the Petition Date through December 31, 2005, at six percent (6%); (ii) from January 1, 2006 through December 31, 2006, at eight percent (8%); and (iii) from January 1, 2007, until paid, at the applicable Louisiana judicial interest rate plus one percent (1%). If the Holder's General Unsecured Claim is Allowed on or before the Effective Date, the Reorganized Debtor will issue the General Unsecured Claim Note to the Holder, or make the distribution if the Holder's General Unsecured Claim is in the Allowed amount of $1,000 or less, within fifteen (15) days of the Effective Date. If, however, the Holder's General Unsecured Claim is not Allowed on or before the Effective Date, the Reorganized Debtor will issue the General Unsecured Claim Note to the Holder, or make the Cash distribution if the Holder's General Unsecured Claim is in the Allowed amount of $1,000 or less, within fifteen (15) days after the earlier of the date on which (i) an Order allowing the General Unsecured Claim becomes a Final Order, or (ii) the Holder and the Debtor or Reorganized Debtor execute a Stipulation Regarding the Amount and Nature of the Claim.

### 6. Class 6 – Intercompany Claims

Class 6 shall consist of the Intercompany Claims. Based on the Debtor's review of the Proofs of Claim of the Debtor's Affiliates, the Debtor estimates that the Intercompany Claims total approximately $67 million. A schedule of the Intercompany Claims, to the extent such Intercompany Claims are fixed, liquidated and not disputed as of the date hereof, is attached to the Debtor's Disclosure Statement as Exhibit E. Under the Debtor's Plan, except as noted below, Intercompany Claims include any Claim by an Affiliate of the Debtor based upon the Debtor's defaults on an Executory Contract that the Debtor assumes pursuant to Article VIII of the Debtor's Plan and section 365 of the Bankruptcy Code to the extent that those defaults are for the period before the Petition Date. The exception is that, assuming the Debtor's assumption, Intercompany Claims do not include the Cure Amount Claims based on defaults under the (a) ISES PPA, (b) RB 30 PPA, (c) WBL PPA, or (d) UPSA.

Under the Debtor's Plan, for amounts owed by ENOI under the Services Agreement for the period before the Petition Date are treated as an Intercompany Claim, as opposed to a Cure Amount Claim, and are paid pursuant to the terms of an Intercompany Note. Under the treatment proposed in Section 5.6 of the Debtor's Plan and as described below, the Intercompany Claims in Class 6 are Impaired under the Debtor's Plan. Therefore, the Debtor will solicit acceptances of the Debtor's Plan from the Holders of Intercompany Claims.

In full satisfaction of the Intercompany Claims, each Holder of an Intercompany Claim will receive an Intercompany Note in the principal amount of the Allowed amount of such Holder's Intercompany Claim plus an amount equal to interest on such Allowed Claim at the following per annum rates: (a) from the Petition Date through December 31, 2005, at six percent (6%); (b) from January 1, 2006 through December 31, 2006, at eight percent (8%); and (c) from January 1, 2007, until the Effective Date, at the applicable Louisiana judicial interest rate plus one percent (1%). The Louisiana judicial interest rate for 2007 is nine and one-half percent (9.5%). Each Intercompany Note will mature on the third anniversary of the Effective Date, or, at the Debtor's option, upon the earlier sale, transfer or other disposition of all or substantially all of the Reorganized Debtor's distribution assets. The Intercompany Notes will bear per annum interest, until paid, at the applicable Louisiana judicial interest rate plus one percent (1%). If the Holder's Intercompany Claim is Allowed on or before the Effective Date, the Reorganized Debtor will issue the Intercompany Note to the Holder within fifteen (15) days of the Effective Date. If, however, the Holder's Intercompany Claim is not Allowed on or before the Effective Date, the Reorganized Debtor will issue the Intercompany Note to the Holder within fifteen (15) days after the earlier of the date on which (a) an Order allowing the Intercompany Claim becomes a Final Order, or (b) the Holder and the Debtor or Reorganized Debtor execute a Stipulation Regarding the Amount and Nature of the Claim; *provided, however,* that any such Stipulation Regarding the Amount and Nature of Claim must be approved by the Bankruptcy Court, after notice and hearing.

### 7. Class 7 – Litigation Claims

Class 7 consists of the Litigation Claims. The Disputed Claims of the Gordon and Lowenburg Plaintiffs are treated as Litigation Claims. ( For a discussion of the Disputed Claims of

the Gordon and Lowenburg Plaintiffs, see Article VI.A. of the Debtor's Disclosure Statement, entitled, "The Gordon and Lowenburg Ratepayer Cases and Article X.B.5, entitled, "Gordon and Lowenburg Ratepayer Cases.") Excluding the Gordon and Lowenburg Disputed Claims, the Debtor estimates that the Allowed Litigation Claims may range from approximately $4 million to $18.5 million. Because the Debtor believes that the Gordon and Lowenburg Plaintiffs will not be successful in asserting Claims against the Debtor, the Debtor estimates the Disputed Gordon and Lowenburg Claims at -0.- Under the treatment proposed in Section 5.7 of the Debtor's Plan and as described below, the Litigation Claims in Class 7 are Unimpaired under the Debtor's Plan. Therefore, the Debtor will not solicit acceptances of the Debtor's Plan from the Holders of the Litigation Claims. Unless otherwise agreed in a written agreement by and between the Holder of a Litigation Claim and the Debtor or Reorganized Debtor, each Litigation Claim will be Unimpaired, will not be discharged by the Confirmation of the Debtor's Plan, and the legal, equitable and contractual rights to which such Litigation Claim entitles the Holder of such Claim shall be unaltered by the Debtor's Plan.

### 8. Class 8 – Workers' Compensation Claims

Class 8 consists of Workers' Compensation Claims. The Debtor estimates that the Allowed Workers' Compensation Claims total $1.5 million, to be paid over the life of the Allowed Workers' Compensation Claims. Under the treatment proposed in Section 5.8 of the Debtor's Plan and as described below, the Workers' Compensation Claims in Class 8 are Unimpaired under the Debtor's Plan. Therefore, the Debtor will not solicit acceptances of the Debtor's Plan from the Holders of the Workers' Compensation Claims. The Disbursing Agent will pay all Workers' Compensation Claims that are Allowed and determined to be valid under applicable state law and the corresponding programs that the Debtor maintains, in accordance with the terms and conditions of such state law and such programs. Nothing in the Debtor's Plan shall be deemed to discharge, release, or relieve the Debtor or Reorganized Debtor from any current or future liability with respect to any Allowed Workers Compensation Claim, regardless of when the underlying injuries occurred.

### 9. Class 9 – Government Environmental Claim

Class 9 consists of the Government Environmental Claim. Although not liquidated and Disputed, the Debtor has reached an agreement in principle with the U.S. Government. Pursuant to that agreement, subject to the occurrence of the Effective Date, (a) the Government Environmental Claim will be deemed an Allowed Claim in the amount of $250,000, and (b) in full satisfaction of the Allowed Government Environmental Claim, within fifteen (15) days of the Effective Date, the Disbursing Agent will make distributions of $150,000 to the Louisiana Wildlife and Fisheries Foundation, and $100,000 to the U.S. Fish & Wildlife Service. Under the treatment proposed in Section 5.9 of the Debtor's Plan, the Government Environmental Claim is Unimpaired. Therefore, the Debtor will not solicit acceptances of the Debtor's Plan from the Holder(s) of the Government Environmental Claim.

### 10. Class 10 – Odom Claim

Class 10 consists of the Odom Claim. Under the treatment proposed in Section 5.10 of the Debtor's Plan, and as discussed below, the Odom Claim is Impaired. Therefore, the Debtor will solicit acceptances of the Debtor's Plan from the Holder(s) of the Odom Claim. The Odom Claim is a Disputed Claim, and the Holder(s) of the Odom Claim are subject to the injunction of Section 10.2 of the Debtor's Plan. Nevertheless, the Holder(s) of the Odom Claim and the Debtor may continue to

prosecute and/or to defend the Odom Claim in the courts of the State of Louisiana, but the Holder(s) of the Odom Claim are and shall be enjoined from taking any action against the Debtor, the Reorganized Debtor, any insurer on any policy of insurance providing insurance in favor of the Debtor or Reorganized Debtor, or the property of any of them to collect or to further the collection of any portion of the Odom Claim, other than such action as may be allowed pursuant to other provisions of the Debtor's Plan. Upon entry of a final judgment that is not the subject of any appeal or writ of review and that has not been stayed by order of a court of competent jurisdiction, to the extent that such final judgment remains in full force and effect (a) the Odom Claim will become an Allowed Claim and will be entitled to the treatment afforded to General Unsecured Claims in Class 5, and (b) the Holder(s) of the Odom Claim may take any action to collect the Odom Claim allowed by non-bankruptcy law against any insurer on any policy of insurance in favor of the Debtor or Reorganized Debtor or any property of any such insurer.

### 11. Class 11 – Preferred Interests

Class 11A consists of the 4.75% Preferred Series, Class 11B consists of the 4.36% Preferred Series, and Class 11C consists of the 5.56% Preferred Series. The Preferred Interests in Class 11A, Class 11B, and Class 11C are Impaired, and are entitled to vote on the Debtor's Plan. Under the proposed treatment of Classes 11A, 11B, and 11C, as provided in Section 5.11 of the Debtor's Plan, each Class has the following two options. Under Option A, if the Class votes in favor of the Debtor's Plan, (a) the Preferred Interests in that Class will remain outstanding, (ii) within fifteen (15) days of the Effective Date, the Disbursing Agent will pay to the Holders of the Preferred Interests any accumulated, unpaid dividends, and (c) the Holders of the Preferred Interests in that Class will be entitled to the same rights and privileges that existed on the Effective Date; *provided, however*, on and after the Effective Date, the Unsecured Debt Provision will terminate and have no force or effect. Under Option B, on the other hand, if the Class does not vote in favor of the Debtor's Plan, in full satisfaction of the Preferred Interests in such Class, the Debtor will provide treatment to the Holders of the Preferred Interests in such Class which is fair and equitable with respect to such Preferred Interests. Upon the Effective Date, (a) the Preferred Interests in Classes in Option B will be cancelled and rendered null and void, without any corporate action or any action under any applicable agreement, law, regulation, rule or order, and (b) the obligations of the Debtor and Reorganized Debtor under any and all agreements and instruments related to such Preferred Interests, or executed in connection therewith, shall be discharged.

### 12. Class 12 – Equity Interests

Class 12 consists of the Equity Interests. The sole Holder of the Equity Interests is Entergy Corporation. Under the treatment proposed in Section 5.12 and Section 6.4 of the Debtor's Plan, the Equity Interests are Impaired and are entitled to vote on the Debtor's Plan.

## C. FINANCING THE DEBTOR'S PLAN

### 1. Rate Relief

In June 2006, ENOI made its annual formula rate plan filing, in the form of the 2006 Electric FRP and 2006 Gas FRP Applications, with the City Council. The 2006 FRP Applications presented various alternatives to reflect the effect of ENOI's lost customers and decreased revenue caused by Hurricane Katrina. ENOI's recommended alternative adjusted for lost customers and assumed that the City Council's June 2006 decision to allow recovery of all Grand Gulf costs through the fuel

adjustment clause stays in place (a significant portion of Grand Gulf costs was previously recovered through base rates). Under that alternative, annual increases of $6.4 million in electric base rate revenues (an increase of 4.4%) and $22.8 million in gas base rate revenues (an increase of 160.9%) are warranted. The filings triggered the prescribed four-month period for review by the City Council's Advisors and other parties. Rate adjustments, if any, could be implemented as soon as the first billing cycle of November 2006.

When it filed the 2006 FRP Applications, ENOI also filed with the City Council the Storm Cost Recovery Riders and the Storm Reserve Riders. With the Storm Cost Recovery Riders, ENOI sought to recover over a ten-year period the $114 million in electric restoration costs and the $25 million in gas restoration costs caused by Hurricane Katrina that it had actually spent through March 31, 2006. ENOI also proposed semiannual filings to update the riders for additional storm restoration spending and also to consider the receipt of CDBG Funds or Katrina Insurance Proceeds that it may receive. With the Storm Reserve Riders, ENOI sought to establish over a ten-year period a $150 million storm reserve to provide for the risk of another storm. ENOI requested that the City Council consider the proposed Storm Cost Recovery Riders and Storm Reserve Riders within the same time frame as the 2006 FRP Applications, which would allow implementation as soon as the first billing cycle of November 2006.

In October 2006, the City Council approved a settlement agreement that resolves ENOI's 2006 FRP Applications, Storm Reserve Riders and Storm Cost Recovery Riders. The settlement provides for phased-in rate increases while taking into account the anticipated receipt of CDBG Funds as recommended by the LRA. The settlement provides for no change in electric base rates through December 2007, with a $3.9 million increase implemented in January 2008. Recovery of all Grand Gulf costs through the fuel adjustment clause will continue. Gas base rates will increase by $4.75 million in November 2006, an additional $1.5 million in March 2007, and an additional $4.75 million in November 2007. The settlement calls for ENOI to file a base rate case by July 31, 2008. Any storm costs in excess of CDBG Funds and Katrina Insurance Proceeds will be addressed in that base rate case. The settlement also authorizes a $75 million storm reserve for damage from future storms, which will be created over a ten-year period through a storm reserve rider beginning in March 2007. These storm reserve funds will be held in a restricted escrow account. The settlement was approved by City Council Ordinance R-06-459, dated October 27, 2006.

## 2. CDBG Funds

In December 2005, the United States Congress passed H.R. 3645 and H.R. 3673 as Hurricane Katrina relief bills to make emergency appropriations that included $11.5 billion in CDBG grants for states affected by the Hurricanes Katrina, Rita and Wilma that allow the states to fund recovery priorities. In May 2006 Congress passed H.R. 4939 that included supplemental appropriations in the amount of $4.2 billion for CDBG grants. Pursuant to these laws HUD has allocated approximately $10.4 billion to the State of Louisiana, with the remainder being allocated to other states affected by these hurricanes. These states, in turn, will administer the grants. HUD's regulations allow funding to be provided to publicly owned utilities for infrastructure restoration.

ENOI submitted justification statements to the LRA and the LRA Infrastructure Committee in September 2006 requesting a grant of $592 million in CDBG Funds. ENOI's justification statement requesting $592 million supports the costs associated with restoring and rebuilding its damaged electric and gas facilities and unrecovered fixed costs caused by Hurricane Katrina after giving effect to an estimated receipt of $250 million of Katrina Insurance Proceeds. Specifically, the

{N1609126.3}                                          - 48 -

components of ENOI's $592 million CDBG request include (a) $271 million for infrastructure restoration costs for ENOI's electric and gas facilities destroyed by Hurricane Katrina, (b) $355 million for rebuilding of large portions of the cast iron and steel piping in ENOI's gas system damaged by salt water infiltration, (c) $194 million in unrecovered fixed costs, and (d) $22 million in customer account write-offs, less the estimated Katrina Insurance Proceeds of $250 million. ENOI had originally presented a statement in March 2006 that justified $718 million in CDBG Funds, but took actions to reduce its unrecovered fixed costs, resulting in the lower request.

On October 12, 2006 the LRA voted to recommend $200 million in CDBG Funds for ENOI. The LRA resolution regarding the $200 million recommendation included the following conditions to receipt of the CDBG Funds as requested by the City Council:

(a) CDBG Funds may only be used to offset the cost of restoration, reconstruction and rebuilding of ENOI's damaged electric and gas utility systems, and to offset such other unrecovered fixed costs as may be the responsibility of ratepayers;

(b) CDBG Funds should be used to mitigate and/or eliminate possible rate increases to New Orleans utility ratepayers;

(c) No CDBG Funds may be used to profit ENOI's parent, Entergy Corporation;

(d) ENOI must agree that all restoration, reconstruction, and rebuilding costs claimed for CDBG Funds must be certified as reasonable and necessary through an independent process approved by the LRA;

(e) ENOI must not claim in any forum capital assets paid for with CDBG Funds as additions to the rate base for ratemaking purposes or for the valuation of ENOI's assets in connection with the city's perpetual option to purchase set forth in the applicable 1922 Ordinances, as amended; and

(f) Any CDBG Funds awarded to ENOI should be exempt from existing or future liens held by any of ENOI's Bondholders and, except to the extent necessary to reimburse audited expenditures for restoration, reconstruction, and rebuilding, the Entergy Corporation debtor-in-possession loan to ENOI.

On December 4, 2006, Louisiana lawmakers voted overwhelmingly (82-5 House; 28-5 Senate) to approve awarding the Debtor $200 million in CDBG Funds. Receipt of $200 million in CDBG Funds in Cash is needed to fund the Debtor's Plan, and is a condition to the Effective Date pursuant to Section 9.1(b) of the Debtor's Plan. ENOI's best current estimate is that it will receive CDBG Funds by the end of April 2007, and certainly well before June 30, 2007, based on the following time table: (a) before February 21, 2007, HUD will review, revise and approve the action plan, and ENOI will submit costs for certification to the City Council; (b) on or before March 1, 2007, the City Council will certify costs and ENOI will submit its application for reimbursement to the State of Louisiana; and (c) before the end of March, the State of Louisiana will approve the application and request funding from HUD. HUD will then remit payment to the State of Louisiana, and the State will remit payment to ENOI.

ENOI has submitted applications to recover storm costs (a) for the period through March 31, 2006, in the net amount of $146.429,000 (the "First Application"), and (b) for the period from April

1, 2006 through October 31, 2006, in the additional amount of $51,914,000 (the "Second Application"). On January 22, 2007, the Debtor filed a third application for the recovery of storm costs, which application will cover costs expended from October 31, 2006 through December 31, 2006 (the "Third Application"). The First, Second, and Third Applications exceed $200 million. On January 18, 2007, the City Council issued a Revised Procedural Resolution (the "Revised Resolution"), wherein the City Council indicated its present intention to render its decision, no later than March 1, 2007, on the certification of ENOI storm costs through December 31, 2006.

On January 18, 2007, the City Council's utility advisors, Bruno and Tervalon, LLP and Pailet, Meunier and LeBlanc, LLP, each certified public accounts (collectively, the "CPAs"), issued their Final Audit of the First Application. In that Final Audit, the CPAs expressed an opinion (among other things) that (a) ENOI had spent, through March 31, 2006, a total of $139,455,537, and (b) those costs were in all material respects reasonable and necessary storm costs. The CPAs are now reviewing the Second Application and, after it is filed with the City Council, will review the Third Application.

### 3. **Katrina Insurance Proceeds**

#### a. *Insurance Proceeds Protocol*

The Debtor's insurance for property damage is provided under policies issued to Entergy Corporation and the Debtor is not a direct payee under those policies. Recovery under the policies covering damage caused by Hurricane Katrina, as it is received by Entergy Corporation, is to be allocated among the various Affiliates whose property is covered by those policies.

On May 5, 2006, the Debtor Filed a Motion for Approval of a Protocol for the Allocation and Distribution of Katrina Insurance Proceeds (the "Protocol Motion") (P-815). The Protocol Motion was necessary, in part, because both ENOI and Entergy Corporation had agreed with the Bond Trustee that any Katrina Insurance Proceeds related to Hurricane Katrina losses would be held in a segregated, interest bearing bank account until the Bankruptcy Court had approved a protocol, or methodology, for the allocation and distribution of those Katrina Insurance Proceeds. In the Protocol Motion, ENOI sought approval of the methodology or protocol by which Katrina Insurance Proceeds related to ENOI's losses for Hurricane Katrina will be allocated and distributed among and to ENOI and the Operating Companies, each of whom are covered by the same insurance polices. The Bankruptcy Court granted the Protocol Motion on May 25, 2006 (P-867).

#### b. *Receipt of Katrina Insurance Proceeds and Allocation Under the Protocol*

ENOI's primary non-nuclear property insurance coverage is placed through OIL. OIL is a mutual insurance company, originally designed to service the needs of the various energy companies that joined together to form OIL. Today, other energy-industry insured companies that are owners of, and insured by, OIL include (by way of example) Murphy Oil Company, Marathon Oil Corporation, ChevronTexaco, and Motiva Enterprises, L.L.C.

An insurance policy issued by OIL (the "OIL Policy") was in full force and effect when ENOI experienced widespread loss and damage as a result of Hurricane Katrina. Although the Operating Companies, including ENOI, are covered under the OIL Policy, Entergy Corporation, as a shareholder of OIL, is the sole named insured on the OIL Policy.

The OIL Policy provides $250 million of coverage (per occurrence) for Entergy Corporation, and the Operating Companies, subject to a deductible of $20 million. OIL has advised its insureds/shareholders that, due to the devastation caused by Hurricane Katrina, OIL intends to invoke the OIL Policy's aggregate collective cap for all OIL's insureds for Katrina damages of $1 billion. Further, it is likely that the total damages claimed by all OIL insureds for Katrina damages will exceed $1 billion. As a result, it is anticipated that all insureds will suffer a proportionate reduction in their claims payments.

At the time that Hurricane Katrina made landfall, ENOI's excess insurance coverage was placed through two Excess Carriers, American International Group ("AIG") and Lloyd's of London ("Lloyds"). The insurance policies issued by the Excess Carriers (collectively, the "Excess Policies") were in full force and effect when ENOI experienced loss and damage as a result of Hurricane Katrina. Like the OIL Policy, the named insured under the Excess Policies is Entergy Corporation, but the Excess Policies jointly cover ENOI and the other Operating Companies.

The Excess Policies provide an aggregate of $150 million per occurrence above the coverage provided by the OIL Policy on a quota-share basis (i.e., each Excess Carrier is responsible for $75 million) with an annual aggregate for flood loss of $150 million. The Entergy system-wide insurance recovery for Hurricane Katrina, net of the $20 million deductible and the OIL aggregate breach, is approximately $299 million. ENOI's portion of this recovery is estimated at $250 million. On March 1, 2006, Entergy Corporation received its first partial payment from OIL, in the amount of $14,838,208.29 (including interest), for losses incurred by ENOI and the other Operating Companies. On May 24, 2006, Bankruptcy Court granted ENOI's Protocol Motion. In accordance with the approved protocol, ENOI received a payment of $4,610,610 (P-897). A second proof of loss, in the amount of $3.75 million, was submitted on behalf of all of the Operating Companies on September 5, 2006. The payment was received from OIL on September 22, 2006. ENOI's share of this payment was $2,596,157.07. Additionally, discussions with OIL have resulted in its agreement that Entergy's insured losses from Hurricane Katrina exceed their $250 million coverage limit after deductible. Detailed discussions with the AIG loss adjuster have been very productive, but these discussions are ongoing. Discussions with the London insurers are ongoing as they continue the loss adjustment process.

### c.   *Anticipated Receipt of Katrina Insurance Proceeds before the Effective Date*

To date, the Debtor has received a total of $7,206,767 in Katrina Insurance Proceeds. Based on its discussions with OIL and the Excess Carriers, the Debtor believes that it will receive additional Katrina Insurance Proceeds in excess of $42.8 million on or before June 30, 2007. Receipt of an additional $42.8 million in Katrina Insurance Proceeds in Cash is needed to fund the Debtor's Plan, and is a condition to the Effective Date pursuant to Section 9.1(c) of the Debtor's Plan.

## D.   DISTRIBUTION UNDER THE DEBTOR'S PLAN

All distributions under the Debtor's Plan shall be made by the Debtor as Disbursing Agent or such other Entity designated by the Debtor as Disbursing Agent. As provided in Article VII of the Debtor's Plan, all distributions under the Debtor's Plan shall be made (i) to the Holder of each Allowed Claim and Preferred Interest on the Distribution Record Date at the address of such Holder as listed on the Debtor's Schedules, unless the Debtor or, on and after the Effective Date, the

Reorganized Debtor, has been notified in writing of a change of address, including, without limitation, by the Filing of a timely Proof of Claim by such Holder that provides an address for such Holder different from the address reflected on the Debtor's Schedules, or (ii) pursuant to the terms of the Bond Indenture and Mortgage.

As of the close of business on the Distribution Record Date, the claims register and records of the stock transfer agent shall be closed, and there shall be no further changes in the record Holder of any Interests. The Debtor shall have no obligation to recognize any transfer of any Claim or Interest occurring after the Distribution Record Date. The Debtor shall instead be authorized and entitled to recognize and deal for all purposes of the Debtor's Plan with only those record Holders stated on the claims register or the records of the stock transfer agent as of the close of business on the Distribution Record Date.

## E.    TIMING OF DISTRIBUTIONS UNDER THE DEBTOR'S PLAN

Unless otherwise provided in the Debtor's Plan, or otherwise agreed in a written agreement by and between (i) the Holder of a Claim or Preferred Interest, and (ii) the Debtor or Reorganized Debtor, in full satisfaction of the Holder's Claim or Preferred Interest, each Holder will receive the distribution provided for under the Debtor's Plan. If the Holder's Claim or Preferred Interest is an Allowed Claim or Preferred Interest on or before the Effective Date, the Disbursing Agent will make the distribution to such Holder within fifteen (15) days of the Effective Date. If, however, the Holder's Claim or Preferred Interest is not Allowed on or before the Effective Date, the Disbursing Agent will make the distribution to such Holder within fifteen (15) days after the earlier of the date on which (i) an Order allowing the Claim or Preferred Interest becomes a Final Order, or (ii) the Holder and the Debtor or Reorganized Debtor execute a Stipulation Regarding the Amount and Nature of the Claim.

## F.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Bankruptcy Code grants the Debtor the power, subject to the approval of the Bankruptcy Court, to assume or reject Executory Contracts and Unexpired Leases. If an Executory Contract or Unexpired Lease is rejected, the counterparty to the agreement may File a claim for damages incurred by reason of the rejection. In the case of rejection of Unexpired Leases of Real Property, such damage claims are subject to certain limitations imposed by the Bankruptcy Code.

### 1.    Executory Contracts and Unexpired Leases in General

Except as otherwise provided in the Debtor's Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Debtor's Plan, each Executory Contract or Unexpired Lease that is listed in Plan Exhibit 8.1 would be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Confirmation Order would constitute an Order of the Bankruptcy Court approving each such rejection, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date; *provided, however,* that with the exception of (a) the FGIC Insurance Agreements, (b) the ISES PPA, (c) the RB 30 PPA, (d) the WBL PPA, (e) the UPSA, and (f) that certain Master Leasing Agreement by and between BLC Corporation and ENOI, dated as of December 1, 1983, as amended and supplemented, covering ENOI's lease of numerous vehicles and pieces of equipment used by ENOI in its day-to-day operations (the "BLC Master Lease Agreement") (each of which will be assumed on the Effective Date), at any time before March 1, 2007, the Debtor reserves the right to either (a) delete any Executory Contract or Unexpired Lease

listed therein, thus providing for its assumption pursuant to Article VIII of the Debtor's Plan, or (b) add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to Section 8.1 of the Debtor's Plan. Thereafter, the Debtor will provide notice of any amendments to Plan Exhibit 8.1 to the Creditors' Committee and the parties to the Executory Contracts or Unexpired Leases affected thereby. Such notice will be sent by overnight delivery or by telecopy. and will include a Ballot and a form for Filing a Proof of Claim.

Pursuant to Section 8.1(b) of the Debtor's Plan, the Confirmation Order would constitute an Order of the Bankruptcy Court approving the assumption of each Executory Contract and Unexpired Lease that is not rejected pursuant to Section 8.1(a) of the Debtor's Plan, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. An Order of the Bankruptcy Court entered on or before the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Debtor's Plan of: (a) the contract or lease being assumed or assumed and assigned; (b) the Cure Amount Claim, if any, that the Debtor believes it would be obligated to pay in connection with such assumption; and (c) the procedures for such party to object to the assumption of the applicable contract or lease or the amount of the proposed Cure Amount Claim.

Assuming there is no Cure Amount Claim related to the assumption of the UPSA or the PPAs, the Debtor estimates that the total Cure Amount Claims are approximately \$4.6 million, consisting of the following: (a) the amount necessary to assume the BLC Master Lease Agreement; and (b) the FGIC Cure Amount Claim, net of any additional payments made pursuant to the Stipulation and Order made by FGIC with respect to the Insured Bonds.

Pursuant to Section 8.2 of the Debtor's Plan, to the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Debtor's Plan would be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor: (a) by payment of the Cure Amount Claim in Cash on the Effective Date; or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding the amount of any Cure Amount Claim, or any other matter pertaining to assumption of such Executory Contract or Unexpired Lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code would be made following the entry of a Final Order resolving that dispute and approving the assumption.

Further, notwithstanding anything in the Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease pursuant to Article VIII of the Debtor's Plan gives rise to a Cure Amount Claim by the other party or parties to such contract or lease, such Cure Amount Claim would be forever barred and would not be enforceable against the Debtor or Reorganized Debtor unless a request for payment of Administrative Claim is Filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Procedures Order (Exhibit B), the notice of the entry of the Confirmation Order, or another Order entered on the Docket within thirty (30) days after the Effective Date.

As previously mentioned in the Debtor's Disclosure Statement, the Debtor intends to assume, as of the Effective Date, the UPSA, the System Agreement, and the Services Agreement. Further, if the PPAs have not been assumed before the commencement of the Confirmation Hearing, the Debtor also intends to assume the PPAs. Finally, the Debtor intends to assume the BLC Master Lease Agreement.

{N1609126.3}                              - 53 -

### 2.    Obligations to Indemnify Directors, Officers and Employees

Section 8.4 of the Debtor's Plan provides that the obligations of the Debtor or Reorganized Debtor to indemnify any person who is serving or has served as one of its directors, officers or employees by reason of such person's prior or future service in such a capacity or as a director, officer or employee of another corporation, partnership or other legal entity, to the extent provided in the applicable certificates of incorporation or bylaws, by statutory law or by written agreement, policies or procedures of or with the Debtor, would be deemed and treated as executory contracts that are assumed by the Debtor or Reorganized Debtor pursuant to the Debtor's Plan and section 365 of the Bankruptcy Code as of the Effective Date. Accordingly, such indemnification obligations would survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before, on or after the Petition Date.

### 3.    Assumed Insurance Policies and Agreements

The Debtor does not believe that the insurance policies issued to, or insurance agreements entered into by, the Debtor before the Petition Date constitute executory contracts. To the extent that such insurance policies or agreements are considered to be executory contracts, then, notwithstanding anything contained in Article VIII to the contrary, the Debtor's Plan would constitute a motion to assume such insurance policies and agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order would constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtor, its estate, and all parties in interest in the Bankruptcy Case. Except as otherwise provided in Section 5.3(b) of the Debtor's Plan with respect to the FGIC Cure Amount Claim, unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtor existing as of the Confirmation Date with respect to each such insurance policy or agreement. Nothing contained in the Debtor's Plan would constitute a waiver of any claim, right or cause of action that the Debtor or Reorganized Debtor may hold against the insurer under any policy of insurance or insurance agreement.

### 4.    Assumption of the Bonds, the Bond Indenture and Mortgage, and the FGIC Insurance Agreements.

Section 8.7 of the Debtor's Plan provides that, to the extent that the Bonds, the Bond Indenture and Mortgage, and the FGIC Insurance Agreements are executory contracts within the meaning of section 365 of the Bankruptcy Code, then, notwithstanding anything contained in Article VIII of the Debtor's Plan to the contrary, the Debtor's Plan will constitute a motion to assume the foregoing (as applicable). Subject to the occurrence of the Effective Date, the entry of the Confirmation Order on the Docket will both (a) constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code, (b) a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtor, its estate, and all parties in interest in the Bankruptcy Case, and (c) a determination by the Bankruptcy Court that each of the Bonds and the Bond Indenture and Mortgage and the FGIC Insurance Agreements are deemed assumed by the Debtor as of the Effective Date; *provided, however,* (a) that the payment of the FGIC Cure Amount Claim and the Allowed FGIC Professional Fee Claim shall constitute the cure of any default under the FGIC Insurance Agreements, such that no additional Cure Amount Claim shall exist with respect to the assumption of the FGIC Insurance Agreements, and (b) that the

treatment provided under the Debtor's Plan in respect of the Bond Claims, Bond Trustee's Professional Fee Claims and the Bond Trustee's Claim shall constitute the cure of any default under the Bonds and the Bond Indenture and Mortgage, such that no additional Cure Amount Claim shall exist with respect to the assumption of the Bonds and the Bond Indenture and Mortgage.

### 5. Compensation and Benefit Programs

Except as otherwise provided in a motion Filed before the Effective Date, all employment plans, practices, programs and policies maintained by the Debtor as of the Effective Date shall remain in full force and effect following the Effective Date, subject to any and all rights of the Debtor under applicable non-bankruptcy law to amend or terminate such plans, practices, programs and policies.

### 6. Retiree Benefits

Section 8.9 of the Debtor's Plan provides that payment of any Retiree Benefits (as such benefits shall be continued solely to the extent, and for the duration of the period, that the Debtor is contractually or legally obligated to provide such benefits, subject to any and all rights of the Debtor under applicable law (including, without limitation, the Debtor's right to amend or terminate).

### G. IMPLEMENTATION AND EFFECT OF CONFIRMATION OF THE DEBTOR'S PLAN

On the Effective Date, except as otherwise transferred, sold or otherwise provided for in the Debtor's Plan, the property of the Debtor's estate shall vest in the Reorganized Debtor.

From and after the Effective Date, the Reorganized Debtor may operate its business, and may use, acquire and dispose of property free of any restrictions imposed under the Bankruptcy Code. As of the Effective Date, all property of the Reorganized Debtor shall be free and clear of all Liens, claims and interests of Holders of Claims and Equity Interest, except as otherwise provided in the Debtor's Plan.

Unless otherwise provided, all injunctions or stays provided for in the Bankruptcy Case under section 105 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect in accordance with the terms of such injunctions. Unless otherwise provided, the automatic stay provided under section 362 of the Bankruptcy Code shall remain in full force and effect until the Effective Date.

### H. DISCHARGE AND INJUNCTION

### 1. Discharge of Claims

Except as otherwise expressly provided in the Debtor's Plan or the Confirmation Order, Section 10.1 of the Debtor's Plan provides that the rights afforded under the Debtor's Plan and the treatment of Claims under the Debtor's Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date. Except as provided in the Debtor's Plan or the Confirmation Order, as of the Effective Date, the Debtor's Plan shall discharge the Debtor from all Claims or other debts that arose on or before the Effective Date, and all debts of

the kind specified in section 502(g), 502(h), or 502 (a) of the Bankruptcy Code, whether or not (i) a Proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code, or (c) the Holder of such Claim voted to accept the Debtor's Plan.

In accordance with the foregoing, except as provided in the Debtor's Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and liabilities against the Debtor, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtor at any time to the extent that such judgment relates to a discharged Claim.

Except as otherwise provided in the Debtor's Plan or in any contract, instrument, release or other agreement or document entered into or delivered, Section 10.6 of the Debtor's Plan provides that, on the Effective Date, all mortgages, deeds of trust, Liens or other security interests or encumbrances of any kind against the property of the Estate will be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens or other security interests, including any rights to any collateral thereunder, will revert to the Reorganized Debtor and its successors and assigns, and the former Holder thereof will, upon request of the Debtor, execute such documents evidencing such release and discharge as the Debtor may reasonably request.

Solely with respect to the United States (which term shall include for purposes of the Debtor's Plan, all agencies of the United States), notwithstanding any other provision of the Debtor's Plan to the contrary, nothing in the Debtor's Plan or the Confirmation Order shall operate to expand the Debtor's discharge beyond those established by the Bankruptcy Code unless otherwise agreed to a written agreement, by and between the United States and the Debtor or Reorganized Debtor.

### 2. Injunction

Except as otherwise expressly provided in the Debtor's Plan or the Confirmation Order, Section 10.2 of the Debtor's Plan provides that, as of the Effective Date, any Entity that has held, currently holds or may hold a Claim or other debt or liability or Preferred Interest that is discharged, released, waived, settled or deemed satisfied in accordance with the Debtor's Plan will be permanently enjoined from taking any of the following actions on account of any such Claims, debts, liabilities, Preferred Interests or rights: (a) commencing or continuing in any manner any action or Cause of Action or other proceeding against the Debtor, the Reorganized Debtor, or the property of either of them, other than to enforce any right that does not comply with, or is inconsistent with, the provisions of the Debtor's Plan; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor, the Reorganized Debtor, or the property of either of them, other than as permitted pursuant to (a) above; (c) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Debtor, the Reorganized Debtor, or the property of either of them, other than as permitted pursuant to (a) above; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor or Reorganized Debtor; and (e) commencing or continuing any action or Cause of Action, in any manner, in any place that does not comply with or is inconsistent with the Debtor's Plan; *provided, however*, (a) that such injunction shall not preclude the United States of America or any of its police or regulatory agencies from enforcing their police or regulatory powers, (b) except in connection with a properly Filed Proof of Claim for an Allowed Claim, the foregoing proviso does not permit the United States of America or any of its police or regulatory agencies to obtain any monetary

recovery from the Debtor or its property or interests in property with respect to any such Claim or other debt or liability that is discharged or Preferred Interest or Equity Interest, including, without limitation, any monetary claim or penalty in furtherance of a police or regulatory power, (c) in accordance with Section 11.2 of the Debtor's Plan, such injunction shall not preclude the City Council or the City of New Orleans from enforcing their police and regulatory powers, including with respect to regulatory actions based upon unresolved regulatory matters that arose before the Petition Date and that could result in orders to refund or credit ratepayers, or (d) except in connection with a properly Filed Proof of Claim for an Allowed Claim by the City Council or the City of New Orleans for their own account, the foregoing proviso (c) does not permit the City Council or the City of New Orleans or any of its police or regulatory agencies to obtain any monetary recovery from the Debtor or its property or interests in property with respect to any Claim or other debt or liability that is discharged, including, without limitation, any monetary claim or penalty in furtherance of a police or regulatory power.

### 3.    Releases

(a)    PURSUANT TO SECTION 10.3(a) OF THE DEBTOR'S PLAN, AS OF THE EFFECTIVE DATE, IN CONSIDERATION OF THE OBLIGATIONS OF THE DEBTOR, THE REORGANIZED DEBTOR AND THE ESTATE UNDER THE DEBTOR'S PLAN, AND OTHER CONTRACTS, INSTRUMENTS, AGREEMENTS OR DOCUMENTS TO BE ENTERED INTO, OR DELIVERED IN CONNECTION WITH, THE DEBTOR'S PLAN, FGIC AND EACH HOLDER OF A BOND CLAIM, AND THEIR SUCCESSORS AND ASSIGNS, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, AS SUCH LAW MAY BE EXTENDED SUBSEQUENT TO THE EFFECTIVE DATE, WILL BE DEEMED TO FOREVER RELEASE, WAIVE AND DISCHARGE ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, CAUSES OF ACTION AND LIABILITIES, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OCCURRENCE TAKING PLACE ON, OR BEFORE, THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTOR, THIS BANKRUPTCY CASE OR THE DEBTOR'S PLAN THAT SUCH ENTITY HAS, HAD OR MAY HAVE (AS OF THE EFFECTIVE DATE) AGAINST ANY OF FGIC, THE BOND TRUSTEE, THE AD HOC BONDHOLDERS COMMITTEE AND EACH PARTIES' OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, MEMBERS (IN THEIR CAPACITY AS SUCH), FINANCIAL ADVISORS, ATTORNEYS AND OTHER REPRESENTATIVES.

The obligations and covenants under the Debtor's Plan include, for example, obligations arising under the executory contracts and leases being assumed under Article VIII of the Debtor's Plan. Pursuant to Section 10.4 of the Debtor's Plan, the releases provided for in Section 10.3(a) shall be effective only as to those Holders of Bond Claims that vote to accept the Debtor's Plan.

Before Filing the Debtor's Plan, the Debtor, Entergy Corporation, the Bond Trustee, FGIC and the Ad Hoc Bondholders' Committee engaged in numerous and often contentious negotiations concerning the terms of a plan of reorganization for the Debtor in an effort to resolve a variety of issues and disputes among the parties. One of the bargained for items was the release contained in Section 10.3(a) of the Debtor's Plan, as demonstrated by the fact that the Debtor cannot make modifications to any provision of Article X of the Debtor's Plan without the prior approval of the Bond Trustee of FGIC, as provided in Section 13.2 of the Debtor's Plan.

{N1609126.3}                          - 57 -

(b)     PURSUANT TO SECTION 10.3(b) OF THE DEBTOR'S PLAN, AS OF THE EFFECTIVE DATE, IN CONSIDERATION OF THE OBLIGATIONS OF THE RELEASED PARTIES UNDER THE DEBTOR'S PLAN, AND OTHER CONTRACTS, INSTRUMENTS, AGREEMENTS OR DOCUMENTS TO BE ENTERED INTO, OR DELIVERED IN CONNECTION WITH, THE DEBTOR'S PLAN, THEIR PARTICIPATION IN THE NEGOTIATION AND IMPLEMENTATION OF THE DEBTOR'S PLAN AND THEIR SERVICES DURING THIS BANKRUPTCY CASE, THE DEBTOR, ON ITS OWN BEHALF AND ON BEHALF OF THE REORGANIZED DEBTOR, AND ITS ESTATE HEREBY FOREVER RELEASE, WAIVE AND DISCHARGE ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, CAUSES OF ACTION AND LIABILITIES, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OCCURRENCE TAKING PLACE ON, OR BEFORE, THE EFFECTIVE DATE (INCLUDING WITHOUT LIMITATION ANY OF THE FOREGOING WHICH MAY BE ASSERTED DERIVATIVELY ON BEHALF OF THE DEBTOR, THE ESTATE OR THE REORGANIZED DEBTOR) IN ANY WAY RELATING TO THE DEBTOR, THIS BANKRUPTCY CASE OR THE DEBTOR'S PLAN THAT THE DEBTOR, ITS ESTATE OR THE REORGANIZED DEBTOR HAS, HAD OR MAY HAVE AGAINST ANY OF THE RELEASED PARTIES OTHER THAN (i) THE AFFILIATES OF THE DEBTOR AND (ii) THE OFFICERS AND DIRECTORS OF THE AFFILIATES OF THE DEBTOR (IN THEIR CAPACITY AS SUCH).

### 4.     Term of Injunctions or Stays

Unless otherwise provided in the Debtor's Plan or the Confirmation Order, Section 10.4 of the Debtor's Plan provides that all injunctions or stays set forth in sections 105 or 362 of the Bankruptcy Code shall remain in full force and effect until the Effective Date rather than the Confirmation Date. Nothing in Section 10.4 of the Debtor's Plan, however, shall be construed as a limitation of the permanent discharge and injunction provisions provided for in the Debtor's Plan.

### 5.     Provisions as to the Qualified Retirement Plan

Notwithstanding the provisions of Sections 10.1 and 10.2 of the Debtor's Plan, or any other provision of the Debtor's Plan, Section 10.5 of the Debtor's Plan provides that nothing in the Debtor's Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code shall, or shall be construed to, discharge, release, or relieve the Debtor or any other party, in any capacity, from any liability with respect to the Qualified Retirement Plan, or any other defined benefit plan sponsored by Entergy Corporation or any member of its controlled group, under any law, governmental policy, or regulatory provision; and further provided that the PBGC shall not be enjoined from enforcing such liability as a result of the provisions for satisfaction, release and discharge of Claims that are contained in the Debtor's Plan.

### 6.     Exculpation

AS OF THE EFFECTIVE DATE, THE EXCULPATED PARTIES SHALL NOT HAVE NOR INCUR LIABILITY TO ANY ENTITY FOR ANY ACTION TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR RELATED TO THE FORMULATION,     PREPARATION,     DISSEMINATION,     IMPLEMENTATION,

**CONFIRMATION, OR CONSUMMATION OF THE DEBTOR'S PLAN, THE DEBTOR'S DISCLOSURE STATEMENT, EARLIER VERSIONS OF SAME OR ANY CONTRACT, INSTRUMENT, RELEASE, OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO, OR ANY OTHER ACTION TAKEN OR OMITTED TO BE TAKEN, IN CONNECTION WITH THE DEBTOR'S PLAN OR THIS BANKRUPTCY CASE; *PROVIDED, HOWEVER,* (A) THAT THE FOREGOING PROVISIONS OF SECTION 10.7 OF THE DEBTOR'S PLAN SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT WOULD OTHERWISE RESULT FROM ANY SUCH ACTION OR OMISSION TO THE EXTENT THAT SUCH ACTION OR OMISSION IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, AND (B) THAT NOTHING IN SECTION 10.7 OF THE DEBTOR'S PLAN SHALL, OR SHALL BE DEEMED TO, RELEASE THE EXCULPATED PARTIES FROM, OR EXCULPATE THE EXCULPATED PARTIES WITH RESPECT TO, THEIR RESPECTIVE OBLIGATIONS OR COVENANTS ARISING PURSUANT TO THE DEBTOR'S PLAN.**

## I.    MISCELLANEOUS PROVISIONS OF THE DEBTOR'S PLAN

### 1.    Corporate Governance

As provided in Section 6.3 of the Debtor's Plan, as of the Effective Date, the Reorganized Debtor's Amended and Restated Articles of Incorporation and Bylaws will be substantially in the form of Plan Exhibit 6.2(a).    Among other things, the Amended and Restated Articles of Incorporation and Bylaws (a) will no longer include the Unsecured Debt Provision, (b) will prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code, (c) will provide for the restriction of dividends contained in Section 6.4 of the Debtor's Plan, and (d) will specify that the foregoing dividend restriction is not for the benefit of, and does not affect the rights of, the Preferred Interests for any purpose, including Article Fifth (J) of the Amended and Restated Articles of Incorporation. After the Effective Date, the Reorganized Debtor may further amend and restate its Amended and Restated Articles of Incorporation or Bylaws as permitted by the General Corporation Law of the State of Louisiana, subject to the terms and conditions of such constituent documents and in accordance with Section 9(b) of Ordinance No. 6822 Commission Council Series of the City of New Orleans, adopted April 18, 1922 and known as the Settlement Ordinance, as same may be modified, repealed or superseded. Plan Exhibit 6.(a)(a) (the Initial Members of the Board of Directors and the Initial Officers of the Reorganized Debtor) will be Filed no later than ten (10) Business Days before the commencement of the Confirmation Hearing.

The initial members of the boards of directors and initial officers of the Reorganized Debtor will consist of the individuals identified on Plan Exhibit 6.2(b). Each such director and officer will serve from and after the Effective Date until his or her successor is duly elected and qualified or until his earlier death, resignation, disqualification or removal in accordance with the terms of the Certificates of Incorporation and Bylaws of the Reorganized Debtor and applicable state law.  Plan Exhibit 6.2(b) identifies the initial term for each director in accordance with the provisions of the Amended and Restated Articles of Incorporation and Bylaws of the Reorganized Debtor.

## 2. **Entergy System Money Pool**

Entergy Corporation maintains a cash management system referred to as the Entergy System Money Pool. Entergy Corporation (as a lender only), Entergy Arkansas, Entergy Gulf States, Entergy Louisiana, Entergy Louisiana Holdings, Entergy Mississippi, Entergy Services, Entergy Operations and System Fuels are the participants in the Money Pool (collectively, the "Money Pool Participants"). The Money Pool is designed to reduce the Money Pool Participants' dependence on short-term borrowing from external sources, such as banks under credit facilities, with higher comparable costs of borrowing. Pursuant to a FERC Order issued June 2, 2006 in Docket No. ES06-46-000, each of the Money Pool Participants that are public utilities (Entergy Arkansas, Entergy Gulf States, Entergy Louisiana, Entergy Mississippi and SERI) is authorized to participate in the Money Pool through March 31, 2008, and to issue short term debt securities under the external credit agreements, the Money Pool agreement and unilateral agreement with Entergy Corporation, provided that the aggregate principal amount outstanding does not exceed specified limits. The Entergy System Money Pool agreement also provides limitations on the maximum amount of any borrowings that a Participant may have outstanding at any time. All loans from the Entergy System Money Pool are evidenced by short-term notes, are payable on demand and bear interest payable monthly at a rate calculated as specified in such notes.

The Cash that is available in the Money Pool consists solely of available funds from the treasuries of each of the Money Pool Participants, which are loaned on a short-term basis (possibly as short as intra-day) to any one or more of the Money Pool Participants, other than Entergy Corporation, or otherwise invested as described further below. The determination of whether a Money Pool Participant at any time has funds that may be available to the Money Pool is made by, or under the direction of, its respective Treasurer or other designee. No Money Pool Participant is authorized to effect external borrowings for the purpose of making loans to other Money Pool Participants in the Money Pool.

Entergy Arkansas, Entergy Gulf States, Entergy Louisiana, Entergy Mississippi and SERI have priority as borrowers from the Money Pool. Entergy Operations, Entergy Services and System Fuels are permitted to borrow through the Money Pool only if, on any given day, there are funds available in the Money Pool after the needs of these other Entergy Money Pool Participants have been satisfied. Entergy Corporation participates in the Money Pool insofar as it has funds available to invest through the Money Pool, but under no circumstances is Entergy Corporation permitted to borrow funds held in the Money Pool.

As to funds remaining in the Money Pool after satisfaction of the borrowing needs of the Money Pool Participants, Entergy Services which serves as administrator of the Money Pool, invests such funds and allocates the earnings thereon between or among those Money Pool Participants providing such excess funds on a pro rata basis in accordance with their respective interests in such funds.

ENOI does not currently participate in the Entergy System Money Pool due to the commencement of this Bankruptcy Case. As provided in Section 6.3 of the Debtor's Plan, from and after the Effective Date, ENOI intends to be a participant in the Money Pool from and after the Effective Date. Such participation is authorized through November 30, 2007 by SEC Orders (HCAR No. 27918), as filed with FERC under provisions of the Public Utility Holding Company Act of 2005, and participation thereafter will require a final order from FERC authorizing ENOI's

{N1609126.3}                                    - 60 -

issuance of short term debt securities under the terms of the Entergy System Money Pool. The Confirmation Order shall provide that any and all money deposited, contributed to or loaned by the Reorganized Debtor into the Entergy System Money Pool (net of amounts borrowed by the Reorganized Debtor after the Effective Date and then outstanding but before reduction for any attempted or actual setoff by any participant in the Entergy System Money Pool or Entergy Services), and interest thereon, will be immediately returned to the Reorganized Debtor upon written notice to Entergy Services, as agent for the Money Pool participants under the terms of the Entergy System Money Pool Agreement.

### 3. Limitations on Declaring and Paying Common Dividends to the Holder of the Equity Interests

Pursuant to Section 6.4 of the Debtor's Plan, ENOI agrees it will not pay a common dividend in 2007 and 2008. In addition, for a period of three years after the Effective Date, the Reorganized Debtor agrees that it will not declare or pay any dividends on its common stock unless (a) the common equity ratio of its capital structure is at or above 40%, and (b) after giving effect to any such dividend, the common equity ratio will not fall below 40%. For purposes of determining the Reorganized Debtor's capital structure, there shall specifically be excluded from debt (x) the principal amount of the Intercompany Notes to be issued to Affiliates in accordance with Section 5.6 of the Debtor's Plan and (y) the principal amount of any securitization bonds issued in connection with the recovery of ENOI's storm costs. Notwithstanding the foregoing, the Reorganized Debtor's agreement to restrict dividend payments on common stock shall cease in the event and on the date that (i) the Reorganized Debtor sells all or substantially all of its distribution assets to the City of New Orleans or to a third party, or (ii) the credit rating of the Reorganized Debtor is published as investment grade by either Standard & Poor's or Moody's and the credit rating of the Reorganized Debtor's senior secured debt is published as investment grade by Standard & Poor's or Moody's; *provided, however,* that in the event that the Reorganized Debtor achieves investment grade, then for a period of three years after the Effective Date, no common dividend shall be paid if such payment would cause the credit rating of the Reorganized Debtor to drop below investment grade as stated in clause (ii) in the immediate preceding sentence. Nothing in Section 6.4 of the Debtor's Plan, or the Amended and Restated Articles of Incorporation provided for in Section 6.2(a) of the Debtor's Plan, will be considered to be for the benefit of, or affecting the rights of, the Preferred Interests.

### 4. Stipulations Regarding the Amount and Nature of the Claims

Except as provided in Section 5.6 of the Debtor's Plan with respect to Intercompany Claims, from and after the Effective Date, the Reorganized Debtor will have authority pursuant to Section 6.6 of the Debtor's Plan to enter into Stipulations Regarding the Amount and Nature of the Claim without the necessity of obtaining Bankruptcy Court approval.

### 5. Retention of Jurisdiction

As provided in Section 12.1 of the Debtor's Plan, until the entry of a final decree in accordance with Bankruptcy Rule 3022, the Bankruptcy Court shall have jurisdiction of all matters arising under, arising out of or relating to the Bankruptcy Case including, but not limited to, the following:

(a)    to insure that the purpose and intent of the Debtor's Plan are carried out;

(b)    to consider any modification of the Debtor's Plan under section 1127 of the Bankruptcy Code;

(c)    to hear and determine all Claims, controversies, defaults, suits and disputes against the Debtor, including, but not limited to, any Disputed Administrative Claim or Disputed Claim;

(d)    to hear, determine and enforce all Claims and Causes of Action;

(e)    to hear and determine all controversies, suits, defaults and disputes that may arise in connection with the interpretation, execution or enforcement of the Debtor's Plan;

(f)    to hear and determine all requests for compensation and/or reimbursement of expenses for services rendered or expenses incurred before the Effective Date which may be made after the Effective Date;

(g)    to hear and determine all objections to Administrative Claims, Claims, controversies, suits and disputes that may be pending at or initiated after the Effective Date, except as provided in the Confirmation Order;

(h)    to consider and act on the compromise and settlement of any Administrative Claim, Claim or Cause of Action on behalf of or against the Debtor;

(i)    to enforce and interpret by injunction or otherwise the terms and conditions of the Debtor's Plan;

(j)    to enter a Final Order concluding and terminating the Bankruptcy Case;

(k)    to correct any defect, cure any omission, or reconcile any inconsistency in the Debtor's Plan or Confirmation Order necessary or helpful to carry out the purposes and intent of the Debtor's Plan;

(l)    to determine all questions and disputes regarding titles to the assets of the Debtor or Reorganized Debtor;

(m)    to classify the Claims or Interests of any Holder and to re-examine Claims allowed for purposes of voting, and to determine objections to Administrative Claims, Claims and Interests;

(n)    to consider and act on such other matters consistent with the Debtor's Plan as may be provided in the Confirmation Order;

(o)    to enforce any injunction or stay whether arising under the Bankruptcy Code or Rules, or the Debtor's Plan; and/or

(p)    to consider the rejection of executory contracts and/or leases that are not discovered before Confirmation and allow Claims for damages with respect to the rejection

of any such executory contracts or leases within such future time as the Bankruptcy Court may direct.

### 4. **Exemption from Transfer Taxes**

As provided in Section 6.7 of the Debtor's Plan, and pursuant to section 1146(c) of the Bankruptcy Code, the following will not be subject to a stamp tax, real estate transfer tax, sales or use tax or similar Tax:  (a) the creation of any mortgage, deed of trust, lien or other security interest; (b) the making or assignment of any lease or sublease; or (c) the making or delivery of any deed, bill of sale or other instrument of transfer or assignment or any plan of merger, consolidation, liquidation or dissolution under, in furtherance of or in connection with the Debtor's Plan.

### 5. **Payment of Statutory Fees**

As provided in Section 4.1(a) of the Debtor's Plan, on or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid by the Debtor or the Disbursing Agent in Cash.  All fees payable pursuant to 28 U.S.C. § 1930(a)(6) will be paid by the Reorganized Debtor in accordance therewith until the closing of the Bankruptcy Case pursuant to section 350(a) of the Bankruptcy Code.

### 6. **Modification of the Debtor's Plan**

Section 13.2 of the Debtor's Plan provides that, subject to the restrictions on modification set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3019, the Debtor or Reorganized Debtor, as the case may be, reserves the right to alter, amend or modify the Debtor's Plan before its substantial consummation; *provided, however*, the prior written consent of FGIC and the Bond Trustee shall be required for any such alterations, amendments or modifications (whether or not deemed material, non-material or adversely affecting FGIC, the Bond Trustee, or the interests of the Bondholders) to the following:  (a) Sections 4.1, 4.2, 4.3, 4.4, 5.3, 5.6, 6.3, 6.4, 6.6, 7.2, 7.6, 7.7, 8.1, 8.2, 8.6, 8.7, 13.2, 13.3, or 13.6 of the Debtor's Plan; (b) the definitions in Article I of the Debtor's Plan that are used in Sections 4.1, 4.2, 4.3, 4.4, 5.3, 5.6, 6.3, 6.4, 6.6, 7.2, 7.6, 7.7, 8.1, 8.2, 8.6, 8.7 13.2, 13.3, or 13.6 of the Debtor's Plan, (c) Articles IX and X of the Debtor's Plan, or (d) Plan Exhibit 1.99 (i.e., the form of the Intercompany Note).

### 7. **Revocation or Withdrawal of the Debtor's Plan**

As provided in Section 13.4 of the Debtor's Plan, the Debtor reserves the right to revoke or withdraw the Debtor's Plan at any time before the Confirmation Date by Filing a notice of withdrawal or revocation.  The Filing of such notice of withdrawal or revocation shall constitute an automatic termination of the Debtor's exclusive periods for Filing a plan of reorganization and soliciting acceptances thereof.  Further, the Filing of a notice of withdrawal by the Debtor after the Confirmation Date shall constitute an automatic termination of the Debtor's exclusive periods for Filing a plan of reorganization and soliciting acceptances thereof.

### 8.    **Binding Effect**

As provided in Section 13.7 of the Debtor's Plan, the Debtor's Plan shall be binding upon and inure to the benefit of the Debtor, the Reorganized Debtor, the Holders of Claims, Preferred Interests, and Equity Interests, together with their respective successors and assigns, and with respect to Section 6.3 of the Debtor's Plan, Entergy Services and the Affiliates who participate in the Entergy System Money Pool.

### 7.    **Governing Law**

As provided in Section 13.10 of the Debtor's Plan, except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under the Debtor's Plan shall be governed by, and construed and enforced as provided in the laws of the State of Louisiana.

### 8.    **Preservation of Certain Claims**

Except as provided in the Debtor's Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Debtor's Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor will retain and may enforce any claims, demands, rights and Causes of Action that the Debtor or Estate may hold, to the extent not expressly released under the Debtor's Plan. The Reorganized Debtor may pursue such retained claims, demands, rights or Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor. Further, the Reorganized Debtor retains its rights to File and pursue any adversary proceedings against any creditor or vendor related to debit balances or deposits owed to the Debtor. Notwithstanding the foregoing, in the context of the Debtor's Plan, the Debtor does not anticipate commencing any Bankruptcy Causes of Action which would provide for recovery from creditors who received preferential transfers under section 547 of the Bankruptcy Code, and is not aware of any other Bankruptcy Causes of Action it may have.

## VIII. CONFIRMATION AND CONSUMMATION PROCEDURE

### A.    THE CONFIRMATION HEARING

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing with respect to the accompanying Debtor's Plan. The Confirmation Hearing in respect of the Debtor's Plan has been scheduled for May 3, 2007, commencing at 10:00 a.m. (Prevailing Central Time), and May 4, 2007, at 9:00 a.m. (Prevailing Central Time). Any objection to Confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or a description of the interest in the Debtor held by the objector, and must be made in accordance with any pre-trial or scheduling orders entered by the Bankruptcy Court. Any such objection must be Filed with the Bankruptcy Court (with a copy to Chambers) and served so that it is received by the Bankruptcy Court on or before ▓▓▓▓▓▓▓▓▓, 2007.

### B.    CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will confirm the Debtor's Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of the Debtor's Plan are that the Debtor's Plan is (i) accepted by all Impaired Classes or,

if rejected by an Impaired Class, that the Debtor's Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) feasible and (iii) in the "best interests" of Holders of Claims and Interests that are Impaired under the Debtor's Plan.

## 1.     Unfair Discrimination and Fair and Equitable Tests

To obtain nonconsensual Confirmation of the Debtor's Plan, the Debtor must be demonstrated to the Bankruptcy Court that the Debtor's Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired, non-accepting Class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." In addition, the "cramdown" standards of the Bankruptcy Code prohibit "unfair discrimination" with respect to the Claims of an Impaired, non-accepting Class. While the existence of "unfair discrimination" under a plan of reorganization depends upon the particular facts of a case and the nature of the claims and interests at issue, in general, courts have interpreted the standard to mean that the Impaired, non-accepting Class must receive treatment under a plan of reorganization which allocates value to such Class in a manner that is consistent with the treatment given to other classes with similar legal claims against or interests in the debtor. The Debtor believes that the Debtor's Plan, and the treatment of all Classes of Claims and Interests under the Debtor's Plan, satisfy the requirements for nonconsensual Confirmation of the Debtor's Plan.

The Bankruptcy Code establishes "cramdown" tests for Claims and Interests, as discussed below.

### a.     *Secured Claims*

In order to satisfy the "cramdown test," each Holder of an Impaired Secured Claim will receive "fair and equitable" treatment. Examples of such treatment (although not necessarily the "fair and equitable" treatment to be provided by the Debtor under the Debtor's Plan) include the following: (i) each Holder of an Impaired Secured Claim retains its Liens securing its Secured Claim and receives on account of its Secured Claim deferred cash payments (x) totaling at least the allowed amount of the secured claim and (y) having a present value at least equal to the value of the collateral that secures the Claim, (ii) each Holder of an Impaired Secured Claim realizes the "indubitable equivalent" of its Allowed Secured Claim, or (iii) the property securing the Claim is sold free and clear of Liens with such Lien attaching to the proceeds of the sale and such Lien on proceeds is treated in accordance with clause (i) or (ii) of this subparagraph. The Debtor further believes that (i) the treatment afforded the Holders of Impaired Bond Claims and the Impaired Capital One Claim under the Debtor's Plan permits Confirmation even if the Debtor's Plan is not accepted by Class 2 or Class 3, and (b) the treatment afforded the Holders of Impaired Other Secured Claims under the Debtor's Plan permits Confirmation even if the Debtor's Plan is not accepted by Class 4.

### b.     *Unsecured Claims*

In order to satisfy the "cramdown test," either (a) each Holder of an Impaired unsecured Claim receives or retains under the Debtor's Plan property of a value equal to the amount of its Allowed Claim, or (b) the Holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive any property under the Debtor's Plan. The Debtor believes that Class 7 (Litigation Claims), Class 8 (Workers' Compensation Claims), and Class 9 (the Government Environmental Claim) are Unimpaired under the Debtor's Plan. The Debtor further believes that the treatment afforded those Holders of Claims in Class 5 (General Unsecured Claims), Class 6

(Intercompany Claims) and Class 10 (the Odom Claims) permits Confirmation even if the Debtor's Plan is not accepted by Class 6 or Class 10.

### c. *Interests*

In order to satisfy the "cramdown test," each Holder of an Interest will receive "fair and equitable" treatment. Examples of such treatment (although not necessarily the "fair and equitable" treatment to be provided by the Debtor under the Debtor's Plan) include the following: (a) each Holder of an Interest will receive or retain under the Debtor's Plan property of a value equal to the greatest of the fixed liquidation preference to which such Holder is entitled, the fixed redemption price to which such Holder is entitled, or the value of the Interest, or (b) the Holder of an Interest that is junior to the non-accepting Class will not receive or retain any property under the Debtor's Plan. The Debtor believes that Class 12 (Equity Interests) are Impaired under the Debtor's Plan, based on the dividend restrictions set forth in Section 6.5 of the Debtor's Plan. The Debtor further believes that the treatment afforded under the Debtor's Plan to the Holders of both Equity Interests and Preferred Interests under Option B of Section 5.11 of the Debtor's Plan permits Confirmation pursuant to section 1129(b), even if Option A of Section 5.11 of the Debtor's Plan is not accepted by the Holders of Preferred Interests in Classes 11A, 11B, or 11C.

### 2. Feasibility

The feasibility test requires the Bankruptcy Court to determine that Confirmation of the Debtor's Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor, unless such liquidation or financial reorganization is proposed in the Debtor's Plan. For purposes of determining whether the Debtor's Plan meets this requirement, the Debtor has analyzed its ability to meet its obligations under the Debtor's Plan. Based upon the Debtor's projections, the Debtor believes that the Debtor's Plan meets the feasibility requirement of the Bankruptcy Code. See Exhibit C (Projected Financial Information).

### 3. Best Interests Test

With respect to each Impaired Class, Confirmation of the Debtor's Plan requires that each Holder of such a Claim or Interest either (a) accept the Debtor's Plan, or (b) receive or retain under the Debtor's Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. To determine what Holders in each Impaired Class would receive if the Debtor were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation case. The Cash amount that would be available for satisfaction of Claims and Interests would consist of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtor, augmented by the unencumbered Cash held by the Debtor at the time of the commencement of the liquidation case. Such Cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from the termination of the Debtor's business and the use of chapter 7 for the purposes of liquidation.

The Debtor's costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. The foregoing types of claims and other claims that may arise in a liquidation case or result from the pending Bankruptcy Case, including any unpaid expenses incurred

by the Debtor during the Bankruptcy Case, such as compensation for attorneys, financial advisors, and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be used to pay prepetition Unsecured Claims.

To determine if the Debtor's Plan is in the best interests of each Impaired Class, the present value of the distributions from the proceeds of the liquidation of the Debtor's unencumbered assets and properties (after subtracting the amounts attributable to the chapter 7 and chapter 11 administrative claims described in the preceding paragraph), are then compared with the value of the property offered to such Classes of Claims and Interests under the Debtor's Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in this Bankruptcy Case, including (a) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (b) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (c) the substantial increases in claims that would be satisfied on a priority basis or on parity with creditors in this Bankruptcy Case, the Debtor has determined that Confirmation will provide each Holder of an Allowed Claim with a recovery that is not less than what such Holder would receive pursuant to the liquidation of the Debtor under chapter 7.

The Debtor also believes that the value of any distributions to each Class of Allowed Claims in a chapter 7 case, including all Secured Claims, would be less than the value of distributions under the Debtor's Plan because such distributions in a chapter 7 case would not occur for a substantial period of time. The Debtor's assets are used to provide electric and gas utility services to the City of New Orleans, and the process of liquidating the Debtor's assets would be subject to review by numerous regulatory agencies, including the City Council, the FERC, and the U.S. Department of Justice. After what would likely be a lengthy process to obtain these regulatory approvals, it is likely that distribution of liquidation proceeds will also be delayed for a substantial period of time after completion of liquidation in order to resolve Disputed Claims and prepare for distributions. If litigation becomes necessary to resolve Disputed Claims asserted in the chapter 7 case, the delay could be further prolonged.

Under the Debtor's Plan, all Allowed Claims will be paid in full, together with post-petition interest at the Louisiana judicial rate, and the Interest holders will retain their Interests, together with accumulated and unpaid dividends in the case of the Preferred Interests. Accordingly, the Debtor does not believe a more detailed financial liquidation analysis presentation is required or would be useful because payment in full of all Allowed Claims and retention of the Interests is a *per se* satisfaction of the best interests test.

## C. CONSUMMATION OF THE DEBTOR'S PLAN

The Debtor's Plan will be consummated on the Effective Date. The Effective Date shall not occur until each of the following conditions has been satisfied, or duly waived pursuant to Section 9.2 of the Debtor's Plan:

(a)     The Confirmation Order shall have been entered by the Bankruptcy Court in a form reasonably satisfactory to the Debtor, FGIC and the Bond Trustee, and no injunction shall be in existence with respect to the Confirmation Order.

{N1609126.3}                    - 67 -

(b)     The Debtor shall have received in Cash at least $200 million in CDBG Funds.

(c)     The Debtor shall have received in Cash at least $50.0 million in Katrina Insurance Proceeds.

(d)     The Stipulation and Order and the Fee Order shall remain in full force and effect and the Debtor shall have fully complied with all of its obligations thereunder.

(e)     No Material Adverse Change shall have occurred from and after the Confirmation Date.

Pursuant to Section 9.2 of the Debtor's Plan, one or more of the foregoing conditions to the Effective Date may be waived, in whole or in part, by the Debtor at any time and without any Order of the Bankruptcy Court; *provided, however,* that FGIC and the Bond Trustee must consent to the waiver of the conditions set forth in Section 9.1(a) or Section 9.1(d) of the Debtor's Plan.

As provided in Section 9.3 of the Debtor's Plan, the Debtor shall File a notice of occurrence of the Effective Date within one (1) Business Day of the Effective Date, and such Notice must (a) state that all conditions to the Debtor's Plan becoming effective have been satisfied, (b) contain a written acknowledgement by FGIC and the Bond Trustee that the conditions set forth in Section 9.1(a) and Section 9.1(d) of the Debtor's Plan have been satisfied or waived in accordance with the Debtor's Plan, and (c) state the date of the Effective Date.

In the event that, on or before June 30, 2007, one or more of the conditions specified in Section 9.1 of the Debtor's Plan does not occur, or has not been waived as provided in Section 9.2 of the Debtor's Plan, Section 9.4 of the Debtor's Plan provides that the Confirmation Order shall be vacated, no distributions under the Debtor's Plan shall be made, and the Debtor and all Holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and FGIC and the Bondholders shall have the right to withdraw (without any further Bankruptcy Court approval) any ballots cast with respect to the Debtor's Plan; *provided, however,* that the Debtor reserves the right to seek from the Bankruptcy Court, for reasonable cause, after notice and hearing, an extension of the June 30, 2007 deadline for the Effective Date to occur, subject to the following: (a) no extension of the Effective Date past December 31, 2007 shall occur unless and until the Debtor pays, after first obtaining Bankruptcy Court authority to pay (after notice and hearing), (i) the amounts set forth in clauses (b) and (c) of the definition of Bond Claim in Section 1.25 of the Debtor's Plan to the Bond Trustee, and (ii) the FGIC Cure Amount Claim to FGIC, and (b) no extension of the Effective Date past June 30, 2008 shall occur without the prior written consent of FGIC and the Bond Trustee.

## IX.   FINANCIAL INFORMATION

The audited balance sheets and the related statements of income, retained earnings and cash flows of the Debtor are filed with the SEC in its Annual Reports on Form 10-K and incorporated herein by reference. The quarter-end balance sheets, the related quarterly and year-to-date statements of income, and the related year-to-date statements of cash flows of ENOI are filed with the SEC in

the Debtor's Quarterly Reports on Form 10-Q and incorporated herein by reference. This financial information is provided to permit the Holders of Claims and Interests to better understand ENOI's historical business performance and the effect of the Bankruptcy Case on the Debtor's business.

ENOI is required to File monthly operating reports with the Bankruptcy Court. The monthly operating reports may be reviewed through the website maintained by the Bankruptcy Court at https://ecf.laeb.uscourts.gov/, or at the Document Website, bmccorp.net  The monthly operating reports are filed under the following docket numbers:  September 2005, P-203; October 2005, P-371 and P-372; November 2005, P-520; December 2005, P-662; January 2006, P-668; February 2006, P-742; March 2006, P-828 and P-831; April 2006, P-874; May 2006, P-981; June 2006, P--1064; July 2006, P-1107; August 2006, P-1184; September 2006, P-1282; October 2006, P-1444; November 2006 (P-1523), and December 2006 (P-1659).

## X.    CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH IN THE DEBTOR'S DISCLOSURE STATEMENT, THE DEBTOR'S PLAN, ALL PLAN EXHIBITS, (AND ANY DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), BEFORE VOTING TO ACCEPT OR REJECT THE DEBTOR'S PLAN.  ANY RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE DEBTOR'S PLAN AND ITS IMPLEMENTATION.

### A.    CERTAIN BANKRUPTCY CONSIDERATIONS

#### 1.    ENOI Might Not Be Able to Obtain Confirmation

Although ENOI believes that the Debtor's Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  There can also be no assurance that modifications of the Debtor's Plan will not be required for Confirmation, that such modifications would not adversely affect the holders of Claims or that such modifications would not necessitate the re-solicitation of votes.

#### 2.    The Bankruptcy Court Might Not Confirm the Debtor's Plan

Even if one or more Classes of Claims or Preferred Interests entitled to vote does not vote to accept the Debtor's Plan, ENOI reserves the right to amend the Debtor's Plan or request confirmation pursuant to the "Cramdown" provisions under Section 1129((b) of the Bankruptcy Code.   The Bankruptcy Court may confirm the Debtor's Plan if (a) at least one Class of Claims that has been Impaired has accepted the Debtor's Plan (such acceptance being determined without including the votes of any "insider" in such Class), and (b) as to each Impaired Class that has not accepted the Debtor's Plan, if the Bankruptcy Court determines that the Debtor's Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Classes.  The Debtor believes that the Debtor's Plan satisfies these requirements; however, there can be no assurance that the Bankruptcy Court will find that these requirements have been satisfied.  If it does not, the Debtor's Plan cannot be confirmed and become effective unless it has been accepted by each Impaired Class of Claims or Preferred Interests that is entitled to vote.

### 3.    Risks of Delay or Non-Occurrence of the Effective Date

If the conditions precedent to the Effective Date set forth in Section 9.1 of the Debtor's Plan have not occurred or been waived pursuant to Section 9.2 of the Debtor's Plan on or before June 30, 2007, the Effective Date will not take place.  The conditions precedent to the Debtor's Plan's effectiveness are dependent on actions of third parties, such as the LRA and the insurance carriers, over which ENOI has no control.

### 4.    The Amount of Allowed Claims May Not Be Finalized Until After the Effective Date

Approximately 560 Proofs of Claim were filed against ENOI.  ENOI has analyzed the Scheduled Claim and the Proofs of Claim, and has used its best judgment to estimate the value of such Scheduled Claims and Proofs of Claim.  To prepare estimates for the Debtor's Disclosure Statement, ENOI has considered the strengths and weaknesses of its positions and the respective positions of Holders of Claims under applicable law.  Despite ENOI's efforts, its estimates could prove incorrect.

### 5.    Objections to Classifications

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or interests in such class.  ENOI believes that the classification of Claims and Preferred Interests under the Debtor's Plan complies with the requirements set forth in the Bankruptcy Code.  However, the Bankruptcy Court may reach a different conclusion.

### 6.    ENOI May Object to the Amount or Classification of a Claim

ENOI reserves the right to object to the amount or classification of any Claim.  The estimates set forth in the Debtor's Disclosure Statement cannot be relied on by any Holder of Claim whose Claim is subject to an objection.

## B.    RISKS RELATING TO THE BUSINESS OF THE REORGANIZED ENOI AFTER THE EFFECTIVE DATE

### 1.    Regulated Business

Following emergence from bankruptcy, ENOI will continue to be an electric and gas utility that is heavily regulated. The electric and gas rates that ENOI is allowed to charge its customers are determined, in large part, outside of ENOI's control as those rates are determined by the City Council. The rates ENOI is allowed to charge significantly influence the financial conditions, results of operations and liquidity of ENOI.  There can be no assurance as to resolution with ENOI's regulator of future rate cases and/or formula rate based plans.

### 2.    Financial Projections

ENOI has prepared the Financial Projections set forth in Exhibit C to the Debtor's Disclosure Statement.  Such Financial Projections are dependent upon the sources of funding described in Article VIII.B of the Debtor's Disclosure Statement, entitled "Financing of the Debtor's Plan," the

{N1609126.3}                                  - 70 -

conditions precedent to the Effective Date of the Debtor's Plan set forth in Article VIII.H of the Debtor's Disclosure Statement, entitled "Conditions Precedent to the Effectiveness of the Debtor's Plan" and certain other assumptions that ENOI believes are reasonable. Some assumptions other than those described in the Conditions Precedent include, but are not limited to, (a) the return of customers to a level that is 65% of the pre-Katrina customer population by end of 2010, (b) the amount of storm restoration costs and gas system rebuild costs and the timing of incurrence and recovery of such costs through CDBG grants, insurance proceeds, and Storm Cost Recovery Riders, and (c) the ability to recover certain other fixed and variable costs through the Fuel Adjustment Clause or other regulatory mechanisms. Additionally, ENOI has incurred, and will continue post-bankruptcy to incur, storm restoration costs, but there may be longer delays in the timing of recovery and the amount of recovery from those assumed in the projections. ENOI's primary insurer, OIL, has advised its insureds and stakeholders that, due to the devastation caused by Hurricane Katrina, OIL intends to invoke the OIL Policy's aggregate collective cap of $1 billion for all of OIL's insureds. It is likely that the total damages claimed by all insureds for Katrina damages will exceed $1 billion, and that insureds, including ENOI, will suffer a proportionate reduction in their claims payments. There is no certainty has to when all claims will be made under OIL's policies by other insureds for Katrina damage and when OIL will complete its assessments of damage and determination if damages are in excess above the $1 billion cap. There also are delays and uncertainties as to timing for recovery and amount of insurance proceeds from the excess carrier.

Although ENOI believes that the Financial Projections and underlying assumptions are reasonable, variations between the actual financial results and those projected may occur. There are a number of factors that could cause actual results to differ materially from those expressed or implied in the Financial Projections. Some of those factors (as well as those factors described in ENOI's Annual Report on Form 10-K for the year ended December 31, 2005 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2006) include:

- growth of ENOI's customer population;

- timing of incurrence of storm restoration costs and recovery of such costs;

- resolution of future rate cases and negotiations, including various performance-based rate discussions, and other regulatory proceedings, including those related to Entergy's System Agreement and ENOI's utility supply Debtor's Plan;

- ENOI's ability to manage its operation and maintenance costs;

- the performance of ENOI's generating plants;

- the prices and availability of power that ENOI must purchase for its utility customers;

- changes in the financial markets, particularly those affecting the availability of capital;

- actions of rating agencies, including changes in the ratings of debt and preferred stock, and changes in the rating agencies' ratings criteria;

- changes in inflation, interest rates, and foreign currency exchange rates;

- volatility and changes in markets for electricity, natural gas, uranium, and other energy-related commodities;

- changes in utility regulation, including the beginning or end of retail and wholesale competition, the ability to recover net utility assets and other potential stranded costs, the establishment of a regional transmission organization that includes ENOI's service territory, and the establishment of market power criteria by the FERC;

- changes in regulation of nuclear generating facilities and nuclear materials and fuel, including possible shutdown of nuclear generating facilities, such as Grand Gulf from which ENOI acquires power under the UPSA;

- uncertainty regarding the establishment of interim or permanent sites for spent nuclear fuel storage and disposal;

- changes in law resulting from proposed energy legislation;

- changes in environmental, tax, and other laws, including requirements for reduced emissions of sulfur, nitrogen, carbon, mercury, and other substances;

- the economic climate, and particularly growth in ENOI's service territory;

- variations in weather, the occurrence of hurricanes and other storms and disasters;

- advances in technology;

- the potential effects of threatened or actual terrorism and war;

- the effects of litigation and government investigations;

- changes in accounting standards, corporate governance and securities law requirements; and

- ENOI's ability to attract and retain talented management and directors.

### 3. Credit Rating and Liquidity Constraints

Following Hurricane Katrina, the senior secured debt ratings of ENOI were downgraded from investment grade to below investment grade. Specifically, Moody's Investor Service, Inc. downgraded ENOI's senior secured debt rating from Baa2 to Caa1; similarly, Standard & Poor's Ratings Services downgraded the secured debt to D. After the Petition Date, Moody's withdrew all ratings of ENOI. Following emergence from bankruptcy, there can be no assurance of the credit ratings that will be assigned to ENOI's senior secured debt, specifically the Bonds, and further, there can be no assurances as to the timing of return of such ratings to investment grade levels. ENOI's non-investment grade credit rating negatively affects its ability to access the capital markets and increases its borrowing cost through higher interest rates for borrowed funds. Additionally, continued below investment grade status by credit rating agencies could prompt fuel and power suppliers and other vendors to require credit support. Any increased costs of borrowing or need to

provide credit support could negatively affect ENOI's financial condition, results of operations and liquidity.

### 4. Liquidity Constraints due to Ability to Recover Costs of Power Through Fuel-Adjustment Clause

ENOI's fuel and purchased power costs are recovered from customers primarily through the fuel adjustment clause, which is subject to regulatory scrutiny. This regulatory risk represents ENOI's largest potential exposure to price changes in the commodity markets. Following Hurricane Katrina and due to other market conditions, there was a rapid increase in natural gas prices. When the level of fuel and/or purchased power costs rises dramatically, such as after Hurricane Katrina, ENOI's working capital requirements increase due to the lag between cost incurrence and cost recovery inherent in the fuel adjustment mechanism. At such times, ENOI's liquidity needs could be constrained. Additionally, at times ENOI's regulator, the City Council, has initiated, and in the future may initiate, proceedings to investigate the appropriateness of the fuel and power purchases for the purpose of determining whether ENOI's underlying decisions were prudent. To the extent such investigations result in disallowances based on findings of imprudence, they could adversely affect ENOI's financial condition and/or liquidity. At December 31, 2005, ENOI had a deferred fuel balance of $33 million.

### 5. Gordon and Lowenburg Ratepayer Cases

#### a. *Rate of Return Litigation: The Lowenburg Regulatory Proceedings*

For a complete description of the Lowenburg Suit and Lowenburg Regulatory Proceedings, see Article VI.A of the Debtor's Disclosure Statement, entitled "Gordon and Lowenburg Regulatory Proceedings." The Lowenburg Plaintiffs allege that ENOI has overcharged ratepayers since 1975 in violation of limits on ENOI's allowed rate of return allegedly established by ordinances passed by the City Council in 1922 and that ENOI should be required to refund between $240 and $825 million to its ratepayers. The Lowenburg Suit was filed in state court in Orleans Parish; in May 2002 a Louisiana appellate court granted ENOI's exception to subject matter jurisdiction over the case and dismissed the Lowenburg Suit. The Lowenburg Plaintiffs then commenced the Lowenburg Regulatory Proceedings before the City Council. Following a hearing in April 2006, the City Council unanimously approved a resolution dismissing with prejudice the Lowenburg Plaintiffs' claims, ruling that the rates charged by ENOI were lawful. The Lowenburg Plaintiffs appealed the City Council resolution to the Civil District Court for the Parish of Orleans, where the matter currently is pending.

In the Bankruptcy Case, the Lowenburg Plaintiffs Filed a motion for class certification on behalf of New Orleans ratepayers and claims on behalf of the purported class. The Bankruptcy Court granted ENOI's motion for summary judgment and dismissed the Lowenburg Plaintiffs' motion for class certification.

Following the Effective Date, ENOI contends that the Lowenburg Plaintiffs' claims may not be pursued as a class action or in any forum other than through the appeal before the Civil District Court for the Parish of Orleans. Although ENOI contends that the Lowenburg allegations are without merit and the dismissal by the City Council should be upheld on appeal, there can be no assurance as to the final results of the Lowenburg claims on appeal. An adverse ruling in the Lowenburg Suit could have a material effect on ENOI's financial condition.

{N1609126.3}                                           - 73 -

### b. *Fuel Clause Litigation – The Gordon Suit and Gordon Regulatory Proceeding*

For a complete description of the Gordon Suit and the Gordon Regulatory Proceeding, see Article VI.A of the Debtor's Disclosure Statement, entitled "Gordon and Lowenburg Regulatory Proceedings." The Gordon Suit was originally filed in Orleans Parish Civil District, but was removed to the United States District Court for the Eastern District of Louisiana. The Gordon Suit names ENOI, Entergy Corporation and other Entergy entities as defendants, and seeks treble damages for alleged injuries arising from ENOI's alleged violations of Louisiana's antitrust laws in connection with certain full procurement and power purchasing practices that allegedly resulted in incorrect costs passed onto ratepayers in ENOI's fuel adjustment clause. The Gordon Plaintiffs and ENOI agreed to stay the Gordon Suit pending resolution by the City Council of the same complaint in the Gordon Regulatory Proceeding. Testimony filed on behalf of the Gordon Plaintiffs in the Gordon Regulatory Proceeding asserted that ENOI and the other Entergy defendants engaged in fuel procurement and power purchasing practices and improperly included certain costs from such practices in ENOI's fuel adjustment that could have resulted in ENOI ratepayers being overcharged by more than $100 million over a period of years. In February 2004, the City Council approved a resolution that resulted in a refund of approximately $11.3 million, including interest, which ENOI paid through refunds to customers during the months of June through September 2004. The resolution concluded, among other things, that the record does not support an allegation that ENOI's actions or inactions, either alone or in concert with Entergy Corporation or any of its Affiliates, constituted a misrepresentation or a suppression of the truth made in order to obtain an unjust advantage of ENOI, or to cause loss, inconvenience or harm to its ratepayers. The Gordon Plaintiffs appealed the City Council's resolution to the Civil District Court for the Parish of Orleans, which affirmed the City Council's resolution, finding no support for Gordon Plaintiffs' claim that the refund amount should have been higher. The Gordon Plaintiffs then appealed (which appeal was earlier defined as the Gordon Regulatory Appeal) to the Louisiana Court of Appeal for the Fourth Circuit, where it remains pending.

In the Bankruptcy Case, the Gordon Plaintiffs filed a motion for class certification on behalf of New Orleans ratepayers and claims on behalf of the purported class. The Bankruptcy Court granted ENOI's motion for summary judgment and dismissed the Gordon Plaintiffs motion for class certification.

ENOI contends that, after the Effective Date, the Gordon Plaintiffs' claims may not be pursued as a class action or in any forum other than through the appeal to the Louisiana appellate court of the Gordon Regulatory Proceeding. Although ENOI contends that the Gordon Plaintiffs' arguments are without merit and the City Council resolution should be upheld on appeal, there can be no assurance as to the final results of the Gordon claims on appeal. An adverse ruling in this proceeding could have a material effect on ENOI's financial condition.

### 6. **Other Litigation Risks**

ENOI is involved in the ordinary course of business in a number of lawsuits involving employment, commercial, asbestos, hazardous material, ratepayer, and injuries and damages issues, among other matters. The State of Louisiana in which ENOI operates has proven to be an unusually litigious environment. Judges and juries in Louisiana have demonstrated a willingness to grant large verdicts, including punitive damages, to plaintiffs in personal injury, property damage, and business

{N1609126.3}                                           - 74 -

tort cases. ENOI uses legal and appropriate means to contest litigation threatened or filed against them, but the litigation environment in Louisiana poses a significant business risk.

## C. ANOTHER DISASTROUS HURRICANE, INCREASES IN INSURANCE COSTS AND ABILITY TO PROCURE INSURANCE COVERAGE

ENOI's proximity to the Gulf of Mexico makes it susceptible to the risks of hurricanes. Hurricane Katrina and the resulting flooding due to the failure in the New Orleans levee system, caused catastrophic damage to the area that ENOI serves and its utility assets. If another disastrous hurricane were to cause significant damage to ENOI's electric or gas infrastructure and/or cause another significant decline in ENOI's customer base, the storm restoration costs and loss of revenue could have a material adverse affect on ENOI's financial condition. In order to plan for such potential risk, in June 2006, ENOI filed the Storm Cost Recovery Riders and Storm Reserve Riders to provide for $150 million in storm reserves to be collected over a ten-year period. There can be no assurances that the Storm Cost Recovery Riders and Storm Reserve Riders, if granted, will be sufficient to cover any future restoration costs caused by another hurricane or whether there will be sufficient Katrina Insurance Proceeds, storm rate recovery or other funds to adequately cover such losses.

Additionally, as a result of losses incurred by Hurricane Katrina and the risk of damage due to future storms, ENOI currently is incurring significant increases in its cost for insurance premiums, while at the same time facing a decrease in policy limits. ENOI's current primary insurer, OIL, has decreased the aggregate limit for coverage for all participants from $1 billion per occurrence to $500 million effective as of June 1, 2006. While ENOI property insurance options are currently being evaluated, all insurance markets appear somewhat apprehensive about insuring ENOI's natural peril risks (windstorm and flooding). Following Hurricane Andrew, insurance coverage became unavailable or cost prohibitive to the utility sector in the Gulf Coast and Atlantic Coast regions for transmission and distribution lines, with certain exceptions offered by OIL for lines within 1,000 meters of substations. ENOI had to become self-insured for such transmission and distribution lines, with the exception of the coverage offered by OIL for lines within 1,000 meters of substations, which OIL prospectively may exclude from coverage. Due to extensive damages caused by Hurricane Katrina, Rita and Wilma, the insurance industry is limiting coverage for windstorm and flood damages for utilities within 100 miles of coastline that can be affected by Atlantic Named Wind Storms. ENOI therefore is also is at risk for decreases in capacity of coverage per occurrence for damages caused by natural perils (*i.e.,* wind and flood) and for exclusion or very limited coverage for certain underground assets because of the flood exposure. While ENOI currently has coverage for direct physical loss or damage to its property (including transmission and distribution lines) including flood, earthquake, windstorm, and boiler and machinery breakdown, ENOI's ability to continue to procure commercial insurance at levels sufficient to provide protection against future storm damage and at rates that are reasonable is at risk.

## D. RECOVERY OF THE CITY OF NEW ORLEANS

There is significant uncertainty as to the rebuilding and repopulation of the City of New Orleans that could affect ENOI following its emergence from bankruptcy. Prior to Katrina, ENOI had 190,000 electric customers and 145,000 gas customers. Currently, approximately 85,000 electric customers and 65,000 gas customers have returned and are taking service.

While overall load has increased to nearly 65% of the pre-Katrina level (measured by megawatt-hours), this load level may change in the future due to numerous factors that are difficult to predict. For example, only 42% of the pre-Katrina electrical residential customers have returned and many are taking electrical service to repair damaged homes while not permanently residing in those homes or they are taking electrical service at temporary residences such as trailers. There is no assurance as to whether these customers will elect to remain in New Orleans permanently over the long-term. In addition, residential load may be affected by the $4.2 billion Louisiana Road Home Program, under which the LRA may provide cash awards to residents of New Orleans to repair or sell damaged homes. Residential repopulation for New Orleans further remains highly uncertain due to increases in insurance costs or the lack of availability of homeowners insurance and the uncertainty of the Orleans levee protection system's ability to protect against future hurricanes.

Similarly, approximately 70-75% of ENOI's commercial load and 85-90% of industrial load has returned to pre-Katrina levels. Without an increase in population and more certainty as to rebuilding efforts in New Orleans, the businesses that have returned likewise face risks due to lack of demand, particularly in the commercial sector, and lack of an available workforce for both commercial and industrial sectors. This is because the level of demand for goods and services offered by these businesses will be largely determined by factors such as the level and stability of repopulation, potential relocation decisions of key employers, and the success of the entertainment and tourism industries in attracting visitors to the City, among others.

ENOI's financial forecast is premised upon electric load reaching 65% of the level it was projected to be in 2010 in financial forecasts that were prepared pre-Katrina. This level is consistent with the level of load currently in place, but there is no assurance that this level will be sustained.

## XI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE DEBTOR'S PLAN

The following discussion summarizes certain factors that may affect the anticipated federal income tax consequences of implementation of the Debtor's Plan to the Debtor. No opinion is expressed as to the tax consequences of confirmation of the Debtor's Plan with respect to the Reorganized Debtor. This discussion does not address all federal income tax consequences of the Debtor's Plan nor does it address the state or local income tax or other state and local tax consequences of implementation of the Debtor's Plan to Holders of Claims against and Interests in the Debtor. Counsel for the Debtor has not, and will not render any opinion concerning the tax consequences of confirmation of the Debtor's Plan to the Debtor, Reorganized Debtor, Holders of Claims and Interests, or any other Entity.

The description of the federal income tax consequences of implementing the Debtor's Plan is based on interpretation of the applicable provisions of the Internal Revenue Code of 1986 (the "Tax Code"), the regulations promulgated thereunder and other relevant authority, including all amendments and revisions to the Tax Code. This interpretation, however, is not binding on the IRS or any court. The Debtor has not obtained, nor does it intend to obtain, a ruling from the IRS, nor has the Debtor obtained an opinion of counsel with respect to any of these matters. Finally, the discussion below is general in nature and is not directed to the specific tax situation of any particular interested taxpayer.

{N1609126.3}                          - 76 -

**FOR THESE REASONS, ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE TAX CONSEQUENCES OF IMPLEMENTATION OF THE DEBTOR'S PLAN TO THEM UNDER APPLICABLE FEDERAL, STATE AND LOCAL TAX LAWS.**

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE DEBTOR'S PLAN ARE COMPLEX. THE SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTOR, THE REORGANIZED DEBTOR, OR HOLDER. THE TAX CONSEQUENCES TO EACH CLAIM OR INTEREST HOLDER WILL VARY BASED ON THE HOLDER'S CIRCUMSTANCES. ACCORDINGLY, EACH CLAIM OR INTEREST HOLDER SHOULD CONSULT WITH HIS OR HER TAX ADVISOR AS TO THE SPECIFIC TAX CONSEQUENCES TO SUCH HOLDER OF THE DEBTOR'S PLAN, INCLUDING THE APPLICATION AND EFFECT OF FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX LAWS.**

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THE DEBTOR'S DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY THE DEBTOR, THE REORGANIZED DEBTOR, OR ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS NOT INCLUDED HEREIN BY THE DEBTOR OR THE REORGANIZED DEBTOR IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON SUCH HOLDER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

For U.S. federal income tax purposes, Entergy Corporation is the parent of an affiliated group of corporations which includes the Debtor that join in the filing of a consolidated federal income tax return (the "Entergy Group").

## A. CANCELLATION OF INDEBTEDNESS INCOME

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness ("COD") income recognized during the taxable year. COD income generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of (i) the amount of cash, (ii) the issue price of any new debt, and (iii) the fair market value of any other property transferred by the debtor in satisfaction of such discharged indebtedness (including stock). COD income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.

The Tax Code permits a debtor in bankruptcy to exclude its COD income from gross income, but requires the debtor to reduce its tax attributes, such as net operating loss ("NOL") carry forwards, current year NOLs, tax credits, and tax basis in assets (collectively, "Tax Attributes"), by the amount of the excluded COD income. Treasury regulations address the application of the rules for the reduction of Tax Attributes in situations where a member of a U.S. consolidated group recognizes excluded COD income. Under the ordering rules of the Treasury regulations, generally, the Tax

Attributes of the debtor corporation are reduced first (including its NOLs and the stock basis of its subsidiaries). In this regard, the Treasury regulations adopt a "tier-down" approach such that if the debtor reduces its basis in its stock in a subsidiary, corresponding reductions must be made to the Tax Attributes of that subsidiary. To the extent that the excluded COD exceeds the Tax Attributes of the debtor member, the Treasury regulations require the reduction of certain Tax Attributes (NOLs, but not tax basis in assets) of other members of the consolidated group. To the extent the amount of excluded COD income exceeds the Tax Attributes available for reduction after reduction of certain Tax Attributes of other consolidated group members, the remaining COD income, generally, has no adverse federal income tax consequences. The reduction in Tax Attributes generally occurs after the calculation of a debtor's tax for the year in which the debt is discharged.

Under the Tax Code, a debtor that recognizes excluded COD income may elect to reduce its basis in depreciable assets prior to the reduction of other Tax Attributes, with any excess COD income applied next to reduce NOLs and other Tax Attributes in the prescribed statutory order. With respect to some or all of the Classes, the Debtor may incur COD income and may have to reduce Tax Attributes.

## B.   LIMITATION ON NOL CARRY FORWARDS AND OTHER TAX ATTRIBUTES

As of the end of its taxable year ending December 31, 2005, based on all tax returns filed to date, the Debtor's share of the Entergy Group reported consolidated NOL carry forward of approximately $7,5 billion is $112,427,623. In general, when a corporation (or a consolidated group) undergoes an "ownership change" and the corporation does not qualify for (or elects out of) certain applicable bankruptcy exceptions, Section 382 of the Tax Code limits the corporation's ability to utilize its pre-change losses to offset future taxable income. Such limitation also may apply to certain losses or deductions that are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change and that are subsequently recognized. It is not anticipated that Debtor or the Entergy Group will undergo an ownership change as a result of the Debtor's Plan. Therefore, Section 382 of the Tax Code should not limit use of Debtor's losses.

## C.   U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS

The U.S. federal income tax consequences to Holders of Claims and Interests arising from the distributions to be made in satisfaction of their Claims and Interests pursuant to a bankruptcy plan of reorganization may vary, depending upon, among other things: (a) the type of consideration received by the Holder of a Claim in exchange for the indebtedness it holds; (b) the nature of the indebtedness owed to it; (c) whether the Holder has previously claimed a bad debt or worthless security deduction in respect of its claim against the corporation; (d) whether such claim constitutes a security; (e) whether the Holder of a Claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. federal income tax on a net income basis; (f) whether the Holder of a Claim reports income on the accrual or cash basis; and (g) whether the Holder of a Claim receives distributions under the Debtor's Plan in more than one taxable year. For tax purposes, the modification of a Claim may represent an exchange of the Claim for a new Claim, even though no actual transfer takes place. In addition, where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been held or is treated as

{N1609126.3}                                     - 78 -

having been held, whether the Claim was acquired at a market discount, and whether and to what extent the Holder previously claimed a bad debt deduction with respect to the underlying Claim. **All Holders of Claims and Interests should consult their tax advisors regarding the consequences that could result from Confirmation of the Debtor's Plan.**

## D. INFORMATION REPORTING AND BACKUP WITHHOLDING

Certain payments, including certain payments of Claims pursuant to the Debtor's Plan, payments of interest, payments of dividends, if any, on the preferred stock and the proceeds from the sale or other taxable disposition of preferred stock, may be subject to information reporting to the IRS. Moreover, such reportable payments may be subject to backup withholding unless the taxpayer: (i) comes within certain exempt categories (which generally include corporations) or (ii) provides a correct taxpayer identification number and otherwise complies with applicable backup withholding provisions. In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Debtor's Plan would be subject to these regulations and require disclosure in the Holders' tax returns.

## XII. VOTING BY HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE

The Claims and Interests in the following Classes are Unimpaired under the Debtor's Plan, and are deemed to have accepted the Debtor's Plan under the provisions of section 1126(f) of the Bankruptcy Code: Class 1 (Other Priority Claims); Class 7 (Litigation Claims); Class 8 (Workers' Compensation Claims); and Class 9 (the Government Environmental Claim), The Debtor will not solicit acceptances of the Debtor's Plan from Holders of Claims or Interests in Class 1, Class 2, Class 7, Class 8, or Class 9.

The Claims and Interests in the following Classes are Impaired under the Debtor's Plan: Class 2 (Capital One Secured Claim); Class 3 (Bond Claims); Class 4 (Other Secured Claims); Class 5 (General Unsecured Claims); Class 6 (Intercompany Claims); Class 10 (Odom Claim); Class 11A (the 4.75% Preferred Series); Class 11B (the 4.36% Preferred Series); Class 11C (the 5.56% Preferred Series); and Class 12 (Equity Interests). Accordingly, the Debtor will solicit acceptances of the Debtor's Plan from the Holders of Claims and Interests in Class 3, Class 4, Class 5, Class 6, Class 10, Class 11A, Class 11B, Class 11C and Class 12.

A Class of Claims has "accepted" the Debtor's Plan if the Debtor's Plan has been accepted by the Holders of Claims in the Class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims that have cast Ballots to accept or reject the Debtor's Plan. A Class of Interests (the Preferred Interests and Equity Interests) has "accepted" the Debtor's Plan if the Debtor's Plan has been accepted by Holders of Interests in the Class that hold at least two-thirds (2/3) in amount of the Allowed Interests that have cast Ballots to accept or reject the Debtor's Plan. (For a more detailed description of the requirements for Confirmation of the Debtor's Plan, see Article VIII of the Debtor's Disclosure Statement, entitled "Confirmation and Consummation Procedures.") If one or more Classes entitled to vote on the Debtor's Plan votes to reject the Debtor's Plan, the Debtor reserves the right to amend the Debtor's Plan or request Confirmation pursuant to

the "cram-down" provisions contained section 1129(b) of the Bankruptcy Code. If at least one Class of Claims that is Impaired under the Debtor's Plan has accepted the Debtor's Plan (determined without including acceptance of the Debtor's Plan by insiders), section 1129(b) of the Bankruptcy Code permits Confirmation notwithstanding its rejection by one or more Impaired Classes. Under section 1129(b), the Debtor's Plan may be confirmed by the Bankruptcy Court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting Impaired Class.

Any Holder of an Impaired Class of Claims or Interests (a) whose Claim or Interest has been listed by the Debtor in the Schedules Filed with the Bankruptcy Court (provided that such Claim or Interest has not been scheduled as disputed, contingent or unliquidated), or (b) who Filed a Proof of Claim on or before the Bar Date (or, if not Filed by such date, any Proof of Claim Filed within any other applicable period of limitations or with leave of the Bankruptcy Court), which Claim or Interest is not the subject of an objection, is entitled to vote. Holders of Claims or Interests that are Disputed are entitled to vote their Claims or Interests only to the extent that such Claims or Interests are Allowed for the purpose of voting pursuant to an Order of the Bankruptcy Court obtained after notice and an opportunity for hearing. The following is a summary of the voting procedures adopted in the Confirmation Procedures Order (Exhibit B) that is attached to the Debtor's Disclosure Statement as Exhibit B. BMC Group, Inc. (the "Voting Agent") was retained by the Debtor pursuant to an Order entered on June 30, 2006 (P-977). (For a full description of those voting procedures, please refer to the Voting Procedures Order, as well as the Ballots that are collectively attached to the Debtor's Disclosure Statement as Exhibit D.)

The Impaired Classes are collectively referred to hereinafter as the "Voting Classes." The Bankruptcy Court has set February 5, 2007 as the Voting Record Date. (Confirmation Procedures Order, Exhibit B.) If you are a Holder of a Claim or Preferred Interest as of the Voting Record Date, and if you are entitled to vote to accept or reject the Debtor's Plan, a Ballot is enclosed for the purpose of voting on the Debtor's Plan. If you are a Holder of a Claim or Preferred Interest that is entitled to vote and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning the procedures for voting on the Debtor's Plan, please contact the Voting Agent at 1-888-909-0100.

Special instructions for Holders of Bond Claims are contained in Ballot Nos. 3A, 3B, 3C and 3D (attached as part of Exhibit D to the Debtor's Disclosure Statement). Special instructions for Holders of Preferred Interests are contained in Ballot Nos. 11A, 11B, and 11C (attached as part of Exhibit D to the Debtor's Disclosure Statement). Please vote and return your Ballot in the envelope provided. If you are the beneficial owner of record of either Bonds or Preferred Interests as of the Voting Record Date of February 5, 2007, you may complete a Ballot for delivery to either (a) the "Voting Agent"), by the Voting Deadline of ████████████████, 2007, at 5:00 p.m. (Prevailing Central Time) (the "Voting Deadline"), or (b) delivery to a broker, bank, dealer or other agent or nominee (a "Master Ballot Agent"), by the return date specified in the Ballot, and the Master Ballot Agent will submit a Master Ballot, on or before the Voting Deadline, that summarizes the votes cast by beneficial owners of Bonds or Preferred Interests, or nominees of such beneficial owners. **THE BALLOT IS NOT A LETTER OF TRANSMITTAL AND MAY NOT BE USED FOR ANY PURPOSE OTHER THAN TO VOTE TO ACCEPT OR REJECT THE DEBTOR'S PLAN. HOLDERS OF BOND CLAIMS OR PREFERRED INTERESTS OF SHOULD NOT SURRENDER CERTIFICATES REPRESENTING BONDS OR PREFERRED INTERESTS, AND NEITHER THE DEBTOR NOR THEIR VOTING AGENT WILL ACCEPT DELIVERY OF ANY SUCH CERTIFICATES.** Other Holders of Claims in the Voting Classes will receive a Ballot and a return envelope addressed directly to the Voting Agent.

{N1609126.3}                    - 80 -

> **THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., PREVAILING CENTRAL TIME, ON ▓▓▓▓▓▓▓▓, 2007.**

**Ballots must be** *received* **by the Voting Agent by the Voting Deadline.** If a Ballot is received after the Voting Deadline, it will not be counted. Complete the Ballot by providing all the information requested, and sign, date and return the Ballot by mail, overnight courier or personal delivery to the Voting Agent at one of the following address:

| By U.S. Mail: | By Delivery or Courier: |
| --- | --- |
| **ENOI VOTING AGENT** | **ENOI VOTING AGENT** |
| **BMC Group, Inc.** | **BMC Group, Inc.** |
| **P.O. Box 977** | **1330 E. Franklin Ave.** |
| **El Segundo, CA  90245-0977** | **El Segundo, CA  90245** |

ANY EXECUTED BALLOT THAT FAILS TO INDICATE AN ACCEPTANCE OR REJECTION OF THE DEBTOR'S PLAN WILL NOT BE COUNTED. WITH THE SOLE EXCEPTION OF MASTER BALLOTS RETURNED TO THE VOTING AGENT BY A MASTER BALLOT AGENT, **BALLOTS RETURNED TO THE VOTING AGENT WILL NOT BE ACCEPTED BY THE VOTING AGENT BY FACSIMILE TRANSMISSION OR ANY OTHER ELECTRONIC MEANS**.

The Debtor's Disclosure Statement and Exhibits A-E, the Debtor's Plan and Plan Exhibits can be downloaded, without charge, at the internet site with the address www.bmccorp.net.

## XIII. CONCLUSION AND RECOMMENDATION

The Debtor's Disclosure Statement is intended to assist each Holder of Claims against and Interests in the Debtor to make an informed decision regarding the acceptance of the Debtor's Plan. If the Debtor's Plan is confirmed, all Holders of Claims and Interests will be bound by its terms. The Debtor believes that confirmation and implementation of the Debtor's Plan is preferable to any of the alternatives described above and respectfully urges each Holder of a Claim against or Interest in the Debtor to review the Debtor's Disclosure Statement carefully and the enclosed copy of the Debtor's Plan, to accept the Debtor's Plan, and to evidence such acceptance by returning their Ballots on or before the date to be fixed by the Bankruptcy Court.

Date:    As of February 5, 2007

/s/ Elizabeth J. Futrell
R. PATRICK VANCE (#13008)
ELIZABETH J. FUTRELL (#5863)
NAN ROBERTS EITEL (#19910)
TARA G. RICHARD (#26356)
JOSHUA LEWIS (#29950)
Jones, Walker, Waechter, Poitevent,
 Carrère & Denègre, L.L.P.
201 St. Charles Avenue
New Orleans, LA 70170-5100
Phone: (504) 582-8000
Fax: (504) 582-8011

Attorneys for Entergy New Orleans, Inc.,
the Debtor and Debtor-in-Possession